IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KAREN BRANDEWIE,                )
                                )
            Plaintiff,          )
                                )
v.                              ) Civil Action
                                ) Number 05-625-GMS
STATE OF DELAWARE               )
DEPARTMENT OF CORRECTION,       )
                                )
            Defendant.          )

            Deposition of KAREN BRANDEWIE, taken
pursuant to notice at Department of Correction
Headquarters, 245 McKee Road, Dover, Delaware,
beginning at 10:16 a.m., on Friday, August 25, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.

APPEARANCES:

        RONALD G. POLIQUIN, ESQUIRE
        YOUNG, MALMBERG & HOWARD
          30 The Green
          Dover, Delaware  19901
          On behalf of Plaintiff

        MARC P. NIEDZIELSKI, ESQUIRE
        DEPUTY ATTORNEY GENERAL
          Carvel State Office Building
          820 North French Street, 6th Floor
          Wilmington, Delaware  19801
          On behalf of Defendant

                WILCOX & FETZER

    1330 King Street - Wilmington, Delaware 19801

                (302) 655-0477

                www.wilfet.com

Karen Brandewie

```
 1              KAREN BRANDEWIE,

 2          the deponent herein, having first been duly

 3          sworn on oath, was examined and testified as

 4          follows:

 5  BY MR. NIEDZIELSKI:

 6     Q.   Miss Brandewie, my name is Marc Niedzielski,

 7  and I represent Department of Correction.  And I'm

 8  going to be asking you a series of questions.  Have

 9  you ever been deposed before?

10     A.   Been deposed?

11     Q.   Been a witness in which your deposition was

12  taken?

13     A.   Not that I can recall.

14     Q.   Have you ever been in an office and had your

15  deposition taken with a court reporter?

16     A.   No, I have not, sir.

17     Q.   All right.  Let me just go over some basic

18  things to understand, make sure you understand it.

19  Obviously you're under oath so you have an obligation

20  to tell the truth.  That means, in addition, that you

21  shouldn't guess about things you're not certain of.

22  If you're asked to approximate, you can do that.  If

23  you don't understand the question, you should let me

24  know and I will rephrase the question.
```

Karen Brandewie

1     A.   Okay.

2     Q.   If at any time you need a break, let me know

3   and we'll arrange that as well.  If you answer a

4   question, unless you indicate that you don't

5   understand the question, it will be assumed that you

6   understood the question.  All right?

7     A.   Okay.

8     Q.   First of all, are you presently on any

9   medications today?

10    A.   Yes, I am.

11    Q.   Which medications are you on?

12    A.   Citalepram, Lamictal and -- I always forget the

13   name of the third one.  There is a third pill that I

14   am on presently.  I know it's recorded in the records

15   but I can't remember the name.  And I'm also on

16   medication for menopause.

17    Q.   All right.  Now, the first medication you

18   indicated, what is that for?

19    A.   Depression.

20    Q.   And the second medication, what's that for?

21    A.   Lamictal is for extra anxiety.  The other pill

22   that I can't remember the name of is my anxiety pill.

23    Q.   Is it "Praxil," something like that?

24    A.   I think it starts with an L.

Karen Brandewie

1    Q.    Okay, and the medication you're on for

2    menopause, is that like hormone replacement?

3    A.    Yes.

4    Q.    Do any of those medications affect your ability

5    to understand questions?

6    A.    No, sir.

7    Q.    Do any of those medications, would they

8    interfere with your ability to remember things from

9    the past?

10   A.    Only when I was over medicated.  I was over

11   medicated sometime ago, but they've had my medicines

12   fixed for the last seven, eight months they've had me.

13   Q.    There was a period of time where you believe

14   you were over medicated?

15   A.    Oh, I definitely was.  I was falling asleep at

16   the wheel at work.  I couldn't stay awake, couldn't

17   remember things.

18   Q.    All right, I want to ask you a bunch of

19   questions about your biographical information, okay?

20   A.    Okay.

21   Q.    First I'd like to ask you, where were you born?

22   A.    Baltimore, Maryland.

23   Q.    And what was the date of your birth?

24   A.    7-20-64.

Karen Brandewie

1    Q.    And how long did you reside in Baltimore,

2  Maryland?

3    A.    I couldn't tell you that, sir.  It wasn't very

4  long.  My father moved us around from state to state.

5    Q.    And do you have any brothers or sisters?

6    A.    Yes, I do.  I have a brother and a sister

7  living, and one deceased brother.

8    Q.    You have a deceased brother?

9    A.    Yes.

10    Q.    When did he die?

11    A.    June 13th, '82.

12    Q.    And did he die in Montana?

13    A.    He died in North Dakota.  He drowned.

14    Q.    And you have a sister and a brother who are

15  living?

16    A.    Yes, sir.

17    Q.    And where are you in relation to them and their

18  ages?

19    A.    Oh, my brother is two and a half years younger

20  than me.  My sister is two years older, so I'm in the

21  center.

22    Q.    Where did you reside after Baltimore, Maryland?

23    A.    It would have been in Pennsylvania, I believe

24  Harrisburg.  Gosh, I've got all that with DOC.  I can

Karen Brandewie

1    get that paper and bring it to you.  Because we moved

2    so much, I'm -- I mean I can't tell you what years or

3    anything.  But --

4        Q.    I understand.  I'm going to ask you to do the

5    best you can, okay?  Is that okay?

6        A.    Okay, that's good.

7        Q.    All right.  Harrisburg, PA, how long did you

8    live there?  Do you remember approximately the periods

9    of time?

10       A.    I know that I went to kindergarten in Maryland;

11   first and second grade I believe Pennsylvania; third

12   grade California.  If you want me to keep going, I

13   will.  Fourth grade I was in White Fish, Montana.

14   Went from White Fish, Montana, to West Glacier

15   National Park, Montana.  Went from -- I spent the

16   fifth and sixth grade going to school in West Glacier.

17   Seventh grade I went to school in Columbia Falls,

18   Montana.  Eighth grade was Columbia Falls, Montana.

19   Ninth grade I began my year in Columbia Falls,

20   Montana, went from there to Harrisburg, Pennsylvania,

21   finished my school year, the ninth grade, in Kodiak,

22   Alaska.  Tenth grade I was in North Dakota.  Eleventh

23   grade I was in Baltimore.  My senior year I graduated

24   from Big Fork, Montana, High School.

Karen Brandewie

1   Q.   Now, is the reason you were at all these

2   various locations because of your father's work or

3   something?

4   A.   He wanted us kids to experience life, he said.

5   So he traveled and he'd be a cop wherever we went.

6   Q.   He was a police officer?

7   A.   Yes, he was.

8   Q.   Did he get a pension from anyplace?

9   A.   No.  My father is deceased.

10  Q.   Okay.  When did he die?

11  A.   He died May 25th, '93.

12  Q.   And what about your mother, is your mother

13  living?

14  A.   Yes, she is.

15  Q.   Where does she live?

16  A.   Georgetown.

17  Q.   How long has she been living there?

18  A.   I do not know, sir.  I think probably 25 years.

19  I did not grow up with my mother.

20  Q.   She was never with you when you went to all

21  these various places?

22  A.   No, she was not.

23  Q.   Now, after you graduated from high school in

24  Montana, where did you go from there?

Karen Brandewie

1     A.   North Dakota.

2     Q.   And what did you do in North Dakota?

3     A.   I worked at McDonald's.

4     Q.   How long did you work for McDonald's in North

5     Dakota?

6     A.   Not even a year, then I went back to Montana to

7     visit my father and I met my children's father.

8     Q.   And his name is?

9     A.   Brian.

10    Q.   And is it pronounced Brandewie?

11    A.   Brandewie.

12    Q.   Brandewie.  And how old were you when you got

13    married?

14    A.   Nineteen.

15    Q.   And how many children did you have with

16    Mr. Brandewie?

17    A.   Three.

18    Q.   What are their names?

19    A.   James.

20    Q.   How old is James?

21    A.   He's 22.

22    Q.   And the next one?

23    A.   Isaac, I-s-a-a-c.

24    Q.   How old is Isaac?

Karen Brandewie

1    A.   He's 20.

2    Q.   And your youngest?

3    A.   Amaris, A-m-a-r-i-s, and she's 19.

4    Q.   What does James presently do?

5    A.   He just got out of the military, and he is in

6    college in Memphis, Tennessee.  I mean Nashville, I'm

7    sorry, Nashville, Tennessee, and he is in for

8    automotive diesel, I believe.

9    Q.   What about Isaac?

10   A.   Isaac is in college to be a missionary.

11   Q.   And what about Amaris?

12   A.   She's a full-time mom.

13   Q.   How long has she been a mom?

14   A.   Since July.

15   Q.   Is she married?

16   A.   Yes, she is.

17   Q.   Is her name, I take it it's no longer

18   Brandewie?

19   A.   No, it's Diaz, D-i-a-z.

20   Q.   Okay, after you were in North Dakota, you went

21   back to Montana, what did you do in Montana when you

22   married Mr. Brandewie?

23   A.   I stayed with his parents while he went

24   overseas.

Karen Brandewie

1    Q.   Was he in the service?

2    A.   He was in the Navy.

3    Q.   And I take it the children's dates of birth

4  would correspond to dates he was home on leave or

5  liberty?

6            MR. POLIQUIN:  Objection.

7    A.   Yes.

8            MR. POLIQUIN:  You may answer the

9  question.

10   Q.   Is that correct?

11   A.   Um-hum.

12   Q.   All right.

13   A.   I wasn't whoring around, if that's what you

14  were intending to say.

15   Q.   I wasn't asking that.  I was just saying in the

16  ages of the children, it looks like they're

17  approximately two years apart, and that would be the

18  typical tour, a little under two years.  Okay?

19   A.   (Nodded affirmatively.)

20   Q.   I wasn't suggesting anything.  Do you

21  understand that?

22   A.   (Nodded affirmatively.)

23   Q.   All right.  How long did you stay in Montana?

24   A.   We got married in September of '83.  I believe

Karen Brandewie

1    in January, the end of January or beginning of

2    February of '84 we moved to Mississippi.

3        Q.    Was he still in the Navy?

4        A.    Yes, he was.

5        Q.    Where did you move in Mississippi?

6        A.    Gulfport.

7        Q.    And how long did you live in Gulfport?

8        A.    Ten years.

9        Q.    So until 1995 you were in Gulfport,

10   Mississippi?

11       A.    Yes, I was.

12       Q.    Why did you leave Gulfport, Mississippi?

13       A.    I got divorced.

14       Q.    And where did you go from Gulfport,

15   Mississippi?

16       A.    Georgetown, Delaware.  I was there until I

17   moved up to Dover.

18       Q.    Did you remain at the same location when you

19   moved from Gulfport, Mississippi, to Georgetown,

20   Delaware?

21       A.    No, I did not.  I was staying at my mother's

22   house.

23       Q.    And were you employed during this period of

24   time from the time you graduated from high school?

Karen Brandewie

1  You told us about a McDonald's.

2   A.   After McDonald's I was not employed.  He did

3  not want me to work.

4   Q.   In 1994 when you divorced, when you moved back

5  to Georgetown, Delaware, were you then employed?  Did

6  you get a job?

7   A.   No, sir.  I got a job at Harrison House when I

8  first got here.  But because of the late hours, I

9  didn't keep that job.  I went in to CHEER and then I

10  lost -- I couldn't use my mom's car, so I had to wait

11  until I got my own car in order to get employment for

12  myself, and that's when I went to VNA.

13   Q.   All right.  I'm sorry, let me just back up.

14  I'll try to digest what you just said.

15            When you first got up here in 1994, there

16  was some short period of time you had employment; is

17  that correct?

18   A.   Um-hum.

19   Q.   And that was with who?

20   A.   Harrison House.

21   Q.   What does Harrison House do?

22   A.   It's a nursing home.

23   Q.   And how long did you work at this nursing home?

24   A.   Probably only two months.

Karen Brandewie

1    Q.    And you indicated there was a problem with

2    transportation?

3    A.    I didn't have a car.  It was my mother's car.

4    Q.    Did your mother need the car for --

5    A.    Yes.

6    Q.    -- her own job?  So then was there a period of

7    time after you worked for the Harrison House that you

8    were unemployed?

9    A.    Yes.

10    Q.    And what period of time was that?

11    A.    I believe I got my job with VNA in May of '94,

12    May or June, I can't recall, but somewhere around

13    there.

14    Q.    What was your job with VNA?

15    A.    I was a nursing assistant.

16    Q.    Were you a CNA?

17    A.    I was not certified, no.

18    Q.    Just so the record is clear, VNA stands for

19    Visiting Nurses Association?

20    A.    Yes, it is.

21    Q.    How long did you work for VNA?

22    A.    I think I was with them for four years.

23    Q.    Would that bring us to approximately May or

24    June of 1998?

Karen Brandewie

1   A.   I do not recall.  I don't.

2   Q.   What was the next job you had?

3   A.   After I left VNA?  I had private nursing jobs,

4   I believe, then.

5   Q.   Meaning?

6   A.   Where I was a home health aide is basically

7   what it was.  People would hire me for -- I didn't

8   have insurance, but --

9   Q.   You didn't have health insurance?

10   A.   Right.  But they hire me, they hire you on to

11   take care of their people.  That's what I did until I

12   went to Stockley.

13   Q.   All right.  And when did you start at Stockley?

14   A.   I think I started with Stockley like a year

15   before I got with, so it had to be in '99.

16   Q.   And what was your job at Stockley?

17   A.   I was a custodial worker.

18   Q.   And I take it the job is as the name implies?

19   A.   Right.

20   Q.   You were custodial.

21   A.   Yes.

22   Q.   Okay.  Now at that point you were working for

23   the State, correct, in 1999?

24   A.   Um-hum.

Karen Brandewie

1    Q.    And you were getting healthcare benefits?

2    A.    Yes.

3    Q.    Now, prior to that, were you also caring for

4    your children?

5    A.    Yes, I was.

6    Q.    If they didn't have health insurance, how did

7    you work the --

8    A.    They had health insurance through my

9    ex-husband, military benefits.

10   Q.    Did you get health insurance through your

11   ex-husband?

12   A.    No, I did not.

13   Q.    Do any of your children have medical problems?

14   A.    My oldest son does now, yeah, through the

15   military.

16   Q.    What's his medical problem?

17   A.    His back is messed up, his shoulder, his shins,

18   he has flat feet now.  I think that's about it.  It

19   happened in Iraq.

20   Q.    Do any of your other children have any kind of

21   medical problems?

22   A.    No.

23   Q.    Who is living with you presently?

24   A.    No one.

Karen Brandewie

1    Q.    Where are you living presently?

2    A.    I am in Felton.

3    Q.    What had been your address prior to living in

4    Felton?

5    A.    6 Gordy Street, Georgetown.


6    Q.    And prior to that, were you living at another

7    location in Georgetown?

8    A.    Before I moved there?  Yeah, but I cannot

9    remember the address.  I think it was West Street.  It

10   was over by the high school.

11   Q.    How long did you live at 6 Gordy Place?

12   A.    How long was I there?  I think two years.

13   Maybe a little longer.

14   Q.    When did you move to Felton?

15   A.    December, last year.

16   Q.    Of 2005?

17   A.    Um-hum.

18   Q.    Why did you move to Felton?

19   A.    To be closer to my job.

20   Q.    And where is your job?

21   A.    Morris Community Correctional Center.

22   Q.    After you were divorced from Brian Brandewie in

23   1994, did you get remarried thereafter?

24   A.    I got remarried '95.

Karen Brandewie

1    Q.    And what was the name of the individual you

2    married?

3    A.    Matthew Mitchell.

4    Q.    And how long did that marriage last?

5    A.    Four years.

6    Q.    To 1999?

7    A.    Um-hum.

8    Q.    And where did you reside with him when you were

9    married to him?

10   A.    At his mom's at first until we moved out and

11   got a mobile home in, it was a mobile home park in

12   Georgetown.  I can't remember the name.  Went from

13   there to a farmhouse.  I can't remember that address

14   either.  I know it's out behind Troop 4.

15   Q.    And then what was your maiden name?

16   A.    Marriott.

17   Q.    Marriott?

18   A.    Um-hum.

19   Q.    Like the hotels?

20   A.    Yes.

21   Q.    Is your ex-husband, Mr. Mitchell, still in the

22   area?

23   A.    I have no idea.

24   Q.    Was he from Delaware?

Karen Brandewie

1     A.   Yes.

2     Q.   Was he from the Sussex County area?

3     A.   Um-hum.

4     Q.   Did you get remarried after that, after 1999?

5     A.   Yes, I did, in 2000, I believe.

6     Q.   And who did you marry?

7     A.   Mark Atwell.

8     Q.   And how long were you married to Mr. Atwell?

9     A.   I believe it was a year.

10    Q.   Only a year?

11    A.   Yes.

12    Q.   You got divorced in 2001?

13    A.   I believe we were only married a year.  I may

14    be wrong, but I believe we were only married a year.

15    Q.   No, I'm just asking to the best of your memory.

16    That's fine.  I'm not challenging, I'm just trying to

17    put this all --

18    A.   I'm just saying, I think it was a year.

19    Q.   Okay.  And why did you divorce Mr. Atwell?

20    A.   Well --

21         MR. POLIQUIN:  Objection.  You may answer

22    the question.

23         THE WITNESS:  Hmm?

24    Q.   I'm sorry, I should have told you about that.

Karen Brandewie

1  He is allowed to object on the record just to preserve

2  an issue.  But unless he instructs you not to answer a

3  question, you just go ahead and answer it, okay?  I

4  know it seems a little whacky, but he'll object and

5  unless he instructs you not to answer, you can go

6  ahead and answer.  Okay?

7    A.    Okay.  The reason that I divorced him was

8  because he was molesting my daughter.

9    Q.    When did you --

10    A.    Actually I didn't find out he was molesting my

11  daughter at that time.  The reason we were divorced is

12  because he got physical with me, as far as I went from

13  this side of the room to that side of the room really

14  fast.  And I just told him to leave, get out.  And at

15  that point we hadn't divorced.  We were just

16  separated.  Then shortly thereafter I found out he had

17  been molesting my daughter.  And that's when I just

18  said there is no reconciliation.

19    Q.    Okay.  So you were separated from him in 2001,

20  you believe?

21    A.    Yes.

22    Q.    Do you believe you might have divorced him like

23  in 2003?

24    A.    No.  We were divorced before then.  My divorce

Karen Brandewie

1  didn't take that long.

2  Q.  All right.

3  A.  It may have been complete by 2002, but I was

4  divorced.

5  Q.  Well, when did you find out he was molesting

6  your daughter?

7       MR. POLIQUIN:  Objection.  You may answer

8  the question.

9  A.  I believe it was in July.

10  Q.  Of?

11  A.  Of the, that same year, I guess 2001.

12  Q.  Was it reported to the police at that time?

13  A.  Yes, it was, because the counselor's -- what

14  was the name of the hospital she was put in?

15  Q.  Meadowwood?

16  A.  No.  There's another one up there.  Right

17  across from Christiana, if you go back there, there's

18  that one.

19  Q.  Oh, wait a second.  It's Rockford Center.

20  A.  Rockford Center.  She was hospitalized there,

21  and yes, they did call the authorities.

22  Q.  In 2001?

23  A.  Whenever it was reported.

24  Q.  Do you recall when he was arrested?

Karen Brandewie

1          MR. POLIQUIN:  Objection.

2     Q.   What year?

3     A.   No, I don't.  I don't recall the years.  I can

4  recall the times.

5     Q.   What do you mean, you can't recall the years

6  but the times?

7     A.   Because like I said, I'm not sure if we were

8  married a year or married longer.

9     Q.   Okay.

10    A.   So... if I ran home and looked at my divorce

11  papers, I could tell you.  But at this present moment,

12  I can't.

13    Q.   Well, my understanding is that as the mother of

14  the victim, that you would have been kept kind of in

15  the loop as to the prosecution and all that sort of

16  stuff.  Is that a fair statement?

17    A.   I was not kept in the loop of much of anything.

18          MR. POLIQUIN:  I want to just make an

19  objection for this line of questioning, and so I don't

20  have to object after each question.

21          MR. NIEDZIELSKI:  Okay, that's fine.  I

22  take that as a continuing objection.

23    Q.   Did they communicate with you, tell you what

24  was going on?

Karen Brandewie

1   A.   Not until I would call them, and then a lot of

2   times not a whole lot.

3   Q.   Okay.  Now my understanding was Mark Atwell was

4   indicted with quite a few charges.

5   A.   Yes, he was.

6   Q.   Like 19 counts or something like that.  But

7   eventually he was pled to two misdemeanors; is that

8   correct?

9   A.   Yes.

10   Q.   Well, do you know why that was?

11   A.   Well, if I knew, it would make it a lot easier.

12   But I don't know.

13   Q.   Well did you ask anyone at the --

14   A.   I have asked.  I did ask.  "That's just the way

15   it's going to be," and that's what I was told.  And

16   that's exactly what I was told by Melanie Withers.


17   Q.   By Melanie?

18   A.   Withers.  She is a district attorney or

19   attorney general or...

20   Q.   Had your daughter Amaris -- is that right?

21   A.   Amaris.

22   Q.   Had she ever had a prior problem or prior

23   complaints about being sexually abused?

24   A.   Um-hum.

Karen Brandewie

1    Q.    When was that?

2    A.    With one of my ex-husband's, one of the guys,

3    he was arrested before.  It was right, not long before

4    all this happened, and I can't remember the

5    gentleman's name.  He is in DCC right now locked up.

6    He worked at the coffee shop in Georgetown.

7    Q.    And you believe it occurred shortly before

8    these allegations came out?

9    A.    Um-hum.

10   Q.    And did your daughter go through therapy

11   because of this?

12   A.    Yes, she did.

13   Q.    Did you go with her?

14   A.    Yes, I did.

15   Q.    Was that a condition of the therapy was that

16   you also accompany her?

17   A.    No, it was not.

18   Q.    Did you choose to do that?

19   A.    Um-hum, and if she wanted me there, I'd go.

20   Q.    And you say she's married now?

21   A.    Yes, she is.

22   Q.    When did she get married?

23   A.    She got married in December last year.

24   Q.    Same time that you moved to Felton?

Karen Brandewie

1    A.    Um-hum.

2    Q.    Did you move to Felton because she was leaving

3    the house?

4    A.    I moved to Felton because it was closer to my

5    job.

6    Q.    Okay.  Any other reason you moved to Felton?

7    A.    No.  I know my landlord raised my rent and I

8    couldn't afford to stay there, so I was going to have

9    to move to another home anyway.  But I needed to get

10   closer to my job.

11   Q.    When did you begin work for the Department of

12   Correction?

13   A.    November '06 -- or November 2000.  I think the

14   30th.

15   Q.    And when you say you started, is that when you

16   started cadet training?

17   A.    The academy, yes.

18   Q.    How long were you in cadet training or the

19   academy?

20   A.    Two months I believe is how long it lasts.

21   When I came out I went to DCC.

22   Q.    Does everybody essentially go to DCC?

23   A.    Pretty much, yeah.

24   Q.    How long were you at DCC?

Karen Brandewie

1     A.    I think I was only at DCC for a year and a

2     half, to my knowledge.

3     Q.    You said only for a year and a half.

4     A.    Yeah.

5     Q.    Most people would say, "I was there for a year

6     and a half."

7     A.    Actually I did, I did enjoy it there.

8     Q.    You did?

9     A.    I did.

10    Q.    Well, it was a long commute, though, wasn't it?

11    A.    Extremely long.

12    Q.    Were there other officers that worked with you

13    at DCC that were also from Sussex County?

14    A.    Yes.

15    Q.    From Georgetown area?

16    A.    In fact, I drove back and forth with one of

17    them.  She is no longer a correctional officer.

18    Q.    Okay, what were your responsibilities at DCC

19    while you were there?

20    A.    It would vary.  If I was officer in charge,

21    then I would be in charge of the building and the

22    officers that would be placed in the building, and

23    then up to 200 inmates, paperwork, making sure you do

24    all your counts.  You have equipment that you have to

Karen Brandewie

1  make sure is there, your cuffs, your shackles.  Go do

2  your tier checks, your yard checks.  Everything has to

3  be done, completed in order to take to the lieutenant.

4      Q.   Did you work in a particular area of DCC?

5      A.   At first, no.  At first I worked across the

6  compound.  So I worked in Charlie Building, Delta

7  West, Echo Building.  They had me once in W.  So I was

8  all over the place at first, and then they placed me

9  in the SHU, so I was placed in the SHU with death row

10  and those that they considered their problem children,

11  the ones that would throw feces and urine on you and

12  stuff like that.

13      Q.   SHU stands for Secured Housing Unit?

14      A.   Um-hum.

15      Q.   So you were at SHU in approximately 2001; is

16  that correct?

17      A.   Probably the end of 2001.

18      Q.   Was the deputy warden in charge of SHU new at

19  that time, Larry McWiggin?

20      A.   Yes, he was.  He is a wonderful man, wonderful

21  man.

22      Q.   I'll tell him.

23      A.   Oh, he knows, he knows.

24      Q.   All right.  Do you think that female officers

Karen Brandewie

1  are able to do the same job as male officers?

2     A.  I believe we're able to do the same job.

3     Q.  Do you believe that they should -- in other

4  words, do you believe that when they assign people to

5  a facility, they should assign females to different

6  parts of the facility than men simply because they are

7  female?

8     A.  Some buildings, yes.

9     Q.  How about SHU?

10        MR. POLIQUIN:  I'm going to object.  Go

11  ahead, you can answer the question.

12    A.  Do I think that they should not put women in

13  SHU, is what you're saying?

14    Q.  Um-hum.

15    A.  Actually, the SHU is a more secured area, so I

16  don't think that.  In other words, number one, you've

17  got -- I don't know if you've been in the SHU, but you

18  have --

19    Q.  As an inmate, no.

20    A.  -- you have separate cells.  They cannot come

21  out of that cell without being shackled and

22  handcuffed.  And there's two officers on that one

23  inmate.  You take a female in a regular housing unit

24  and she's walking down a tier with 60 to 80 men by

Karen Brandewie

1   herself, that they're not locked down, that's

2   obviously more dangerous.

3      Q.   Why?

4      A.   Because they can come out on to you at any

5   time, any given time.  And if you're walking down the

6   tier alone, what do you have?  You have nothing.

7      Q.   Well, isn't the same situation for male

8   officers?

9           MR. POLIQUIN:  Objection to this line of

10  questioning as to her opinions.  But go ahead and

11  answer the question.

12     A.   Isn't it now -- I'm sorry?

13     Q.   Isn't it the same for a male officer?

14     A.   Isn't what the same?

15     Q.   Doesn't he run the same risk?

16     A.   Somewhat, but not necessarily.  I believe a

17  female runs a bigger risk than a male.  Obviously you

18  do have homosexuals in there, but obviously most of

19  them are not.  And most of them have been locked up

20  for years and have not had a female.  And when there

21  is a female that comes down that tier, and she's all

22  by herself and there's nobody around, that opens up

23  more opportunity for them and more temptation for

24  them.  And we're not dealing with men with regular

Karen Brandewie

1    minds.  We're dealing with people with sick minds.

2    These are rapists, murderers.

3      Q.    So you believe that females should not be

4    assigned to certain parts of the prison?

5            MR. POLIQUIN:  Objection.  I think it's a

6    mischaracterization of her testimony.  But go ahead,

7    answer the question.

8      A.    Not without backup.

9      Q.    Okay.  In other words, you don't think that

10   women should be treated the same as men --

11           MR. POLIQUIN:  Objection.

12     Q.    -- in all the locations of DCC?

13     A.    In all locations of DCC?

14     Q.    Um-hum.

15     A.    Obviously if all officers get background -- or

16   get backup, you're really being treated the same.  But

17   I think they need to consider the fact that a woman

18   stands more risk going down those tiers by themselves.

19   And that common sense tells you that.

20     Q.    Well, and that's what I'm trying to get to.  So

21   you believe that you should not necessarily assign men

22   and women equally or without regard to their gender to

23   jobs in the facility, in DCC?

24           MR. POLIQUIN:  Objection, asked and

Karen Brandewie

1    answered.  You can answer the question.

2      A.    Again?

3      Q.    So you believe that men and women should not be

4    simply assigned to various positions within DCC, but

5    some consideration should be made for whether they're

6    male or female?

7      A.    I think in some instances, yes, it needs to be

8    considered.

9      Q.    Okay.  I'm going to show you a document; a

10   whole stack of documents.  And what I'd like you to do

11   if you would, please, is skip back to where your

12   résumé starts.

13     A.    My résumé.  Okay.

14     Q.    Is this a résumé --

15     A.    Oh, this is an old résumé.

16     Q.    How old is it?

17     A.    Well, shoot.  It's, it's pretty old because

18   I've updated my new one with the job qualifications.

19   This was simply to go with this title, what I was

20   going in for.

21     Q.    In other words, were you applying for a

22   position?

23     A.    In other words, right.  I was applying for this

24   position.  And when you apply for a certain job, if

Karen Brandewie

1    you, you know, if you've got a résumé, you adjust your

2    résumé toward what that, and that's the way I see it,

3    so that's what I did.  But yeah, this is old.

4    Q.  In other words, you have a more current one?

5    A.  Yes, I do.

6    Q.  Since what time, I mean?

7    A.  Couple months back.  I've been looking for

8    employment for the past, well, since I believe March.

9    Q.  You've been looking for employment, any

10   particular reason why?

11   A.  Yes.  I want to get out of the State of -- I

12   mean DOC.  I want to get out of Department of

13   Corrections.

14   Q.  Okay.

15   A.  For the obvious reasons.

16   Q.  What are the obvious reasons?

17   A.  Sexual harassment, race association

18   discrimination, that's why.

19   Q.  Now, what I was going to ask you about your

20   résumé, if you turn about three pages after the first

21   page, you see there is a big open area?

22   A.  Where?

23   Q.  Right there.

24   A.  Oh, yeah.  That happens, that happens with the

Karen Brandewie

1    computer, and I'm not a computer buff, so, I did have

2    an officer help me fix that on my new one.

3       Q.   Okay, turn it to the next page.

4       A.   Yeah, the same thing.

5       Q.   There is another -- in other words, was nothing

6    printed there?

7       A.   No, there was nothing printed there.  I just

8    don't know how to use a computer, and that's how it

9    printed out.

10      Q.   Okay.

11      A.   Well, I mean not everybody is as good with a

12   computer as most.

13      Q.   Just asking.  Let me ask you to look at this

14   document and read the title of it.

15      A.   "The Response to First Set the Interrogation

16   Directed By Plaintiff"?

17      Q.   "Interrogatories."

18      A.   "General object -- objections."  Okay.

19      Q.   Have you ever seen that document before?

20      A.   I may have, I don't know.

21      Q.   Well, why don't you take some time and look

22   through it.

23      A.   Okay.  I can tell you I don't recall.  I don't

24   know.  If my attorney sent it to me, obviously I did.

Karen Brandewie

1    Q.   Do you recall being asked to verify the

2    information that was contained in there?

3           MR. POLIQUIN:  Objection.  Objection, if

4    it goes to any conversations you had with me, you

5    don't have to answer the question.

6    A.   I don't recall.

7    Q.   Okay.  So you don't recall seeing this?

8    A.   I don't recall.

9           MR. NIEDZIELSKI:  Okay.  Just for the

10   record, we agree it's the response to the first set of

11   interrogatories directed to plaintiff, correct?  It is

12   dated the 3rd day of March, 2006.  You'll so

13   stipulate?

14          MR. POLIQUIN:  Correct.

15          MR. NIEDZIELSKI:  All right.

16   Q.   One of the questions in this interrogatory

17   asked you to identify in chronological order all

18   healthcare providers, for example, doctors, dentists,

19   physicians, surgeons, therapists, that have treated or

20   examined you in the last 10 years and provide the

21   dates of service of treatment, the nature of any

22   treatment or examination, the result of each

23   examination.

24          For the last 10 years, in other words,

Karen Brandewie

1    from 1996, can you list the doctors that you've seen

2    and the reasons that you see those doctors?

3              THE WITNESS:  Did I list them already?

4              MR. POLIQUIN:  Answer to your best of your

5    knowledge.

6    A.   Oh, so you want me to just say them out loud?

7    Q.   Yes.

8    A.   Oh, okay.  Since '96?

9    Q.   Yes.

10   A.   Dr. Ramani, he's a colon doctor.  And he's for

11   stomach also.

12   Q.   Gastroenterologist?

13   A.   That's it.

14   Q.   Okay.

15   A.   Dr. French, he is my gynecologist.  And he also

16   did my hysterectomy.  Dr. Eileen Davis, she is my

17   family physician.

18   Q.   Do you continue to see Dr. Davis?

19   A.   I haven't seen her in a long time.  I

20   haven't -- shoot, it's not been a long -- it's been a

21   long time since I've seen her.

22   Q.   When was the last time you think you've seen

23   her?

24   A.   It's got to be at least a year ago, maybe more.

Karen Brandewie

1    Q.    And she's your family practitioner?

2    A.    Um-hum.

3    Q.    All right.  Who else have you seen?

4    A.    As far as doctors.

5    Q.    Well, the question was broader, it's not just

6    doctors, but any healthcare provider.

7    A.    Okay, okay, well Julie Warnick is my counselor.

8    Q.    And when is the last time you saw her?

9    A.    A couple weeks ago.

10    Q.    How frequently do you see Julie Warnick?

11    A.    Well, I'm being transferred over to a new

12    counselor now, Miss Franklin I think is her name, in

13    Children and Families First in Milford, because Miss

14    Warnick got her own private practice.  So I haven't

15    seen the new counselor.  I'll see her September 1st.

16    Q.    How frequently did you see Julie Warnick when

17    you did see her?

18    A.    It was once every two weeks.  Before it was

19    once a week, sometimes it was twice a week, sometimes

20    three times a week.

21    Q.    And when did you first start seeing Julie

22    Warnick?

23    A.    I started seeing her -- I don't recall.

24    Q.    Well what year?  Do you remember what year you

                    Karen Brandewie

1    started seeing her?

2        A.    Probably around the same time that all of this

3    happened.

4        Q.    "All of this happened"?

5        A.    With the prison.

6        Q.    Well, can you --

7        A.    So it had to have been somewhere around,

8    because I talked with her about that, and it was

9    during the time, the same time with my ex-husband.  So

10   it had to have been around 2001, 2002, somewhere

11   around there.

12       Q.    So do you think you've been seeing Miss Julie

13   Warnick for approximately five years?

14       A.    I'd say at least four.

15       Q.    At least four years.

16       A.    Yeah.

17       Q.    All right.  And you continue to see her?

18       A.    Not now.  I won't be able to see her now, I'm

19   getting a new counselor.  I'll see Miss Franklin.

20       Q.    Okay, but you will see Miss Franklin in place

21   of Miss Warnick, correct?

22       A.    Right, right.

23       Q.    Anybody else?

24       A.    Dr. Borer.

Karen Brandewie

1    Q.   Dr. Borer?

2    A.   Um-hum.  He is the psychiatrist.

3    Q.   And where is his practice?

4    A.   He has one in Dover and one in Milford and one

5    in Georgetown.  Milford is where I go.

6    Q.   And what is Dr. Borer's specialty?

7    A.   I have no idea.  I just know he is a

8    psychologist or a psychiatrist.  He is one of those.

9    Q.   Does he prescribe medication for you?

10   A.   Yes, he does.

11   Q.   And you indicated that at some point you were

12   over prescribed medication, correct?

13   A.   Yes.

14   Q.   And when was that approximately?

15   A.   About a year ago, I think.

16   Q.   About a year ago?

17   A.   About a year ago.

18   Q.   Did you have to be driven home on one of those

19   occasions?

20         MR. POLIQUIN:  Objection.  You can answer

21   the question.

22   A.   No, I did not.

23   Q.   From work?

24   A.   No, I did not.

Karen Brandewie

1    Q.   Did you have to be excused from work because of

2    the medication problem?

3    A.   I called in a couple of times.  I was on my way

4    up, and I couldn't make it.  I turned around and went

5    back home and went to bed.  And then it was just a few

6    times at work where the staff lieutenant who was the

7    lieutenant at the time, stated his concerns because I

8    was so lethargic.

9         MR. POLIQUIN:  I'm going to state a

10   continuing objection.  You can answer to the best of

11   your knowledge.

12   Q.   Sure.  But I mean it was noticeable at work,

13   the point was, that you were over medicated, correct?

14   A.   Um-hum.

15   Q.   All right.  Are you presently engaged?

16   A.   Am I engaged?

17   Q.   Um-hum.

18   A.   I tell people I am.

19   Q.   Are you?

20        MR. POLIQUIN:  Objection.

21   A.   No.

22   Q.   Why do you tell people you're engaged?

23   A.   So they'll leave me alone.  That's the obvious

24   reason.

Karen Brandewie

1    Q.    People in general?

2    A.    Um-hum, men in general.

3    Q.    Men in general?

4    A.    Yeah.

5    Q.    Are men hitting on you in general?

6    A.    Male officers did.

7    Q.    How about outside of your workplace?

8    A.    I don't do anything outside my workplace but

9    stick around the house, so men wouldn't have a chance

10   for that.

11   Q.    Do you belong to a church?

12   A.    Yes, I do.

13   Q.    Which church?

14   A.    Lewes Church of Christ.

15   Q.    The Lewes?

16   A.    (Nodded affirmatively.)

17   Q.    Do you still belong to that?

18   A.    Yes, I do.  I don't belong to it.  Yes, I do go

19   to it.

20   Q.    What I mean by that is now you live in Felton.

21   A.    Yes, I do go to it on Sundays.

22   Q.    How long have you been a member of the Lewes

23   Church of Christ?

24   A.    Since '95, I believe.

Karen Brandewie

1    Q.   Are there anybody, COs, or officers --

2    A.   Captain Flaherty.

3    Q.   Is he a member of that congregation?

4    A.   Yes.

5    Q.   Do you see him on Sundays?

6    A.   No, I do not.  We have three services and he

7    obviously goes before I go, if he goes still.  I don't

8    know.

9    Q.   Any other doctors you've seen in the last 10

10   years?

11   A.   I think within the last 10 years I may, may

12   have seen a -- what are those doctors called?  When

13   you get hurt on the job and they send you over to a,

14   but I don't know the name of the people anymore.  It

15   was in Milton -- I mean in Millsboro.  It was over by

16   the Dollar General, I remember that.  It's like an

17   occupational place.  I wouldn't know who it was I saw,

18   though.

19   Q.   Your records indicate you were in a car

20   accident?

21   A.   In '95.

22   Q.   Is that correct?

23   A.   In '95 I was hit, yes.

24   Q.   And you brought a civil suit?

Karen Brandewie

1    A.   I didn't.

2         MR. POLIQUIN:  Objection.  You may answer

3    the question.

4    A.   I didn't bring a civil suit.  My mother-in-law

5    did.  She was driving.  I was a passenger.  My husband

6    at the time was a passenger.

7    Q.   Your mother-in-law brought the suit.  Were you

8    named as a plaintiff as well?

9    A.   I guess.

10   Q.   Were you represented by a lawyer in that

11   matter?

12   A.   He represented every one of us.  He brought us

13   all in for questioning and, so, yeah.  We were

14   rear-ended.  It was a five-car pileup.

15   Q.   Was that matter settled?

16   A.   Yeah.

17   Q.   And did you get a cash settlement?

18   A.   Um-hum.  I don't recall how much, but yes, I

19   did.

20   Q.   Have you ever had any kind of cosmetic surgery?

21   A.   Yes, I have.

22        MR. POLIQUIN:  Objection.

23   Q.   What kind of surgery?

24   A.   I had implants put in, due to the abuse I had

Karen Brandewie

1  as a child.

2    Q.   When was that?

3    A.   Back in '90, I think it was '90.

4    Q.   1990?

5    A.   Um-hum.

6    Q.   I don't understand, you had them put in because

7  of the abuse you suffered as a child.

8    A.   I prefer not to go into that.  That's pretty

9  private.

10    Q.   Well, does it have something to do with your

11  present depression?

12    A.   No.

13         MR. POLIQUIN:  Objection.

14    A.   Absolutely not.  That was dealt with a long

15  time ago.  I dealt with all of that abuse years ago.

16  Why?

17    Q.   Well --

18    A.   Why would implants make me depressed?

19    Q.   No, no.  You were the one that said the reason

20  you had implants was because of, to deal with your

21  abuse as a child.

22    A.   Um-hum.

23    Q.   And that's what I'm trying to figure out, what

24  do implants --

Karen Brandewie

1    A.   It has to do with physical disfiguration is

2    what it has to do with, okay?  That's all.  That was

3    corrected.  That's what it had to deal with.

4    Q.   It was to correct scarring or something?

5    A.   It was to correct, yes.

6    Q.   Any other forms of cosmetic surgery or --

7    A.   No.

8    Q.   Now you indicated there was a hysterectomy by

9    Dr. French?

10    A.   Yes.

11    Q.   And that was fairly recent; is that correct?

12    A.   Actually, the first part of my hysterectomy was

13    like, I think eight years ago.  And I just had the

14    last of it a year and a half ago or so.

15    Q.   Did you have a hysterectomy and then

16    oophorectomy?

17    A.   A what?

18    Q.   That's where they remove the ovaries?

19    A.   No.  They left my ovaries in me and the uterus.

20    And they just took all of that out just recently,

21    about a year ago or so.

22    Q.   So initially you had your uterus removed, you

23    said '95 or something?

24    A.   Honestly, I don't know what he removed.  I just

Karen Brandewie

1   know he did a partial and then he came back and did

2   the rest of it, that's all.

3     Q.   All right.  Well who did the enhancement

4   surgery for you?

5     A.   I have no idea.  I don't recall the doctor's

6   name.  I don't recall the business.

7     Q.   Where was it?

8     A.   It was in Mississippi.  It was in Gulfport.

9     Q.   Now, typically, was it paid for by insurance?

10    A.   No.

11    Q.   It was considered elective?

12    A.   What do you mean?

13    Q.   In other words, it wasn't like surgery that an

14   insurance company would pay for.  It wasn't required,

15   it was something that you wanted to have done?

16    A.   No, actually I got some money out of my father

17   through that to get it done, because the courts felt

18   he did -- he owed me.

19    Q.   Okay.  Well, is it fair to say that you had

20   fairly unhappy things occur in your childhood?

21         MR. POLIQUIN:  Objection.  Answer the

22   question.

23    A.   That wasn't my childhood, sir.

24         MR. POLIQUIN:  Just answer the question,

Karen Brandewie

1  Miss Brandewie.

2    A.  Yes.

3    Q.  We got into this line of questioning, I asked

4  you about cosmetic surgery, you indicated you had

5  breast implants about 1990.

6    A.  Um-hum.

7    Q.  And you indicated it was because of the abuse

8  you suffered as a child.

9    A.  Okay.

10    Q.  Was that your testimony?

11    A.  Um-hum.

12    Q.  Well, then I'm trying to ask you now a simple

13  matter:  did you have a very unhappy childhood?

14    A.  Yes, I did.

15    Q.  And were you abused as a child?

16    A.  Yes, I was.

17    Q.  Were you sexually abused as a child?

18    A.  Yes, I was.

19          MR. POLIQUIN:  Just state an ongoing

20  objection to this line of questioning.

21          MR. NIEDZIELSKI:  Okay.

22          MR. POLIQUIN:  But answer the questions.

23          THE WITNESS:  Okay.

24    Q.  Did you have an opportunity in the 1990s and

Karen Brandewie

1  1980s to seek counseling for that?

2    A.   Yes, I did, in '93.

3    Q.   All right.

4    A.   Actually I sought counseling in Mississippi

5  before I moved up here.  But before it could really

6  get started, I moved here and then I started seeing

7  Julie Warnick.

8    Q.   Okay.

9    A.   In '93.

10   Q.   You started seeing Julie Warnick in 1993, you

11 believe?

12   A.   Um-hum.

13   Q.   All right.  And that was because of the

14 problems you were suffering as a result of child

15 abuse?

16   A.   Right.

17   Q.   Is that a fair statement?

18   A.   Um-hum.  And at the time my father had

19 committed suicide, so I was dealing with that also.

20   Q.   Your father killed himself?

21   A.   Um-hum.

22   Q.   When?

23   A.   '95.

24   Q.   And your father was a police officer?

Karen Brandewie

1    A.    Yes, he was.

2    Q.    Mark Atwell was a police officer, wasn't he?

3    A.    Yes, he was.

4    Q.    Was Mr. Mitchell a police officer?

5    A.    No, he was not.

6    Q.    Let's talk about more mundane things now.

7              I want to hand you a mess of documents,

8    and let me just explain something.  You see at the

9    bottom there there is a number stamped on the bottom

10   of the page?

11   A.    Yes.

12   Q.    That's referred to as a Bates stamp number.

13   And that's something that I do in my office so that if

14   we're looking through documents or there's a question,

15   for instance, your lawyer, Mr. Poliquin can call me

16   and say, "Marc, I don't understand D00018," and we

17   know what we're talking about, okay, just as a matter

18   of, so it's done for convenience.

19             The very first page there is a two-page

20   document, is it not?  And it's Bates stamped D0001

21   through 2.

22   A.    Um-hum.

23   Q.    And what is that document, and who is it from?

24   A.    It's from Warden Kearney.

Karen Brandewie

1    Q.   And who is it to?

2    A.   Alan Machtinger.

3    Q.   Who is Alan Machtinger?

4    A.   I don't know what he does.  He works right

5   here.

6    Q.   Does he have something to do with human

7   resources?

8    A.   Yes.

9    Q.   All right.  Now, have you seen this document

10   before?

11   A.   Yes, I have.

12   Q.   And is there anything in there you think is not

13   accurate?

14   A.   I didn't just ignore it.  I told them it was

15   not me.

16   Q.   No, that's what I'm asking -- you don't have to

17   like -- point us to a paragraph you believe is not

18   accurate, okay?  Is that the third paragraph you're

19   speaking of?

20   A.   That's the middle, right here.

21   Q.   The middle one.  And what do you believe is not

22   accurate?

23   A.   It says that I chose to ignore it.

24   Q.   And figured it would go away.

Karen Brandewie

1    A.   What do they mean by ignoring it?  I mean

2    ignoring it, you just turn around and walk off.  When

3    he said this was happening, I told him I didn't

4    appreciate it.  And that --

5    Q.   When Officer James Henry told you?

6    A.   -- that it was not me, yes.  That's what I told

7    him.

8    Q.   So you would not agree with the

9    characterization that you chose to ignore it.

10   A.   Okay, what --

11   Q.   Anything else in there that you think is not

12   accurate?

13   A.   No.

14   Q.   Now we turn to the next page, D0003, and am I

15   correct that's an e-mail from you?

16   A.   Yes.

17   Q.   That was printed out by somebody.  Who printed

18   that out?

19   A.   I made copies of that.

20   Q.   Yeah, but this one has got whose name at the

21   very top?

22   A.   What do you mean?  Oh, that's Kearney.

23   Q.   Okay, wouldn't that suggest to you that he

24   printed off this e-mail?

Karen Brandewie

1    A.   I -- you know, what, I don't know.

2    Q.   Well what I'm saying is that if you print out

3    an e-mail yourself that's directed to you, your name

4    would be at the top.

5    A.   Okay.

6    Q.   Are you familiar with that?

7    A.   Yeah.  So he copied this e-mail?

8    Q.   He printed it off.

9    A.   Okay.

10   Q.   All right?  Is this a copy of the e-mail that

11   you sent him?

12   A.   Um-hum, yeah.

13   Q.   Now, Warden Kearney was deposed yesterday.

14   A.   Okay.

15   Q.   All right.  This is a copy of the e-mail that

16   you sent him?

17   A.   Um-hum.

18   Q.   Now, yesterday we deposed Warden Kearney, and

19   in response to questions from your attorney, he

20   indicated that he believes that you had spoken to him,

21   actually approached him verbally first, and that he

22   asked you to send him, put something in writing.

23   A.   No, he did not.  I spoke to DeLoy about Lenny

24   Whitman's e-mails to me.  I don't ever recall

Karen Brandewie

1  approaching --

2          MR. POLIQUIN:  Just answer the question

3  he's asking.

4   Q.   Your memory is that you did not approach him?

5   A.   No.

6   Q.   That your first approach was by a letter, by

7  this e-mail?

8   A.   To my -- yeah.

9   Q.   Correct?

10   A.   As far as I can remember, yeah.

11   Q.   In other words, it would be incorrect to the

12  extent that Warden Kearney indicated that he believes

13  you approached him first in person, spoke about it and

14  he asked you to put it in writing and send it to him?

15          MR. POLIQUIN:  Objection, asked and

16  answered.  You can answer the question.

17   A.   I don't recall, sir.

18   Q.   Okay.  Let's just go through this e-mail.  Now,

19  prior to this time, had you ever written anything to

20  either Mike DeLoy or Richard Kearney or anyone else

21  about the issues you were having with other

22  correctional officers and rumors?

23   A.   I actually went to them verbally, not in

24  writing.

Karen Brandewie

1    Q.   Who did?

2    A.   I did.

3    Q.   When?

4    A.   I spoke to DeLoy about it.

5    Q.   About what?

6    A.   Concerning the problem I was having in the

7    institution.

8    Q.   Concerning the allegation of porn sites or a

9    different allegation?

10   A.   Oh, no, I didn't know about the porn sites

11   until Jim Henry came to me and told me.

12   Q.   Okay.  So what you approached Mike DeLoy about

13   was an e-mail or problems you were having with a

14   correctional officer, correct?

15   A.   Right.

16   Q.   His name is Lenny Whitman; is that correct?

17   A.   Whitman, um-hum.

18   Q.   We're going to talk about that in just a

19   minute.  What I'd like to do right now is focus in on

20   this.  What I'm trying to get from you is prior to

21   Sunday, November 2nd, 2003, you had not approached

22   anyone about the, quote, rumors about you being on a

23   porn site?

24             MR. POLIQUIN:  Objection.

Karen Brandewie

1    A.    Yes, yes, I had, because I heard the rumors

2    before then, from the date that Mr. Henry told me

3    about it, from that point on.  But when I first heard

4    them saying I had some type of -- my picture was on

5    the Internet, my picture was on the Internet.  It was

6    on the front page of Del Tech's magazine.  So that's

7    what I assumed they were talking about.  And then Jim

8    Henry told me something different.

9              And from the point that he told me, and I

10   cannot tell you the date, but that's when I started

11   talking to people about it.  I said I don't know why

12   people are spreading rumors that I'm on some

13   pornographic Internet.

14   Q.    Okay, perhaps I didn't make my question clear.

15   Let me try it again.  What I'm trying to ask you is

16   prior to this e-mail --

17   A.    I don't know the dates.  That's why I can't

18   tell you.

19   Q.    Did you complain?

20   A.    Yes, I did.

21   Q.    To whom?

22   A.    Captain Flaherty, Captain Brittingham,

23   Lieutenant Johnson, Lieutenant Fisher.  There were

24   several of them that I complained to.

Karen Brandewie

1    Q.   And you complained to them?

2    A.   About the E-mails.

3    Q.   And asked them to do something about it?

4    A.   About the harassment, yes.

5    Q.   And you asked them to do something?

6             MR. POLIQUIN:  Objection, asked and

7    answered.  Go ahead, answer the question again.

8    A.   At that point in time, I did not.

9    Q.   You did not ask them to do anything?

10   A.   Not that I can recall.

11   Q.   In other words, you remarked to them that you

12   heard these things?

13   A.   No, I complained and cried about it.

14   Q.   To who?  Do you remember who?

15   A.   I just told you their names.

16   Q.   Did you cry to every one of them?

17   A.   Yes, I did.

18   Q.   Okay.  Do you recall the dates that you --

19   A.   No, I do not.

20   Q.   Well, can you give me an approximation?

21   A.   No, I cannot.

22   Q.   Well, was it within a month of this e-mail,

23   within a year, two years?

24   A.   It was all within the same time and before.

Karen Brandewie

1    Before I wrote him was when I found out from Jim Henry

2    what was going on.  And that's when I was complaining

3    about it.  But I can't tell you dates because I don't

4    even remember what date it was that Jim Henry told me.

5     Q.   All right.  Now let's just read this, okay?

6    And I'm going to read it and you tell me if I'm

7    reading it correctly, and then I'm going to ask you

8    for your explanation of certain phrases in here, okay?

9     A.   Okay.

10    Q.   And it's addressed "Warden Kearney.  Some time

11    back it was brought to my attention from another

12    officer here that the guys in MSB were looking at porn

13    sites."

14            Did I read that correctly?

15    A.   Yes, you did.

16    Q.   "They found one that read white married female

17    looking for black male with big dick."

18    A.   Um-hum.

19    Q.   "From what I have been told this woman does not

20    look like me but they began showing others that came

21    in the building to work and told them that it was me."

22    A.   Um-hum.

23    Q.   "I thought I put an end to this rumor."

24    A.   Right.

Karen Brandewie

1    Q.    "However, yesterday an inmate brought to my

2    attention the fact that officers have been talking

3    with inmates concerning this matter, telling them I am

4    on a porn site.  Inmates have also been telling other

5    officers what they had been told."

6    A.    Okay.

7    Q.    "Upon arriving to work in the Key Building

8    tonight I spoke with another officer that was

9    informing me that his wife works for P&P was telling

10   him that she had heard that a female officer named

11   Atwell was on a porn site and that her husband was

12   arrested for molesting her daughter."

13   A.    Um-hum.

14   Q.    Who are you referring to there?

15   A.    To where?

16   Q.    When you're saying "Another officer told me

17   about the P" --

18   A.    Brzezicki.

19   Q.    Okay.

20   A.    His wife is in P&P.

21   Q.    And, "She told him where the site was and he

22   informed me."

23   A.    Right.

24   Q.    All right.  Have you ever seen that site?

Karen Brandewie

1    A.    Yes, there was a picture that was given to me.

2    Q.    By who?

3    A.    John Ryan.

4    Q.    When?

5    A.    We pulled it up and put it out for the

6    attorney.


7    Q.    And when was that?

8    A.    That was when all this first started.  I can't

9    tell, tell you the date.  He's my union rep.

10   Q.    Was it before or after you saw Warden Kearney?

11   A.    After.

12   Q.    How much soon after?

13   A.    I think it was after our meeting with him.

14   Q.    Okay, do you recall when you met with him?

15   A.    I don't remember the dates, no.

16   Q.    If the documents were suggesting that --

17   A.    I remember going in there, but I don't remember

18   the dates.

19   Q.    Okay, he indicates in that first document that

20   he met with you on November the 6th, 2003 at 9 a.m.

21   A.    Okay.

22   Q.    And that your COAD representative John Ryan was

23   there.  Would that have been the time that John Ryan

24   would have pulled that up off the Internet?

Karen Brandewie

1   A.   I think it was after that.  I can't be sure.

2   Q.   And where did John Ryan pull it off the

3   Internet from?  What location?

4   A.   I have no idea, sir.

5   Q.   Did he just come to you with it?

6   A.   I just know he had it so that I could take it

7   to my attorney.

8   Q.   Okay, so you didn't actually see him --

9   A.   No, I didn't.

10  Q.   -- bring it up on the computer?

11  A.   No.

12  Q.   All right.  All right now, we dropped off

13  "named Atwell was on"...  "And that her husband was

14  arrested for molesting her daughter."  Okay, now when

15  was your husband arrested for molesting your daughter?

16  A.   I don't remember the time.

17  Q.   Was it around this time, or prior to this time?

18  A.   It would have to be around this time.  It had

19  to have been maybe a little bit prior to.

20  Q.   And then you go on to say, "Sir, this is

21  supposed to be a professional institute where staff

22  support staff but my character has been destroyed and

23  continues to be destroyed every day.  This particular

24  rumor has reached both P&P offices, VOP and Work

Karen Brandewie

1   Release.  I do not understand the mentality of the men

2   who work here.  I've never done anything to anyone and

3   I certainly do not get involved with helping rumors

4   spread.  It's one thing to joke with people; however,

5   it has gone to completely different level.  This type

6   of rumor could place me in a more dangerous position

7   with the inmates as they begin to see me

8   differently.  As you know, I am still in the process

9   of becoming a law enforcement officer and pride myself

10  in my work and in the way I carry myself.  The rumor

11  has gone beyond the institution and I seem to be the

12  talk of the town."

13          It goes on to say, "I did speak with

14  Deputy Warden DeLoy about an incident that happened

15  some time back and that point stated I was not going

16  to allow anyone to spread lies about me and destroy my

17  chances of gaining my dreams and life-long ambitions."

18          Now, what are you speaking about your

19  dreams and life-long ambitions?

20  A.   I wanted to become a law enforcement officer.

21  Q.   All right.  And you believe that these kinds of

22  rumors would negatively impact on that?

23  A.   Yes, I did.

24  Q.   All right.  You go on to say, "I think it is a

Karen Brandewie

1   shame that I receive more respect from the inmates

2   than I do from other officers.  As you are all aware,

3   I already have enough to deal with than to have to

4   deal with the immaturity level of the officers hired

5   by the Department of Corrections."

6       A.   Um-hum.

7       Q.   Now what are you referring to there?

8       A.   With what my, happened to my daughter.

9       Q.   Okay.  "I have spoken with someone concerning

10  the legal aspects of this matter and am ready to take

11  whatever steps necessary to put a stop to this

12  foolishness and child behavior, including suing the

13  State for sexual harassment and defamation of

14  character."

15      A.   Um-hum.

16      Q.   "Sir, I would very much appreciate a meeting

17  with you before I go any further with this matter."

18  Correct?  Have I read that correctly?

19      A.   Um-hum, yeah.

20      Q.   And did you get that meeting that you

21  requested?

22      A.   Yes, we did.

23      Q.   And it was very shortly thereafter, correct?

24      A.   Yeah.  It was like a Monday after or something.

Karen Brandewie

1   Q.   Right.  And you had an opportunity to discuss

2   the matter with the warden?

3   A.   Yes, I did.

4   Q.   And did the warden do certain things?

5   A.   He said he was going to.

6   Q.   Did he?

7   A.   Well, it took months for him to get back with

8   me.  I don't know what was done.  I can honestly say I

9   don't know what was done.  To my knowledge, nobody was

10  reprimanded.  So, and obviously there's ways to tell

11  who's been on the computer and who's been doing what,

12  especially in the institution.

13  Q.   Is that true then or is that true now?

14  A.   It's true now and then, because you have to

15  sign in on your post.  And when you get on a computer,

16  you have to sign in on the computer.

17  Q.   First of all, the site in question, is it a Web

18  site?

19  A.   Um-hum.

20  Q.   It is?

21  A.   That's what it said there, it's Yahoo.  I have

22  no idea.

23           MR. POLIQUIN:  Objection.

24  A.   It's Yahoo.

Karen Brandewie

1    Q.    Is it your understanding it's a Web site?

2    A.    That's what I've been told.

3    Q.    If you look carefully at it, what is it, D004,

4    it's called "My Email."  Is that the site?

5    A.    Where does it say "My Email"?  Okay.

6    Q.    And it's a bunch of, wife4blkck@yahoo.com,

7    correct?

8    A.    Um-hum.

9    Q.    So it's a Yahoo personal ad, correct?

10   A.    I guess.

11   Q.    It's not a porn site, as such.

12   A.    I have no idea.

13   Q.    Well, I'm not saying you're dumb.

14   A.    I'm computer illiterate, so I don't know.

15   Q.    In other words, you reported as you understood

16   it, it was a porn site, correct?

17   A.    Right.

18   Q.    All right.  Do you know the difference between

19   a site, for instance, L.L. Bean as a Web site and the

20   difference between that and a personal profile

21   somebody may have on an e-mail?

22   A.    No, I do not.

23   Q.    Do you have a computer at home?

24   A.    No, I don't.  I used to.  My son has it.

Karen Brandewie

1    Q.   That's fine.  In other words, you were

2    reporting as you understood?

3    A.   Right.

4    Q.   And you don't know the difference between a

5    porn site, a site, and an e-mail address?

6              MR. POLIQUIN:  Objection.

7    A.   This was a porn site, as far as I knew.  I

8    don't know the difference, obviously.

9    Q.   Okay.  You've used a computer at home?

10   A.   A little, yes.

11   Q.   All right.  Have you used it to go shopping?

12   A.   No.

13   Q.   Have you used it to surf the Web?

14   A.   I used it to get on and check my e-mail.

15   Q.   And that's it?

16   A.   And I would -- yes, and I would get my kids'

17   help, and yes, that's a little bit embarrassing, but

18   yes.

19   Q.   All right.  But you, for instance, you know

20   what Google is?

21   A.   Yes.

22   Q.   Okay.  You could go to Google and you could

23   say, you could use certain key words and it would give

24   you a whole list of different sites you could go to.

Karen Brandewie

1   Okay?  And some of them are their separate dot-coms,

2   and they could be for shopping, they could be for

3   directions, they could be for buying and selling

4   things, E-bay.

5     A.   But that's what I understood this was.

6     Q.   Okay.  But now you look at this and you agree

7   with me it's not that?

8     A.   I don't know.

9     Q.   Oh.  Well, you see --

10    A.   I don't know what you're getting at, because I

11  don't know.  I mean to me, they said it came off of a

12  Web site.  That's all I know.

13    Q.   Is this the same thing or similar to what

14  Mr. Ryan showed you?

15    A.   What?

16    Q.   What he showed you, the picture is not very

17  distinct, for that I'm sorry.  But it appears to be a

18  very scantily dressed female in a recumbent position.

19  Is that what he showed you?

20    A.   You know, I honestly don't remember the

21  picture.  But I don't know how you get that out of

22  that.

23    Q.   Well, there are better pictures of this.  I

24  just don't happen to have one.  And apparently it is

Karen Brandewie

1   a, it's a female that's in a recumbent or lying

2   position?

3     A.   Yeah.

4     Q.   She's very scantily dressed, and she's got

5   blond hair.  And that's what's there.  Do you recall

6   that photograph?

7     A.   I recall something similar to that.  I don't

8   recall --

9     Q.   I mean do you recall seeing the woman's head?

10  Could you see the woman's head?

11    A.   I remember the hair.  I do remember it was

12  shoulder-length hair.  And it was a blond.

13    Q.   It was blondish?

14    A.   Sandy blond, I believe, yes.

15    Q.   Do you think it looked like you?

16    A.   I didn't think so.

17    Q.   Do you think --

18    A.   But you really couldn't see.

19    Q.   It was fairly indistinct?

20    A.   Yeah.

21    Q.   All right.  But it's clearly not yours?

22    A.   No, I was investigated and cleared from that,

23  yes.

24    Q.   No, I'm saying it's clearly not you.

Karen Brandewie

1    A.    It's not me.

2    Q.    You agree with me it's not you?

3    A.    It's not me.

4    Q.    All right.  Now, what I'd like to do then is go

5    to -- we'll come back to this a little bit later.  But

6    what I'd like to do now is jump to something else.

7    Hold on to that because we're going to be going back

8    to that.  And what this is, this is -- let me just

9    read, and you'll agree that I'm reading this

10   correctly, I've already given you a copy of this.

11   It's Rule 26(a)(1) Disclosures, Requirements By

12   Plaintiff.

13   A.    Okay.

14   Q.    Okay, this was filed by your lawyer on your

15   behalf?

16          MR. POLIQUIN:  Do you have an extra copy

17   of that?  If you don't, that's fine.

18          MR. NIEDZIELSKI:  I thought I did bring an

19   extra copy.

20          MR. POLIQUIN:  I might have a copy.

21          MR. NIEDZIELSKI:  I'm sorry, I thought I

22   brought an extra copy.  I guess I didn't, I'm sorry.

23          MR. POLIQUIN:  That's all right.  Just as

24   you go along we can, as long as I can see what we are

Karen Brandewie

1   looking at, that's fine.

2   BY MR. NIEDZIELSKI:

3     Q.   Okay.  What I want to show you is, following

4   Exhibit G is an e-mail.  I'm going to have this

5   marked.

6     A.   Okay.  That's from Lenny Whitman.

7     Q.   Is that the e-mail you complained about to Mike

8   DeLoy?

9     A.   I believe so, yes, it is.

10        MR. NIEDZIELSKI:  Would you mark that as

11  Brandewie No. 1, please.

12        (Brandewie Exhibit No. 1 was marked for

13  identification.)

14    Q.   Now, let me ask you about that e-mail.  You

15  received it at work?

16    A.   Yes, I did.

17    Q.   And prior to that e-mail, had there been

18  conversation between you and Mr. Whitman?

19    A.   Yes.  He wanted me to have sex in the tower

20  room with him.

21    Q.   Is that something people do?

22    A.   He said they do.

23    Q.   I mean --

24    A.   He said it happens all the time.

Karen Brandewie

1    Q.   Was Mr. Whitman your type?

2    A.   No.

3         MR. POLIQUIN:   Objection.

4    Q.   My point is, you know, you had no interest in

5    him whatsoever?

6    A.   No, I had no interest.

7    Q.   Is that a fair statement?

8    A.   Yes, that's fair.

9    Q.   And how long did he have these conversations

10   with you trying to have sex with you?

11   A.   Oh, he probably asked me five or six times.

12   Q.   Did you say clearly no to him?

13   A.   Yes, I did clearly say no.

14   Q.   What did you say to him?  I mean did you make

15   it clear to him that there was no way on earth you

16   were interested in sex?

17   A.   Yes, I made it completely clear to him.

18   Q.   What did you say to him?

19   A.   That I would not have sex with him.  That I did

20   not do stuff like that, it was not right.  He said

21   everyone does it and no one will find out and if even

22   if they did they wouldn't care.  And I said no,

23   absolutely not.

24   Q.   And you told him you were married and

Karen Brandewie

1   absolutely not?

2     A.   Yes, absolutely not.

3     Q.   Now, how was it you would interact with

4   Mr. Whitman?

5     A.   What do you mean?

6     Q.   Well, would you see him every day?

7     A.   In passing.  I usually -- I never worked with

8   him.  So when I would pass through, he'd be there and

9   he'd stop and talk to me.  We have to wait for doors

10  to open or we'd be stuck in the same door area, that's

11  how.

12    Q.   And where was it that he worked that you would

13  kind of --

14    A.   He worked pretrial.

15    Q.   Well, would he work in the tower?

16    A.   He also worked in the -- he'd come in the

17  bubble, the control, he'd come into the control room.

18  Did he work tower?  Not to my knowledge.  But he knew

19  that I worked the tower all the time because the

20  captains would come up and see me up there and so

21  would lieutenants, so he knew I worked up there.

22    Q.   So you worked in the tower?

23    A.   Yes, I did.

24    Q.   That's why he asked you to have sex in the

Karen Brandewie

1    tower, because you worked there?

2    A.    (Nodded affirmatively.)

3    Q.    Well, did you work the same shift with him?

4    A.    I did a flip flop with my shifts, but yes, I

5    did.

6    Q.    Well, when would he have time to have sex with

7    you in the tower if either of you were so inclined?

8    A.    Because evidently the program person doesn't

9    have a whole lot to do and they can leave.  And SCI,

10   if you decide to take a walk, you can take a walk.

11   Q.    He was a program person?

12   A.    Um-hum.

13   Q.    What does that mean?

14   A.    That's just when they run programs, he sits at

15   the desk and he frisks the inmates and lets them go to

16   the back, that's it.  And there's not always programs

17   running, so he's just basically an extra hand.

18   Q.    And when did he start this?

19   A.    I don't recall.

20   Q.    Well, what's the date of the e-mail?

21   A.    2-5-03.

22   Q.    When you got that e-mail 2-5-03, did you at

23   that point say, "I'm going to do something about

24   this"?

Karen Brandewie

1    A.    When I got this e-mail?

2    Q.    Yes.

3    A.    I went straight downstairs.

4    Q.    To whom?

5    A.    DeLoy.

6    Q.    And did you give it to DeLoy?

7    A.    I didn't give it to anyone, I pulled it up on

8    DeLoy's computer.

9    Q.    And what did DeLoy say?

10    A.    At that point in time DeLoy said, "Well, did he

11    make a pass at you?"  I said, "Well he asked me to

12    have sex."  And then he said, "Well you got to

13    understand, Karen, it's not every day that we have

14    officers that look like you that come here."  That's

15    what he said.

16    Q.    Okay, what else did he say?

17    A.    He asked me what I wanted him to do.

18    Q.    What did you tell him?

19    A.    I told him I wanted it to stop.  He said he

20    would be talking with Lenny.

21    Q.    Did you tell him that you did not want any

22    formal discipline against Lenny?

23    A.    I told him I didn't want to get him in trouble.

24    That wasn't my intentions, but I did want something

Karen Brandewie

1  done.

2    Q.   But you wanted it to stop?

3    A.   I said yes, I wanted something done.  He said,

4  "I'm going to be talking with him," which he never

5  did.

6    Q.   Did he have his lieutenant talk to him?

7    A.   Nobody talked to him, because Lenny Whitman

8  sometime after told me nobody ever spoke to him.  In

9  passing, he said, "Well nobody called me and talked to

10  me."  So I said well nobody talked to him.

11    Q.   Is Lenny --

12    A.   But nobody let me know anything, so I assumed

13  he was right or that he was being honest.

14    Q.   So if I were to show you a form where in fact

15  he was talked to about this by his supervisor and he

16  acknowledged it in writing, would you concede that he

17  was talked to about it?

18            MR. POLIQUIN:  Objection.

19    A.   What difference is that going to make now?

20    Q.   Well, did he ask you to have sex after you

21  talked to DeLoy?

22    A.   No.

23    Q.   He never brought it up again, did he?

24    A.   He never came near me because I went to DeLoy

Karen Brandewie

1    and I knew he wouldn't.

2      Q.   And that's what you wanted?

3      A.   Regardless of had DeLoy said anything, that boy

4    wasn't going to come near me ever again anyway.

5      Q.   And that's what you wanted?

6      A.   Yes, I did.

7      Q.   You wanted him to leave you alone?

8      A.   Um-hum.

9      Q.   And he did leave you alone, correct?

10     A.   Um-hum.

11     Q.   And that e-mail was dated February the 4th.  Do

12   you know when you talked to DeLoy?

13     A.   No, that was the 5th.

14     Q.   5th of February 2003.

15     A.   No, I don't remember when I talked to him.

16     Q.   It was shortly after you got that e-mail?

17     A.   Um-hum.  I talked to him on November 3rd.  Is

18   that when I talked to him?

19     Q.   No, that's Warden Kearney.

20     A.   Oh, DeLoy.  Now what's the question?

21     Q.   The e-mail you received from Mr. Whitman, it's

22   dated the 4th of February, 2003.  Correct?

23     A.   The 5th.

24     Q.   I'm sorry, February the 5th, 2003, correct?

Karen Brandewie

1    A.    Um-hum.

2    Q.    And shortly after that is when you talked to

3    DeLoy?

4    A.    It was like five minutes later.  I went

5    downstairs.

6    Q.    And after you talked to DeLoy, Lenny never

7    approached you again?

8    A.    No, he never approached me again.  I know, I

9    don't know how many e-mails I got, but he never

10   approached me again.

11   Q.    He never asked you about sex or anything?

12   A.    No.

13   Q.    And that's what you wanted to happen.

14   A.    Yeah.

15   Q.    And that happened in this case, correct?

16   A.    Um-hum.

17   Q.    All right.

18         MR. NIEDZIELSKI:  I'll make you a copy if

19   you want after.  I think you probably have enough

20   copies of this.

21   Q.    Let me ask you to turn to D00006.

22   A.    Okay.

23   Q.    All right.  Are you familiar with what that

24   document is?

Karen Brandewie

1    A.   Yeah.

2    Q.   What is that?

3    A.   This is a document that I did, I believe with

4    the Department, yeah, Labor.

5    Q.   Charge of discrimination?

6    A.   Um-hum.

7    Q.   All right.  Now, at this time were you

8    represented by a lawyer on this matter?

9    A.   I don't recall.

10   Q.   Well, in your e-mail in November you indicated

11   that you had approached somebody at Legal Services.

12   And this is dated, what date did you file this

13   complaint?  It's at the bottom next to your signature.

14   A.   1-6-04.

15   Q.   So from the period of November --

16   A.   I hadn't hired an attorney, no.

17   Q.   Well isn't that what you said in your e-mail?

18   A.   I didn't say I hired an attorney.  I said I

19   spoke to somebody concerning the legal matters of it.

20   Q.   All right.  Were you represented by counsel at

21   this point in January?

22   A.   I don't recall.  I don't think I was, but the

23   first attorney that I had was a female and she died.

24   Q.   What was her name?

Karen Brandewie

1     A.    I don't even remember her name.

2     Q.    Phillips?  Lorraine Phillips?

3     A.    Yeah.  That's her.

4     Q.    How did you --

5     A.    Yes, I bet I did have her, because it was --

6     see, I don't remember.

7     Q.    I'm not asking you what you discussed with your

8     lawyer.

9     A.    I know, but I'm trying to remember if I even

10    had one then.

11    Q.    She worked in Ed Gill's office?

12    A.    Yes.

13    Q.    And did she assist you in preparing this charge

14    of discrimination?

15    A.    No, the man at the place did.

16    Q.    At the Department of Labor?

17    A.    Yeah.

18    Q.    In other words, you explained to him?

19    A.    Oh, I had to sit down and tell him everything,

20    yeah.

21    Q.    And did you tell him everything?

22    A.    Yes, I did.

23    Q.    Everything?

24    A.    Yeah.

Karen Brandewie

1    Q.   Okay.  Now, it indicates on Count 1 -- first of

2    all, you believe you're being discriminated based on

3    race and sex, correct?

4    A.   Not race.  Race association.  They're two

5    different things.

6    Q.   Well, see the block there that's --

7    A.   What's a block?

8    Q.   I'm sorry.  There's a little check thing here?

9    A.   Um-hum.

10   Q.   Doesn't it say "race"?

11   A.   He said it has to do with race, so that's why

12   he marked it.

13   Q.   And sex, correct?

14   A.   Um-hum.

15   Q.   All right.  Now, how did it have to do with

16   race or race association?

17   A.   Because when Lenny --

18        MR. POLIQUIN:  Object but answer the

19   question.

20   Q.   Go ahead.

21   A.   When I refused Lenny Whitman and he sent me the

22   e-mail and all of that, when people would talk to me

23   and he would say something about that I'll only talk

24   to black people, I won't talk to whites.  And I told

Karen Brandewie

1   him, if he wouldn't approach me for sex all the time,

2   maybe I'd talk, you know.  But you know, if somebody

3   is going to talk sexual with me, I don't, I don't

4   bother with them.

5     Q.   Well that was the e-mail that Lenny --

6     A.   That wasn't just e-mails.  That was when people

7   would approach me, men there would approach me and say

8   well, you know, the reason -- like one of my

9   sergeants, "The reason that -- you know why people

10  don't want to work with you is because of who you

11  associate with."  And I just told him it doesn't

12  matter who I associate with.

13    Q.   Well, the only thing I'm aware of is the e-mail

14  from Mr. Whitman where he alleges that in conversation

15  with you on February the 5th, 2003.  Are there other

16  e-mails that said that?

17    A.   Not other e-mails.  People who approached me.

18  Not other e-mails.

19    Q.   Okay.  Now, where did you write that, that

20  other people would approach you with the same thing?

21    A.   What do you mean, where did I write it?

22    Q.   Well, I didn't see that in this.  Could you

23  show me where it is in this charge of discrimination?

24    A.   I didn't write that.  Whoever typed it typed

Karen Brandewie

1   it.

2       Q.   Well, you did sign it and you read it first?

3       A.   Um-hum.

4       Q.   All right.  Now, if you look up there, there is

5   a block that says "discrimination took place."  Do you

6   see that?  There is a little block there with dates?

7   Right here.

8       A.   Okay.

9       Q.   And it says, "date discrimination took place,"

10  and it says "earliest," it says "3/2003."  I assume

11  that means March of 2003.

12      A.   Um-hum.

13      Q.   What were you referring to?

14      A.   What do you mean what was I referring to?

15      Q.   What happened in March of 2003?

16      A.   That's when I was being approached by people.

17      Q.   Well, the e-mail, you discussed being

18  approached by Lenny Whitman and his e-mail, which

19  apparently at that date that he sent you the e-mail,

20  that stopped and that was --

21      A.   That was in February.

22      Q.   Right.

23      A.   His e-mails stopped.  He didn't write me any

24  more e-mails or talk to me about sex from that point

Karen Brandewie

1    on.  From that point on it just went to other officers

2    talking about the only reason I wouldn't hang out with

3    them and talk with them was because I only liked black

4    men.

5        Q.    Which officers said that?

6        A.    I don't know the names of them now.  I never

7    documented that.  I can tell you that I had a sergeant

8    that spoke with me about it.  I don't have the names

9    of those people.

10       Q.    Well, do you have any e-mail or something you

11   sent to somebody complaining about that, and where

12   you --

13       A.    Complaining about?

14       Q.    Those subsequent conversations you had with

15   others?

16       A.    No, I just simply told Captain Flaherty once

17   that if he, if it didn't stop, I was going to end up

18   going off and yelling at a few people.  And he said

19   no, I would get in trouble for that.  So I kept my

20   mouth shut.

21       Q.    When was that conversation you had with Captain

22   Flaherty?

23       A.    I don't know.  It may have been May.

24       Q.    May 2003?

Karen Brandewie

1    A.   I don't remember.

2    Q.   You think it could have been sooner than May of

3    2003?

4    A.   It may have been.

5    Q.   Could it have been in February of 2003?

6    A.   No.  It was after the Lenny Whitman e-mail.

7    Q.   Paragraph 1 of the particulars says, "I am a

8    female individual who has been employed by Respondent

9    since November 2000.  I'm still employed as a

10   Correctional Officer in Georgetown, Delaware, at

11   Sussex Correctional Institute.  I have been subjected

12   to a hostile work environment based on my sex and my

13   alleged association with black men."  That's what you

14   stated, correct?

15   A.   Um-hum.

16   Q.   All right.  Under paragraph 2, it says,

17   "Correctional Officer Leonard Whitman (white) made

18   statements about an alleged relationship I had with

19   black men.  He was upset because I would not have sex

20   with him.  Approximately one month later, there were

21   rumors that I had a pornographic Web site seeking a

22   black man.  I spoke to Deputy Warden DeLoy (white)

23   about the rumors regarding Mr. Whitman's e-mails.  I

24   was told he would address it but he has not updated me

Karen Brandewie

1    about the matter.  I discussed the pornographic

2    pictures with Warden Richard Kearney who called

3    Internal Affairs.  I was told that it would be

4    investigated but nothing else has been done."

5            Did I read that paragraph correctly?

6    A.   Yes.

7    Q.   All right.  So paragraph 2 of the particulars

8    of your allegation are that Correctional Officer

9    Leonard Whitman made statements about alleged

10   relationship I had with black men.

11   A.   Yeah.

12   Q.   That was an e-mail.

13   A.   That was in the e-mail about how he said I was

14   caught -- he heard I had been caught in the back of a

15   van having sex with a bunch of black guys.

16   Q.   But that e-mail was February the 5th, 2003,

17   correct?

18   A.   I guess, yeah.

19   Q.   Well, see, the reason I'm asking you is there

20   is an earliest date up here, it talks about March

21   2003.  Could that be a mistake?  Could that merely

22   refer to February instead of March?

23            MR. POLIQUIN:  Objection.

24   A.   I have no idea, sir.  It would have to.

Karen Brandewie

1    Q.   All right.  And then you talked about a month

2    later, so a month after you got this e-mail from

3    Leonard Whitman, there were rumors you were in a

4    pornographic Web site.

5    A.   Yeah.

6    Q.   So that would have been a month after you got

7    the e-mail, you got the e-mail on February the 5th,

8    2003, so about a month after that would be March the

9    5th?

10   A.   Um-hum.

11   Q.   2003?

12   A.   That must be where they're starting their

13   discrimination.

14   Q.   Okay.  So they're talking about things that

15   started in March, not things that started in February?

16   A.   Probably not.

17   Q.   All right.  Now, did you have to answer a

18   questionnaire when you went to the Department of

19   Labor?

20   A.   I don't recall.

21   Q.   Did they ask you detailed questions about every

22   little thing?

23   A.   They, they asked me questions, but I don't

24   recall how detailed they were.

Karen Brandewie

1    Q.   Well, when you went there, did you bring the

2    e-mail with you?

3    A.   I don't recall.  I may have.

4    Q.   Now, this is January the 6th, 2004, okay?

5    A.   Um-hum.

6    Q.   You had an e-mail from February the 5th, 2004,

7    and the matter was resolved.  Correct?

8    A.   February 5th, 2004?

9    Q.   With Whitman.  Um-hum.

10   A.   Or 2003?

11   Q.   2003, I'm sorry.

12   A.   It was not under my knowledge that anything was

13   resolved.  I just felt like he stayed away from me

14   just simply because he was afraid I'd go back to

15   somebody.  To me, it's not resolved unless something

16   is done to somebody.

17   Q.   And the fact that he was --

18   A.   It doesn't mean, just because he may not come

19   to me for sexual favor anymore doesn't mean it's

20   resolved, because how do I know he's not the one that

21   went around and started the Web site thing?  So no,

22   it's not -- it wasn't resolved.  In my mind it was not

23   resolved because there was no discipline taken.

24   Q.   What discipline did you want taken?

Karen Brandewie

1    A.   Well, obviously he should have been reprimanded

2    in some way.  I don't know what the Department of

3    Correction does.  But there's got to be some type of,

4    whether it's a verbal counsel where it's documented,

5    you know, and at least let me know it's done.  I

6    didn't know anything was done.

7    Q.   Well do you understand that they can't explain

8    to you --

9              MR. POLIQUIN:  Objection.

10   Q.   -- a personnel matter of another employee?

11   A.   No.

12   Q.   You don't understand that?

13   A.   Uh-uh.

14   Q.   All right.

15   A.   No, because when I'm told that I'll be updated,

16   I figure I'll be updated.  At least let me know, "Yes,

17   we did something."

18   Q.   Deputy Warden DeLoy didn't say anything to you?

19   A.   Nobody said anything to me.

20   Q.   But you didn't want to get Lenny in trouble.

21   A.   I didn't want to get anybody in trouble.  I

22   wanted it to stop.

23   Q.   But you wanted it to stop.  And you agree it

24   stopped?

Karen Brandewie

1    A.    Um-hum.  But that doesn't mean necessarily that

2    it was over.  That doesn't necessarily mean that I

3    didn't feel uneasy walking around him when I'd end up

4    having to run into him.  It didn't mean any of that.

5    Q.    But how would you ever feel comfortable --

6              MR. POLIQUIN:  Objection.

7    A.    How would I ever feel -- I didn't feel

8    comfortable.

9    Q.    -- walking around there, no matter what was

10   done.

11   A.    I didn't feel comfortable walking around any of

12   those men.

13   Q.    Any of those men, being any of the males that

14   worked there?

15   A.    Yeah.  Understand, once you, once you know

16   there's been several of them involved in all this, you

17   don't know who all has been involved, including from

18   the top down.  How do I know that Warden Kearney

19   wasn't involved?  How do I know that DeLoy wasn't

20   involved?  How do I know that my captains weren't

21   involved?

22   Q.    Well, do you have any information they were?

23   A.    There's only been rumors.  And I don't trust

24   all rumors.

Karen Brandewie

1    Q.   By who?

2    A.   Officers.

3    Q.   Saying what?

4    A.   That all of them have seen it.

5    Q.   Seen what?

6    A.   The pictures over here that we can barely see.

7    Q.   Well, if you make a complaint about something

8    and IA does an investigation --

9    A.   I'm talking about before then.  That they,

10   they've also looked at it.  So how do I know they're

11   not involved?  How do I know that they weren't

12   involved in it before the picture came to their --

13   Q.   Okay, so you believe based on rumors you've

14   heard.

15           MR. POLIQUIN:  Objection.

16   Q.   Is that what you're saying?

17   A.   I'm telling you I don't know.

18   Q.   Well, do you rely on rumors?

19   A.   No.  If I did, I would truly believe it.

20   Q.   Isn't your complaint in this case about rumors?

21   A.   Rumors that were justified.  I saw it.  Look,

22   you see the photos?  Um-hum.

23   Q.   So --

24           MR. POLIQUIN:  Objection.

Karen Brandewie

1    Q.   If the rumors about you were true they'd be

2    justified, it would be okay to spread rumors about

3    you?

4    A.   No, I didn't say that.  It's not okay to spread

5    rumors at all.  It's not okay to start a rumor.

6    Q.   Okay.  Now, in fact in paragraph 3 of your

7    particulars, you say, "I believe that I Respondent" --

8    it should be "that the Respondent is in violation of

9    Title VII of the Civil Rights Act of 1964, as amended,

10   and the State of Delaware's Discrimination in

11   Employment Act, as amended, for continuing to allow me

12   to work in a hostile work environment based on my sex

13   and my alleged association with black men.  I've not

14   been able to perform my duties as a reasonable

15   person."  That's what you say, correct?

16   A.   Um-hum.

17           MR. POLIQUIN:  Objection.  You can answer

18   the question.

19           MR. NIEDZIELSKI:  She said it.

20           MR. POLIQUIN:  No, someone drafted this

21   for her and she signed the statement.

22   Q.   Well you signed it saying you agreed with the

23   statement, correct?

24           MR. POLIQUIN:  She didn't --

Karen Brandewie

1    A.   I signed it thinking that they knew what they

2    were doing.

3    Q.   Well, what does it say right above your

4    signature?

5    A.   Whatever they marked.

6    Q.   What does it say right directly above your

7    signature?

8    A.   "I will advise the agencies if I change my

9    address or telephone number."

10    Q.   And right below that under the line, right

11    above your signature.

12    A.   "Declare under penalty of perjury that the

13    foregoing is true and correct."

14    Q.   And your signature says this is true and

15    correct under penalty of perjury, correct?

16    A.   Um-hum.

17    Q.   You're adopting the statement as being true and

18    correct.

19    A.   Okay.

20    Q.   All right?  Well that's what you signed,

21    correct?

22    A.   Yeah.

23    Q.   Okay?  Now, it is true that that -- first of

24    all, the e-mail information from Mr. Whitman

Karen Brandewie

1  suggesting somehow that you would only go out with

2  black men is incorrect.

3    A.    Right.

4    Q.    Correct?

5    A.    Correct.

6    Q.    And that Web site -- or not Web site, that

7  Internet site has nothing to do with you, correct?

8    A.    Correct.

9    Q.    And in fact, it is not you?

10   A.    Correct.

11   Q.    So you have no association with black men?

12            MR. POLIQUIN:   Objection.

13   A.    No association with black men?  Of course, I

14  talk to them all the time.  I talk to white men too.

15   Q.    No, I'm not asking you that.  I understand

16  that.  I'm not saying you don't interact with black

17  men.  I'm saying any suggestion that somehow you only

18  sexually are involved with black men is incorrect?

19   A.    Yeah, it's incorrect.

20   Q.    Okay.  I'm not asking if you talk to black men.

21   A.    Okay.

22   Q.    I think you obviously do.

23   A.    Okay.

24   Q.    You work with them, don't you?

Karen Brandewie

1    A.   Yes, I do.

2    Q.   You'd have to talk to black men, correct?

3    A.   Um-hum.

4    Q.   All right.  Now, commencing in November of

5    2003, did you continue to work at SCI?

6    A.   Yes, I did.

7    Q.   For how long?

8    A.   I don't remember when I got away from there.  I

9    know that I had a breakdown in the Key Building, and

10   that's all -- I don't remember dates.

11   Q.   Well, didn't you go on leave, medical leave for

12   a while?

13   A.   Yes, I did.

14   Q.   Do you remember when that started?

15   A.   No, I don't.  It was July something.  It was

16   when I -- my daughter was in Rockford Center.

17   Q.   Okay.  Now, I'm trying to figure out, July, is

18   that July of 2003 or 2004?

19   A.   Would probably be 2003.  I don't recall.  I'd

20   have to look in my papers to --

21   Q.   So she was in Rockford Center prior to you

22   sending the e-mail to Warden Kearney?

23   A.   I do not recall.  I don't recall.

24   Q.   All right.  In any event, at some time in the

Karen Brandewie

1  early part of 2004, you were moved out of SCI; is that

2  correct?

3    A.   I had a breakdown.  I was taken out of work for

4  I believe five weeks.  And then my doctor talked with

5  them, I was placed here for eight months.

6    Q.   And what did you do here?

7    A.   I worked in EDC.  I was filing papers, doing

8  whatever they needed me to do.

9    Q.   Was it a pleasant working environment?

10   A.   Yes, it was.

11   Q.   Were people nice to you?

12   A.   Yes, they were.

13   Q.   Did people try to hit on you?

14   A.   No.

15   Q.   All right.  And then what happened after that?

16  Did you request an assignment?

17   A.   No, I did not.  Al Machtinger said I could no

18  longer stay here.  Those were his words to me, and I

19  said all right.  Then I talked with my doctor, and she

20  said someplace small, not someplace where there's a

21  lot of officers.  So it was decided upon MCCC, Morris.

22   Q.   And were you transferred there?

23   A.   Yes, I was.

24   Q.   And have you been there ever since?

Karen Brandewie

1    A.    Um-hum, it was September.  This will be two

2    years September, I believe.

3    Q.    So September of 2004 you were transferred to

4    MCC?

5    A.    I believe so.

6    Q.    What are your duties and obligations there at

7    MCC?

8    A.    Anywhere from working in the duty office to

9    working on a tier or on a floor, a set floor.

10   Q.    What kind of facility is MCC?

11   A.    Work Release.

12   Q.    Does that mean that the --

13   A.    Program building too.

14   Q.    Does that mean, generally speaking, the inmates

15   there are ready to be released?

16   A.    Close to it, within a year.

17   Q.    And usually they need less intensive

18   supervision?

19   A.    I wouldn't necessarily say that, no.  That's

20   the way it's documented.  I don't believe it.  Once a

21   rapist, always a rapist, you know.  You've got the

22   same -- that's my mentality, okay.  That's where I'm

23   saying, just because somebody's raped before and

24   they've gone through whatever they've gone through,

Karen Brandewie

1   you put them in a Level 4 facility, it doesn't mean

2   they're less apt to rape again.

3       Q.   Are you able to perform your job there?

4       A.   Yes, I am.

5       Q.   Do you do it well?

6       A.   Yes, I do.  And I ask for backup.

7       Q.   Do you think you do your job well?

8       A.   Yes, I do.

9       Q.   When you were working here, do you think you

10  did your job well?

11      A.   Yes, I did.

12      Q.   Now, when was your breakdown at SCI?

13      A.   That was during all the mess with the

14  photographs, and it was like several times a week I'd

15  have a captain or a lieutenant come up to the Key

16  tower and talk to me, and I was crying all the time

17  about it.  Told them I'm tired of it, I want the

18  rumors to stop, I just want, I want it to end.  And

19  eventually I just -- that was it.  I don't remember

20  when the breakdown was.  You'd have to look at my

21  medical records.

22      Q.   Now, did there come a time when you complained

23  of additional problems at MCC?

24      A.   Yes.

Karen Brandewie

1    Q.   And when were those occasions?

2    A.   I can't give you dates, but I can tell you that

3    it was because inmates would be transferred.  We don't

4    have -- inmates don't stay in one facility.  They do

5    go around, you know, different institutions.  And the

6    ones from SCI were transferred to our institution and

7    told the other inmates that the officers down there

8    had informed them that I had a pornographic Web site.

9    And then the inmates that were already housed there

10   would come up to me and question me concerning my

11   alleged Web site.

12   Q.   What would you say to them?

13   A.   I let them know that I did not have a Web site,

14   and I would not discuss it any further with them.  And

15   then I would tell the warden.

16   Q.   Okay.  And you would complain to warden -- who

17   is the warden there?

18   A.   Bianco.

19   Q.   And what would he do?  Would he do things?

20   A.   I had complained -- I'd write e-mails to -- who

21   was it?  He was, Kenny Wilson was our captain, I

22   believe, at the time.  Or not captain.

23   Q.   In other words, you would say --

24   A.   Anyway, I would talk to them about it.  And he

Karen Brandewie

1   had basically said at one point there was really not a

2   whole lot they could do because of the stigma that SCI

3   already put out there, but they would make sure that I

4   was okay.

5   Q.   How do you stop a rumor about somebody?

6        MR. POLIQUIN:   Objection.

7   A.   I have no idea.

8   Q.   Can you?

9   A.   I have no idea.

10  Q.   Do you know how to stop a rumor about somebody?

11  A.   I have no idea.

12  Q.   Can a rumor about a person be stopped?

13        MR. POLIQUIN:   Objection.

14  Q.   Do you know that?

15  A.   I have no idea.

16        MR. POLIQUIN:   Asked and answered.

17  Q.   Are offenders, inmates, given to yakking and

18  talking about everything?

19  A.   Yeah.

20  Q.   Do you ever engage in rumor or gossip with

21  people?

22        MR. POLIQUIN:   Objection.

23  A.   I try to stay out of gossip.

24  Q.   You just don't discuss it?

Karen Brandewie

1    A.   Basically you walk away.  Or you let the person

2    you choose to believe something different until you

3    see otherwise.

4    Q.   Do you think an effective way of dealing with

5    gossip or rumor is simply not to respond to it at all?

6            MR. POLIQUIN:  Objection.

7    A.   I have no idea.  Are you asking me do I think I

8    did wrong by reporting it?

9    Q.   No, no.

10           MR. POLIQUIN:  Just answer the question.

11   A.   I have no idea.

12   Q.   I'm asking you a different question.  I'm

13   saying how do you --

14   A.   I have no idea.

15           MR. POLIQUIN:  Answer the question.  I

16   think you already answered the question.

17           MR. NIEDZIELSKI:  She has answered, she

18   has no idea.

19   Q.   Now, on February 5th, 2003, you took an e-mail

20   off from Leonard Whitman and you went to Mike DeLoy

21   right away, correct?

22   A.   I didn't take the e-mail off, but yes, I did go

23   down to him.

24   Q.   And he printed it off?

Karen Brandewie

1    A.    Yes.

2    Q.    Okay.  And November 2nd you sent an e-mail on a

3    Sunday to Warden Kearney regarding the quote

4    pornographic site.

5    A.    Um-hum.

6    Q.    Other than that, have you written any

7    descriptions anywhere of any other steps you took in

8    the interim period of time?

9    A.    What do you mean?

10   Q.    Where you complained about things to anybody.

11   A.    Written it?

12   Q.    Yeah, for instance, between the time you went

13   to Deputy Warden DeLoy, February the 5th, 2003, to the

14   time you sent your e-mail to Warden Kearney on

15   November the 2nd, 2003, do you have any other e-mails

16   you sent to anyone complaining about anything?

17   A.    Not that I can recall.

18   Q.    I mean you could have done that, correct?

19   A.    I went to the top person.  When you go to the

20   top, who else do you go to?

21   Q.    You're aware of what the Department of

22   Correction sexual harassment policy is?

23   A.    Yes.

24   Q.    And it offers you a number of avenues, correct?

Karen Brandewie

1    A.    I haven't read it since I was in the academy,

2    but...

3    Q.    Did you go through it?  Were you trained in it

4    when you went through the academy?

5    A.    Yes, we were.  Yes, we were.

6    Q.    Since you've been to the academy, have you been

7    to any other training sessions?

8    A.    On sexual harassment?

9    Q.    On anything.

10   A.    Oh, yes, I have.  Direct supervision, DACS, I

11   took a few courses I believe in Georgetown, I don't

12   recall the names of them.  I don't believe I went

13   through the sexual harassment training again because

14   we had that in the academy.

15   Q.    But you're aware of whatever the policy is?

16   A.    Okay.

17   Q.    And the steps you have to take or should take?

18   A.    Honestly, I don't know.

19   Q.    Well, first you've got to complain about it,

20   right?

21   A.    Which I did.

22   Q.    And you did at least in two cases, correct?

23   A.    Right.

24   Q.    And what I'm asking you for is between those

Karen Brandewie

1    dates, February 5th --

2      A.   I didn't write anything down.  I complained

3    verbally to my captains.  I complained verbally to my

4    lieutenants.  I did not write it down, no.

5      Q.   Suppose I were to tell you that that is not

6    their memory.

7              MR. POLIQUIN:  Objection.

8      A.   Well --

9              MR. POLIQUIN:  Answer the question.

10     A.   I can't answer that for you.

11     Q.   Okay.  But aren't you supposed to document,

12   make your request or make your complaint in writing?

13   Isn't that what you're supposed to do?

14             MR. POLIQUIN:  Objection.

15     A.   I thought I did that by writing to Kearney.

16     Q.   You did, in November 2003.  I'm asking you

17   between November 2003 and the e-mail from Leonard

18   Whitman, are there any other e-mails you sent to

19   anyone complaining about sexual harassment?

20     A.   No, I just spoke to them.

21     Q.   Okay.  In that document in front of you, I'm

22   going to ask you to turn to D00021.

23     A.   This makes it easy.  Okay.

24     Q.   Have you ever seen that document before?

Karen Brandewie

1    A.   I may have.  If it's the Internal Affairs

2    thing, I'm sure.

3    Q.   When did you see it?

4    A.   I can't tell you when I saw it.  I don't

5    remember.

6    Q.   You don't recall when you first saw it?

7    A.   No, I do not.  It was after my interview with

8    IA.

9    Q.   Was it in January or February of 2004?

10   A.   I don't recall.

11   Q.   It indicates on page 1, "On November the 18th,

12   2003 an interview was conducted with Officer Karen

13   Atwell in the company of Union Representative John

14   Ryan of COAD.  Officer Atwell indicated she did not

15   have a Web site and she had not viewed the Web site in

16   question."

17   A.   Um-hum.

18   Q.   "This had been going on since July of 2003."

19   A.   Okay.

20   Q.   Is that accurate?

21   A.   Yeah.

22   Q.   "Officer Jim Henry informed Officer Atwell of

23   what the officers were saying about her having a Web

24   site.  James Henry also advised Atwell the picture did

Karen Brandewie

1   not look like Karen Atwell anyway."  Do you recall

2   that conversation with Mr. Henry?

3     A.   Right.

4     Q.   Now, was Mr. Henry telling you about this

5   because he wanted to harass you, do you believe?

6     A.   No, no, I never thought Mr. Henry was trying to

7   harass me.  I just thought he was trying to inform me

8   of what others were doing.

9     Q.   Okay.  And then it goes on.

10    A.   Then it talks about Mr. Brzezicki, and that's

11  the one that you asked me about before.

12    Q.   Whoa, whoa.  At the beginning of the first

13  paragraph, it seems to be, "People would say remarks

14  in passing about the female on the Web site where a

15  female was lying naked and playing with herself.

16  She," must be referring to you, "was at the Key"

17  site -- "was at Key."  What's Key?

18    A.   Key is the program building that they have

19  there, Key Building.

20    Q.   Okay.  "When Officer Brzezicki asked to talk to

21  her."  And now they're referring about Officer

22  Brzezicki, okay?

23    A.   Yes.

24    Q.   "He informed her what officers were saying that

Karen Brandewie

1  his wife who worked at Probation and Parole came to

2  him saying that Officer Atwell had a porn site, and

3  that her character was being damaged.  That she had

4  applications in with the Delaware State Police,

5  Wilmington Police and her character was in question."

6      A.   Okay.

7      Q.   Now, you are reporting to IA what Brzezicki

8  told you?

9      A.   Yeah, I told --

10     Q.   This paragraph?

11     A.   Oh, no, I think right here, IA is stating that

12  I was saying that my reputation was being ruined.

13     Q.   Okay.  But you were talking about what Officer

14  Brzezicki told you?

15     A.   Yes, about his wife.

16     Q.   So in other words, my only point was this

17  paragraph is part of the interview of you taken by IA?

18     A.   Yeah.

19     Q.   Okay.  And it indicates that she had

20  applications with Delaware State Police and Wilmington

21  Police.  Was that true?

22     A.   That was me.  That was me.

23     Q.   Did you have applications in with them?

24     A.   I was processing with State Police then and

Karen Brandewie

1  getting ready to apply with Wilmington.

2    Q.   And it goes on to say, "Officer Karen Atwell

3  also said she was under observation due to the arrest

4  of her husband for molesting her daughter.  That

5  custody of her daughter was being looked at."  Is that

6  correct?

7    A.   Custody of my daughter wasn't being looked at.

8  I don't even know where that came from.  I had full

9  custody of my children.  It's not his child, so I

10  don't understand that statement.

11   Q.   Well, what does it mean when it says, "She was

12  under observation due to the arrest of her husband for

13  molesting her daughter"?

14   A.   I have no idea what it means.  I wasn't under

15  observation.  That would mean somebody has to be

16  observing me, right?

17            MR. POLIQUIN:  Objection.  Document speaks

18  for itself.

19            MR. NIEDZIELSKI:  Well, I'm asking her are

20  these accurate statements?  Somebody else is reporting

21  that.

22            MR. POLIQUIN:  Well she's answered that.

23  She can't answer questions beyond her --

24   Q.   Are you denying the statement?

Karen Brandewie

1    A.   The only thing it could have been talking about

2    was the fact that yes, State Police do watch you when

3    you are applying for them.  And the character thing,

4    that's the only thing I can imagine, because outside

5    of that, why would I be under observation?

6    Q.   Well, so you're saying you didn't say that?

7    A.   All I'm saying is I believe they took it out of

8    context, because observation is what State Police tell

9    you when you go to apply for them and you go through

10   their whole thing of applying for their, a job with

11   them.  They observe you.  And at any time they can be

12   watching you.

13             I mean you've got rumors going through the

14   system and they end up hearing them, that does attack

15   your character.  So that's the only thing I can think

16   of that would be --

17   Q.   Well if your husband was arrested for molesting

18   your daughter --

19             MR. POLIQUIN:  Objection.

20   Q.   -- and if the Child Protective Services were to

21   find out that you had enabled that, they could remove

22   custody from you as well, could they not?

23   A.   Um-hum.

24   Q.   That could have been what they were talking

Karen Brandewie

1   about?

2    A.   No.

3    Q.   When you indicate, "Inmates were also bringing

4   the rumor to her attention as well.  They had been

5   listening to officers' conversations.  Officer Atwell

6   indicated her estimation was that at least 10

7   individuals had questioned her concerning that rumor."

8   Ten people asked you about it?

9    A.   At least 10.  Well, and I mean there's been

10  more people than that since then.

11   Q.   It indicates, "On December 1st, 2003 Officer

12  James Henry was interviewed and gave the following

13  statements."  Now he says, "Back in 2000" --

14   A.   2, yeah.

15   Q.   And "Around December he had viewed a piece of

16  paper with her picture on it, which it had been laying

17  out in the guard post 7 on a desk and informed her

18  that she should be aware of it."  Do you recall that?

19   A.   I don't remember when it was, but I do remember

20  that he brought the whole thing of the other page, he

21  brought it to my attention.

22   Q.   But he says in 2002.

23   A.   It wasn't that early, I don't believe.

24   Q.   So you believe he's incorrect about that?

Karen Brandewie

1    A.    I believe he's got his dates wrong.  I have no

2    idea.

3    Q.    And then he says, then middle of the paragraph

4    says, "When he told officer Karen Atwell" --

5    A.    Where is that?  Okay, I got it.

6    Q.    -- "about the picture, Officer Atwell

7    commented, 'Well, did she at least look good?'"

8    A.    I don't remember that.

9    Q.    And then it goes on to say, "Several months

10   passed when in November Karen Atwell called him and

11   they had a conversation over the picture.  Karen said

12   the picture had been all over the place, SVOP,

13   Probation and Parole, Pretrial.  She intended to

14   report this and he might be called to IA for an

15   interview."

16   A.    Right.

17   Q.    So as I understand his statement, and you

18   correct me if you think I didn't correctly read his

19   statement as he suggested, he's suggesting sometime

20   back in December of 2002 he approached you with the

21   picture.  And it was later in November, right before

22   you complained to the warden, that you approached him

23   again and said he might be involved in an IA

24   investigation.

Karen Brandewie

1    A.   I don't know.  That could be.  I don't remember

2    dates.  I don't remember times.  I do remember the

3    things that happened.

4    Q.   Okay.  Well my question, though, is could it,

5    could you have first been aware of these comments back

6    in December of 2002?

7    A.   The comments I was aware of was that I was on

8    the Internet.

9    Q.   Right.

10   A.   And that was my picture.

11   Q.   You thought there were --

12   A.   I thought it was my picture on Del Tech's --

13   Q.   Why was your picture on Del Tech's magazine?

14   A.   Because they asked me to be on the front page

15   for law enforcement, to endorse their magazine.

16   Q.   Have you completed your degree at Del Tech?

17   A.   I have two classes to finish.

18   Q.   It's been a while since you've had two classes

19   to finish, correct?

20   A.   Yes, it has.

21   Q.   When do you intend to do that?

22   A.   As soon as everything is taken care of and I

23   don't have anything over my shoulders to think about

24   and I can concentrate on school.

Karen Brandewie

1    Q.   Okay.  So it's not a priority right now?

2              MR. POLIQUIN:  Objection.

3    Q.   It's not one of your priorities right now?

4    A.   It's one of my priorities, yes.

5    Q.   How long have you been two courses short?

6    A.   I have no idea, sir.

7    Q.   Four years?

8    A.   Yeah, probably.

9    Q.   In your application to become a correctional

10   officer, you indicated that you were, I think, two

11   credits short.  That was before, that was like 1999?

12   A.   2000.

13   Q.   Is that right?

14   A.   I think, 2000.

15   Q.   So that status has remained the same?

16   A.   Um-hum.

17   Q.   He also indicated in his interview, this is the

18   very last two sentences, "He also said he saw nothing

19   to indicate that it affected her job performance or

20   emotions.  He indicated" --

21   A.   Who?

22   Q.   You see that, the very bottom of that

23   paragraph?

24   A.   Okay.

Karen Brandewie

1    Q.    "He also said he saw nothing to indicate that

2    it affected her job performance or emotions.    He

3    indicated that he had not seen the picture since the

4    first time in December 2002.    Officer Henry had access

5    to the computer in MSB building."    In other words,

6    he's talking about --

7    A.    How can he observe a whole lot of me when I

8    didn't work much with him?    The main building they

9    kept me in was the Key Building.    He worked MSB.    I

10    was not around him a whole lot and I did not confide

11    in Mr. Henry in anything.

12    Q.    Why is that?

13    A.    Because I didn't know him well enough.

14    Q.    Now, Officer Henry also said, this is the next

15    paragraph, that it was relayed by the lieutenants that

16    this kind of action going into and taking this kind of

17    stuff off the computers is in violation of the

18    department policy concerning printing and viewing this

19    type of Web site.    You would agree, right?

20    A.    Yes.

21    Q.    It's against the --

22    A.    Um-hum.

23    Q.    What do they call that?    Computer use policy?

24    A.    Yeah.

Karen Brandewie

1    Q.   The next page, page 3 it says, "On December the

2    1st, 2003 Officer Alvin Hudson," do you know Officer

3    Hudson?

4    A.   Yes, I do.

5    Q.   Would you consider him a friend or not?

6    A.   I consider him the same, a co-worker.  They're

7    all friends, really.

8    Q.   All right.  You wouldn't consider him anything

9    special?

10   A.   No.

11   Q.   All right.  "Alvin Hudson was interviewed and

12   he gave the following statement.  Union representation

13   was waived.  He had a conversation with Officer Karen

14   Atwell in the Key Building about an inmate that had

15   come to him and said something about Officer Atwell

16   being on the Web site.  He had viewed the picture but

17   not in the Key Building or Max, some other building.

18   He thought it was in pretrial.  Somebody showed it to

19   him but he did not recall whom that person was.  He

20   ID'd the photo as being the one he saw.  Maybe it was

21   back in August of 2003.  Officer Atwell relieved him

22   in pretrial and said she appeared to be upset because

23   she had learned that the rumor was being circulated at

24   Probation and Parole."  He claims, "He had never seen

Karen Brandewie

1   a picture that was not on a computer.  Computer in

2   pretrial prints only the watch commander's office.  He

3   could not recall who brought it to his attention."

4   A.   Okay.

5   Q.   He indicates one of you relieved the other one

6   in pretrial.  Is that about right?

7   A.   Um-hum.

8   Q.   And did he approach you about this?

9   A.   Yes.  I wasn't sure which building I relieved

10  him, but when I relieved him in whatever building we

11  were at, he told me what had happened.

12  Q.   Okay.  And then it talks, the next paragraph,

13  December 2nd, Mike Shockley was interviewed.  And he

14  indicated essentially he only had gossip about it and

15  he passed it, he knew you.

16  A.   Right.  He worked with me at DCC.

17  Q.   Okay.  "He knew of Officer Karen Atwell telling

18  him that since she had made her complaint to the

19  warden the Web site picture" --

20  A.   Where are you at?

21  Q.   -- "had changed."  In the middle of the

22  paragraph.

23  A.   He had only heard -- he knew that -- okay, go

24  ahead.

Karen Brandewie

1    Q.   "He knew of Officer Karen Atwell telling him

2    that since she had made her complaint to the warden

3    the Web site picture had changed and now the rumor was

4    that she was told to remove it or she would be fired."

5    A.   Right, that's what I had been told.

6    Q.   Who told you that?

7    A.   Different people in passing had told me that.

8    Q.   What?

9    A.   That the picture had been changed.  That

10   somebody blotted out the information and blotted out

11   the face or something, and it was just what I was

12   told.

13   Q.   But then it says "that she was told to remove

14   it or she would be fired."

15   A.   That was part of the rumor, that I had been

16   told.

17   Q.   To remove it?

18   A.   To remove it or I would be fired.

19   Q.   Oh, I see.  Okay, now I understand.  So the

20   theory was --

21   A.   That I should remove my Web site, or whatever

22   it was you call it, or I would be fired.

23   Q.   Okay.  So the theory was somehow it was you,

24   because once you made a complaint to the warden, the

Karen Brandewie

1    nature of the photograph changed on the Web site

2    because you had been told you've got to --

3        A.    That's what the rumor was.

4        Q.    Okay.  "Mike Shockley also had knowledge of a

5    previous incident about being asked out by another

6    employee through e-mail."

7        A.    That would be referring to Lenny Whitman.

8        Q.    "This matter was handled in-house and Officer

9    Atwell was satisfied with the results."

10       A.    I never said I was satisfied with the results.

11   I was told it would be handled in-house, because

12   that's what Deputy Warden DeLoy said.

13       Q.    But you see where they're saying Mike Shockley

14   said that you were satisfied with the results?

15       A.    I never told him I was satisfied with the

16   results.  I told him that it would be handled

17   in-house.  I did not say anything else.  How could I

18   be satisfied -- why would I even say it if I'm not

19   satisfied?  I can't be satisfied unless I find

20   something out.

21       Q.    Did you ask?

22       A.    Ask who?

23       Q.    Anybody.

24       A.    Yeah.

Karen Brandewie

1    Q.   When?

2    A.   When I spoke to DeLoy after that.  And no, it

3  was not in writing.

4    Q.   And what did he say?

5    A.   They hadn't done anything at that point.  I

6  asked Whitman when he went past me and he said, "They

7  have not done anything."  I said, "They didn't even

8  speak to you?"  And he said, "No, they didn't even

9  speak to me."

10   Q.   When was that that you spoke to Whitman?

11   A.   It was after, it was after the e-mail.  I don't

12  know when.

13   Q.   But in any event, Whitman never propositioned

14  you again?

15   A.   No, he did not.

16   Q.   Never sent you any e-mails again, offensive,

17  any nature, correct?

18   A.   (Indicated negative response.)

19   Q.   And never even had any communication with you,

20  correct?

21   A.   Just in passing when he said they never did

22  anything.

23   Q.   Was that earlier on?

24   A.   Um-hum.

Karen Brandewie

1    Q.   Okay.  But you are satisfied with that result,

2  aren't you?

3             MR. POLIQUIN:  Objection.

4    Q.   Because you didn't want him to proposition you

5  again, you didn't want him to talk to you again,

6  correct?

7    A.   The end result came out.  But do I think it's

8  right that he gets away with it?  No.

9    Q.   I'm confused.  I thought you said you didn't

10  want him in any trouble.

11    A.   I didn't want him fired.  That's in trouble.

12    Q.   And you said, I thought you said that if he was

13  counseled or something that would have been okay with

14  you?

15    A.   A verbal counseling, which is also in writing,

16  so it's on his record.

17    Q.   And if that had happened, that would be okay

18  with you?

19    A.   Yeah, it would have been okay.

20             MR. POLIQUIN:  Objection.

21    A.   But I didn't know.  I mean to my knowledge,

22  nobody spoke to him at all.

23    Q.   Okay, then the next paragraph on page 3 is, "On

24  December 2nd, 2003 Officer Ronald Brzezicki was

Karen Brandewie

1    interviewed concerning this inter incident."  He

2    waived union representation.  "He was informed at SCI

3    approximately two months ago and contacted Karen

4    Atwell about rumors he had heard from the front lobby

5    at SCI.  Officer Donna Short had told him about the

6    rumors and the change in the Web site."

7        A.   Okay.

8        Q.   "The rumor at this time was that Officer Atwell

9    had changed the site only showing a portion of her

10   body and the use of a sex toy but no face was visible.

11   Officer Brzezicki indicated he was talking to his wife

12   Christina at P&P and she was talking about the

13   resignation of Officer Atwell's husband from the

14   Georgetown Police Department when he heard the rumors

15   about Officer Atwell on the Web site came into the

16   conversation."

17       A.   Okay.

18       Q.   "Officer Brzezicki indicated he was curious and

19   accessed the Web site at home.  He had gotten the Web

20   site from Officer Donna Short.  He had viewed a

21   photograph, which was identified as the second photo.

22   That Karen complained to him about the problems she

23   was having and he referred her to the warden's office.

24   He said he had not seen anything inside the

Karen Brandewie

1  institution with no knowledge of how it started.  His

2  first knowledge of the incident was approximately 60

3  days prior to the interview."

4           Do you recall approaching or him

5  approaching you in September or October?

6   A.   Whatever day it was that he, I relieved him, I

7  had relieved another officer, he had walked into the

8  Key Building and he called me on to the tier, and

9  that's when he told me that stuff.  I don't remember

10  the day, sir.

11   Q.   Okay.  Now the last paragraph before the

12  conclusion, it says, "Shortly after this," meaning

13  December 2nd, 2003, "I spoke to Officer Karen Atwell

14  over the phone and advised her of the progress and the

15  blocking of the site in an attempt to prevent access.

16  She informed me that she didn't think things were

17  progressing.  She was not happy with the

18  investigation.  She was also afraid the site had been

19  loaded on a disk and brought from home."

20           Is that accurately what you told them?

21   A.   Probably, yes.

22   Q.   Okay, and they did advise you of the progress

23  of the investigation?

24   A.   There was no progress at that time.

Karen Brandewie

1    Q.   Well, they indicated they have interviewed all

2    these people, correct?

3    A.   I don't recall if they told me that at that

4    time.  I don't.  But I guess they did.  As far as an

5    outcome, I was never told anything, no.

6    Q.   All right.

7         MR. NIEDZIELSKI:  I'm going to mark this

8    as Brandewie 2, the whole set of documents.

9         (Brandewie Exhibit No. 2 was marked for

10   identification.)

11        MR. NIEDZIELSKI:  Let's take a break for a

12   short while, okay?  Unless you want a longer break.

13        (Discussion held off the record.)

14        (A brief recess was taken.)

15   BY MR. NIEDZIELSKI:

16   Q.   Have you been looking for other employment?

17   A.   Yes, I have.

18   Q.   When did you start that?

19   A.   I don't know when I started, but I remember one

20   of my applications went in back in March.

21   Q.   Of 2000 what?

22   A.   Just --

23   Q.   2006?

24   A.   This past year.

Karen Brandewie

1    Q.    2006, March 2006 you started looking?

2    A.    I know I was looking before that, but never put

3    any applications in.  I was looking for things that I

4    may be qualified for, that I can remember anyway.

5    Q.    Have you been successful?

6    A.    No, I have not.  I had qualified for them.

7    Q.    Which ones, which positions?

8    A.    With Children and Families -- or Children,

9    Youth and Family Services, and it's for --

10   Q.    It's really complicated, but here's the way it

11   really is:  it's Department of Services For Youth,

12   Children and Their Families.

13   A.    Okay, well that's exactly where it's at.

14   Q.    But test 1 is you have to figure out how to say

15   it.

16   A.    Ha-ha.

17   Q.    Up on Faulkland Road?

18   A.    In Dover.

19   Q.    Oh, what's the name of that, Stevenson House?

20   A.    All I did was I got online and I put them in.

21   Q.    Stevenson House?

22   A.    I didn't put it in Stevenson's House, I put it

23   on the Internet and they got it.  And Karen Smith is

24   the one that has it.

Karen Brandewie

1     Q.   You understand that a youth rehabilitative

2     counselor is the same as a correctional officer except

3     it's for juveniles?

4     A.   I do understand what it is, yes, I do.

5     Q.   Okay.  And what's the pay grade on them?

6     A.   24,000, I believe is what they start out at.

7     Q.   Isn't that less than you get paid?

8     A.   Yes, it is.  But unless I have a bachelor's

9     degree, I'm not going to find a job that pays what I'm

10    paid right now, so I'll end up taking a pay cut.

11    Q.   And that's okay with you?

12    A.   It has to be.


13    Q.   Well, two years in September you've been at

14    Morris Correctional Center, correct?

15    A.   Um-hum.

16    Q.   And other than the couple of incidents that you

17    related to us, has it been okay, a positive

18    experience?

19          MR. POLIQUIN:  Objection.

20    A.   Some.  I still have to -- I still know in the

21    back of my mind that people know what has been put out

22    there about me.  And it makes, it makes it difficult

23    to go to work.  I don't expect you to understand that,

24    but that's the way it is.

Karen Brandewie

1    Q.   Well, I mean have you discussed this with your

2    counselor about dealing with what people think that

3    you know is not true?

4              MR. POLIQUIN:  Objection.

5    Q.   I mean have you discussed the techniques of

6    dealing with that?

7    A.   Um-hum.

8    Q.   And what has she instructed or told you?

9              THE WITNESS:  Do I have to confide what I

10   talked to my counselor about?

11   Q.   Actually, you do.

12   A.   I do?

13   Q.   Yeah.

14   A.   Oh, okay.

15   Q.   Especially when you bring a lawsuit you're

16   seeking for emotional distress and the like.

17   A.   Okay.  Basically to view it as rumors as such

18   and not concentrate on that, focus on other things.

19   Q.   I mean you can't control what rumors people say

20   about you, correct?

21   A.   Correct.

22             MR. POLIQUIN:  Objection.

23   Q.   And that doesn't matter where you're working,

24   correct?

Karen Brandewie

1    A.    Correct.

2    Q.    For instance, when you worked at Shockley, were

3    there rumors about you then?

4    A.    At Stockley?

5    Q.    Yeah, Stockley.

6              MR. POLIQUIN:  Objection.

7    A.    I don't remember.  Oh, yes, there was rumor

8    there.

9    Q.    What was it?

10    A.    That the State Police had me sent there so that

11    I could catch people abusing clients, because I caught

12    two women abusing a client and they turned me in.

13    Q.    And they didn't like you for that?

14    A.    Yeah.

15    Q.    Did the Delaware State Police put you there?

16    A.    No.

17    Q.    So you knew that was just plain foolish,

18    correct?

19    A.    Yeah.

20    Q.    Well --

21    A.    But we're not dealing with -- when you're

22    dealing with rumors going through to inmates who are

23    rapists and murderers, you're dealing with something

24    totally different than dealing with somebody ordinary

                    Karen Brandewie

1    that you're working with.  You're around people who

2    are in there for major crime and they're serving life.

3    Who cares if, if you get one more?

4               Look at the incidence of the counselor.

5    He was a lifer.  He didn't care.  What did he have to

6    lose?  That's the mentality of a lot of them.

7    Q.   I think you're speaking of the Cassie Arnold

8    case?

9    A.   Um-hum.

10   Q.   She was a counselor, she was not a correctional

11   officer.

12   A.   I know she was.  But the same thing can happen

13   to a correctional officer as happens to counselors.

14   Just because you wear a uniform doesn't exempt you.

15   Q.   Well how would a correctional officer, a female

16   correctional officer be in a private office with an

17   offender?

18   A.   I'm not talking about being in a private

19   office.

20              MR. POLIQUIN:  Objection.

21   A.   You're down a tier by yourself among 60 to 80

22   men.  You don't have to be in a little tiny room to be

23   raped.

24   Q.   But here's what I'm confused about, Miss

Karen Brandewie

1   Brandewie.  Perhaps you can help me.  When you were in

2   your academy training course, did they explain these

3   things to you?

4       A.   Explain what?

5       Q.   Some of these offenders are very dangerous?

6       A.   Yeah.

7       Q.   And you knew when you were in the training

8   academy before you ever became a correctional officer

9   that you were going to be probably working in a male

10  facility, correct?

11      A.   Um-hum.

12      Q.   And they told you it could be dangerous for

13  anyone, correct?

14      A.   Yeah.

15      Q.   Do you know what the proportion of correctional

16  officers who have been attacked by inmates, are the

17  majority of them male or female?

18      A.   I have no idea.

19      Q.   Well, if you knew that going in, then why did

20  you choose the job?

21      A.   Why did I choose the job?  A step in law

22  enforcement.  DOC was my stepping stone.  You learn

23  the inside and move to the outside, which a lot of

24  states are going to that same thing, that same

Karen Brandewie

1  mind-set, learn what happens on the inside before you

2  do the outside.  And you know the whole criminal

3  field.

4     Q.   My point was before you ever started working as

5  a correctional officer, you knew the hazards of the

6  job.

7     A.   Before I started working as a correctional

8  officer, before I went in the academy?

9     Q.   No, while you were in the academy, they clearly

10  told you what the hazards were, correct?

11     A.   Okay.

12     Q.   I mean you were under no delusions that it was

13  going to be --

14     A.   No.  But it makes it even more dangerous when

15  people put you out there to be a slut, and the inmates

16  are looking at you as a slut while you go down that

17  tier as opposed to somebody they respect.

18     Q.   Well, a lot of inmates don't have a good image

19  of women anyway, do they?  It doesn't matter whether

20  she's saintly or sinner, it doesn't matter.

21     A.   That's what I just got through telling you.

22  But it makes it even worse when they put a stigma on

23  you that you're a slut.  You might not understand

24  that, beings, one, that you're not a woman; two, that

Karen Brandewie

1    you've never been there.  But I'm telling you exactly

2    what it does.  It makes a difference.

3      Q.   It's no different than a male officer being

4    perceived as being weak --

5               MR. POLIQUIN:  Objection.

6      Q.   -- is it?

7      A.   I believe it is.

8      Q.   So you really don't like working with men

9    inmates?

10     A.   I never said anything about not liking working

11   with anyone.

12     Q.   I mean would you feel more comfortable working

13   in a female institution?

14     A.   I have no idea.  I've never worked in a female

15   institution.  I have worked with females in this

16   institution until we got rid of them.  But I can't

17   tell you that because I've never been there.

18     Q.   Well, the reason I'm asking you that, Miss

19   Brandewie, is now at least three or four times when

20   I've asked you questions you responded with the fact

21   that there are male inmates who could be rapists, and

22   you're speaking of male inmates.  And my question to

23   you is, you wouldn't have that situation in a female

24   institution, would you?

Karen Brandewie

1          MR. POLIQUIN:  Objection.

2    A.   Probably not.

3    Q.   So --

4    A.   I have no idea.  Because everything originated

5    from officers, not inmates.  So I never originally had

6    problems with inmates, it was the officers I was

7    having problems with.

8    Q.   Well, it's some officers you were having

9    problems with.

10   A.   Right.

11   Q.   Because I think you indicated most of them were

12   supportive.

13          MR. POLIQUIN:  Objection.

14   A.   Most of them were supportive?  Did I indicate

15   that?

16   Q.   Well, I think you did.

17   A.   How did I indicate that?

18   Q.   Well, you indicated that, we went through the

19   internal investigation report, and most of the ones

20   that told you about these circumstances were doing it

21   not to harass you, but to inform you.

22   A.   There were a couple who did, yes.

23   Q.   And they were being supportive, correct?

24   A.   Um-hum.  A couple.  That's not most.

Karen Brandewie

1   Q.   Well, since you --

2   A.   I mean most, most are not like that.  Most

3   people are not like that there.  Most of them want to

4   harass.  There are a select few who are nice enough to

5   come forward and inform you.

6   Q.   How is that you know that?

7   A.   Because I was there.

8   Q.   How many correctional officers work at SCI?

9   A.   I have no idea.

10  Q.   How many did you say spoke to you about the

11  rumors?

12  A.   I, I don't know.  Several spoke to me about the

13  rumors.

14  Q.   Do you think the majority of them probably

15  don't care or don't believe the rumor?

16          MR. POLIQUIN:   Objection.

17  A.   I have no idea.  I don't know what they think

18  or feel.

19  Q.   All right, have you ever seen this document

20  before?

21  A.   Um-hum.

22          MR. NIEDZIELSKI:  Could you mark that as

23  Exhibit No. 3, please.

24          (Brandewie Exhibit No. 3 was marked for

Karen Brandewie

1   identification.)

2     Q.   What is this document?

3     A.   What do you mean, what is it?

4     Q.   Describe it.  As you understand it, what is it?

5     A.   It says that I could have a position at a

6   correctional facility as a noncorrectional officer.

7   But I would still have to go inside the correctional

8   facility, and I do not want to go back into a

9   correctional facility.

10    Q.   Is that what it says?

11    A.   Yeah, it says right there, Department of

12  Correction, "at any Department of Correction facility.

13  A noncorrectional officer position."  That's what it

14  says.

15    Q.   I'm going to read this to you.  "I have been

16  authorized to offer your client, Karen Brandewie, a

17  position at her present pay grade (PG 7) at any

18  Department of Correction facility in which there is an

19  opening.  She is free to choose a noncorrectional

20  officer position, but those positions may not be

21  eligible for hazardous duty pay, may be 37.5 hours per

22  work week as opposed to her present 40 hours and may

23  not be eligible for Selective Market Variation."

24    A.   Um-hum.

Karen Brandewie

1    Q.   "This offer is unconditional and does not

2    require she compromise or otherwise settle the pending

3    lawsuit."

4    A.   Okay.  So what's your point?


5    Q.   It was an offer for any position?

6    A.   No.  You're misunderstanding it.  It's a

7    position for any noncorrectional position inside a

8    correctional institution.  That's how I read it.  I

9    don't want to be inside a correctional institution, a

10   facility.

11   Q.   "At any Department of Correction facility."

12   A.   I don't want to be in a correctional facility.

13   Q.   Wait, it doesn't say that.  It says "Department

14   of Correction facility."

15            MR. POLIQUIN:  Objection.

16            THE WITNESS:  Am I missing something?

17            MR. POLIQUIN:  Objection, I think it's

18   been -- she's given her answer to the question.  If

19   you want to ask more questions about the document,

20   that's fine.  But she's given her answer.

21   Q.   Have you seen this letter?

22   A.   Yes, I have.

23   Q.   And that's a letter from your attorney?

24   A.   Right.

Karen Brandewie

1    Q.   And what's he asking?

2    A.   He's asking for one in the Department of

3    Correction facility and that's not what I wanted.

4    Q.   Let me read this.

5    A.   I do not and have not wanted to work at the

6    Department of Correction facilities for a long time.

7    I do want another job in the State.  And maybe I

8    misunderstood him or he misunderstood me, because I

9    don't want to work in a facility.

10   Q.   You don't want to work in a correctional

11   facility?

12   A.   A State job, yes.  No correctional facility.

13   Q.   But you would work in a Department of

14   Correction facility that's not a prison?

15   A.   I never knew there was one open.  I'm thinking

16   facility as a prison.

17   Q.   Okay.

18         MR. NIEDZIELSKI:  Would you mark this as

19   Exhibit No. 4.

20         THE WITNESS:  A facility to me is a

21   prison.

22         (Brandewie Exhibit No. 4 was marked for

23   identification.)

24   Q.   Do you see this document?

Karen Brandewie

1    A.   Yes, I do.

2              MR. POLIQUIN:  I don't think I have a copy

3    of that.

4              THE WITNESS:  You don't?

5              MR. POLIQUIN:  Not to my knowledge.

6              MR. NIEDZIELSKI:  Yes, you do.

7              THE WITNESS:  I don't --

8              MR. NIEDZIELSKI:  I e-mailed it to you.

9              MR. POLIQUIN:  Okay.

10   A.   I don't remember this, but...  So there is

11   things that I can do inside these institutions, is

12   what you're saying.

13   Q.   There are things you can do for the Department

14   of Corrections that do not involve a facility, a

15   correctional facility.

16             MR. POLIQUIN:  I'm going to object to this

17   line of questioning.  If there is a discussion about

18   this, it doesn't seem to be a question that we're

19   having questions that are being asked.

20             MR. NIEDZIELSKI:  The question was she did

21   not understand --

22             MR. POLIQUIN:  Okay, if that's the

23   question, fine.

24   Q.   Is that a fair statement?  You understood it a

Karen Brandewie

1   certain way?

2     A.   Yeah.

3     Q.   Okay.  For instance, when you worked here in

4   this building that we're in presently --

5     A.   I never considered this a correctional

6   facility.

7     Q.   It's a Department of Correction facility.  It's

8   not a correctional facility?

9     A.   Okay, when I hear "facility," I'm thinking

10  prisons.

11            MR. POLIQUIN:  She's answered the

12  question.

13            MR. NIEDZIELSKI:  Okay.

14            MR. POLIQUIN:  That's it.

15            MR. NIEDZIELSKI:  All right.

16            THE WITNESS:  Regardless of how you see

17  it, I'm telling you how I see it.

18            (Brandewie Exhibit No. 5 was marked for

19  identification.)

20            MR. NIEDZIELSKI:  That's all the questions

21  I have.

22            MR. POLIQUIN:  Okay.

23  BY MR. POLIQUIN:

24    Q.   I just have a few questions.  You were asked

Karen Brandewie

1   about accepting the duties of being a correctional

2   officer and the dangers that go along with those

3   duties.  And I believe your answer was that did you

4   accept the responsibility and the dangers that go

5   along with being a correctional officer when you

6   applied for the position and went through the

7   training?

8   A.   Yes.

9   Q.   And the rumors, your complaint has nothing to

10  do with the truth or falsity of the rumors; is that

11  correct?

12  A.   Right.

13  Q.   And --

14  A.   They're --

15  Q.   Excuse me, go ahead.

16  A.   I was just going to say, they place me at a

17  higher risk when I walk through those inmates due to

18  those types of rumors.

19  Q.   And why are you at a higher risk based on the

20  defendant's, Department of Corrections actions?

21          MR. NIEDZIELSKI:  Objection.  Objection,

22  to you classifying us as Department of Corrections

23  objections.

24  Q.   Okay.  Why are you at risk, why do you think

Karen Brandewie

1  you're at risk?

2    A.    Because the inmates no longer see me in that

3  uniform.  They are seeing me as a slut or a porn queen

4  on a Web site.  And in the their mind, as they're

5  already rapists and murderers and sex offenders of

6  whatever type, they see me as loose.

7    Q.    And how did the inmates receive this

8  information?

9    A.    According to them, through the officers.

10    Q.    Based on your experience, how did the inmates

11  perceive these rumors?

12    A.    What do you mean, perceive them?

13    Q.    You stated that --

14    A.    They put me in danger.

15    Q.    -- they received this information from male

16  correction officers; is that correct?

17    A.    Yes.

18    Q.    And a male correctional officer, are the ones

19  involved here, have authority, is that correct?

20    A.    Right.  So they -- when they're told by an

21  officer, it's like God's word.  So they believe.

22    Q.    And these were rumors involving you being part

23  of some type of site soliciting black men for sex?

24    A.    Yes.

Karen Brandewie

1    Q.   And the site indicated that it was a white

2    female wanting black men for, seeking black men for

3    sex?

4    A.   Yes.

5    Q.   And the inmates that were speaking to you about

6    these rumors, were they black men?

7    A.   Some black, some white.  Most of them were

8    black.

9              MR. POLIQUIN:  I have no further

10   questions.

11   BY MR. NIEDZIELSKI:

12   Q.   These inmates that have spoken to you, how many

13   of them have spoken to you about this?

14   A.   I told you before, I couldn't tell you how many

15   now.

16   Q.   More than 10?

17   A.   Yes.

18   Q.   More than 10 inmates?

19   A.   Yes.

20   Q.   And it's been while you've been at Morris

21   Correctional or before that?

22   A.   More than 10 the whole time.  I can't tell you

23   how many did at Morris, probably five.

24   Q.   And would they come up to you and tell you what

Karen Brandewie

1  they heard?

2     A.   Um-hum.

3     Q.   Did they rape you or try to attack you?

4     A.   No, but that doesn't mean they couldn't have.

5     Q.   Well, why were they approaching you, as you

6  understand it?

7     A.   To let me know what they heard, and they asked

8  me if it's true.

9     Q.   So they were concerned about you?

10     A.   No.  Curious.

11     Q.   But they didn't attack you?

12     A.   No.

13     Q.   Did they threaten you?

14     A.   No.

15     Q.   Which --

16     A.   Why would they?  They come out to me right out

17  in the open area where all the officers could see.

18  Are they going to do something in the open?

19     Q.   What correctional officers told them these

20  things?

21     A.   They didn't give names; down at SCI.

22     Q.   Do you know what correctional officers told

23  them that?

24     A.   No, I do not.

Karen Brandewie

1    Q.   Do you know how much information they knew?

2    A.   They knew about the Web site.

3    Q.   When is the last time you had an inmate

4    approach you?

5    A.   I have no idea.  I have to look back at the

6    papers.

7    Q.   Which papers?

8    A.   The e-mails that I wrote Warden Bianco.

9    Q.   And they would detail the last time you were

10   approached?

11   A.   Um-hum.

12   Q.   Have you been approached this year?

13   A.   Yes, some of them were this year, I believe.  I

14   don't know, I'd have to go back and look in the

15   documents.

16   Q.   And just so we're clear, you're not suggesting

17   that you were discriminated against because you're a

18   female?

19            MR. POLIQUIN:  Objection.

20   A.   Well, I guess so if sexual harassment means

21   that.

22   Q.   Well, does sexual harassment have anything to

23   do with what your gender is?

24            MR. POLIQUIN:  Objection.

Karen Brandewie

1    A.    Probably does on both sides.  How do I know?

2    Q.    Well, my point is your complaints are that

3  there were sexual rumors or innuendo about you.

4    A.    Okay.

5    Q.    Correct?  For instance, you're not saying

6  there's a job that you put in for you didn't get?

7    A.    No, I'm not saying there is a job that I put in

8  for that I didn't get because I'm a female.

9    Q.    All right.  And you're not suggesting that some

10  official said to you, "If you don't have sex with me,

11  I won't hire you"?

12    A.    No.  I never said that.

13    Q.    So your complaint is very narrow, and that is

14  that rumors were said about you that were untrue.

15              MR. POLIQUIN:  Objection.

16    A.    It's not necessarily a rumor, it's what the

17  rumors have done.

18    Q.    Rumors of a sexual nature were promulgated

19  about you that are not correct, that are not true?

20              MR. POLIQUIN:  Objection.  She's asked and

21  answered that.

22    Q.    That's your complaint, is it not?

23    A.    Yeah.

24    Q.    And the rumors are about non-job-related items.

Karen Brandewie

1    A.    Um-hum.

2    Q.    Correct?  In other words, it's not a rumor

3    about --

4              MR. POLIQUIN:  Objection.

5    Q.    -- something you were doing while you were

6    working for the Department of Corrections or SCI,

7    correct?

8    A.    Obviously it would be.  How do you figure it

9    wouldn't be if they're saying I'm doing this on the

10   side?

11   Q.    But that's my point.  It's a rumor about

12   something you're doing on the side which is not true.

13   A.    Okay.

14   Q.    But it's not a rumor about anything you're

15   actually doing at work.

16   A.    No.

17              MR. NIEDZIELSKI:  That's all the questions

18   I have.

19              MR. POLIQUIN:  Okay, good enough.  I have

20   no further questions.

21              (The deposition concluded at 12:58 p.m.)

22

23

24

Karen Brandewie

1                    I N D E X

2   Deponent:  KAREN BRANDEWIE                        Page

3   By Mr. Niedzielski................................  2

4   By Mr. Poliquin................................. 134

5   By Mr. Niedzielski.............................. 137

6                  E X H I B I T S

7   Brandewie:                                        Page

8   1     2/5/03 E-mail                               67

9   2     11/6/03 Memo; D00001-29                    119

10  3     9/27/05 Letter from DOJ                    129

11  4     11//7/05 Letter from Ronald Poliquin       132

12  5     11/28/05 Memo from Human Resources to      134

13        Marc Niedzielski

14                  - - - - -

15

16

17

18

19

20

21

22

23

24

Karen Brandewie

1

2

3

4

5

6            Replace this page

7        with the Errata Sheet

8          after it has been

9        completed and signed

10          by the Deponent

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    CERTIFICATE

 2    STATE OF DELAWARE)
                      )
 3    NEW CASTLE COUNTY)

 4              CERTIFICATE OF REPORTER

 5         I, Julie H. Parrack, Registered Professional
      Reporter and Notary Public, do hereby certify that
 6    there came before me on the 25th day of August, 2006,
      the deponent herein, KAREN BRANDEWIE, who was duly
 7    sworn by me and thereafter examined by counsel for the
      respective parties; that the questions asked of said
 8    deponent and the answers given were taken down by me
      in Stenotype notes and thereafter transcribed by use
 9    of computer-aided transcription and computer printer
      under my direction.
10
           I further certify that the foregoing is a true
11    and correct transcript of the testimony given at said
      examination of said witness.
12
           I further certify that I am not counsel,
13    attorney, or relative of either party, or otherwise
      interested in the event of this suit.
14

15                      _____
                        Julie H. Parrack, RMR, CRR
16                      Certification No. 102-RPR
                        (Expires January 31, 2008)
17

18
      DATED:_____
19

20

21

22

23

24
```