IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAREN BRANDEWIE,                          :
                                          :
    Plaintiff,                            :
                                          :
v.                                        :       C.A. No.:  05-625 (MPT)
                                          :
STATE OF DELAWARE                         :
DEPARTMENT OF CORRECTION,                 :
                                          :
    Defendant.                            :


**PLAINTIFF'S OPENING BRIEF IN OPPOSITION
OF SUMMARY JUDGMENT**


**YOUNG, MALMBERG & HOWARD, P.A.**

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
30 The Green
Dover, DE  19901
Supreme Court I.D. 4447
302-672-5600
*Attorney for Plaintiff*

DATED: October 6, 2006

# TABLE OF CONTENTS

PAGE

Table of Citations...................................................................................................ii

Nature and Stage of Proceedings.........................................................................2

Summary of Argument..........................................................................................3

Statement of Facts................................................................................................4

Argument...............................................................................................................8

   I.  THE PLAINTIFF PROPERLY EXHAUSTED THE REQUIRED ADMINISTRATIVE
      REMEDIES.....................................................................................................8

   II.  THE DEFENDANT'S ACTIONS VIOLATED TITLE VII...............................13

   III. THE OFFER OF LESSER PAYING POSITION SEVERAL YEARS AFTER THE
      COMPLAINT IS NOT PROMPT NOR REMEDIAL AND DAMAGES SHOULD BE
      DETERMINED AT TRIAL.............................................................................16

Conclusion............................................................................................................21

# TABLE OF CITATIONS

Cases:                                                                          Page No.

Bennett v. Corroon & Black Corp., 845 F.2d 104, 106 (5th Cir.1988)
mot. denied, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1988)......................13, 14

Davis v. Monsanto Chem. Co., 858 F.2d 345, 350 (6th Cir.1988),
cert denied, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989)...................14, 15

Jensen v. Potter, 435 F.3d 444 (1997)................................................................13

Jew v. University of Iowa, 749 F.Supp. 946 (S.D.Iowa 1990)...........................18

National Railroad Passenger Corp. v. Morgan, 112 S.Ct. at 2068 (2002)...............8-9

Rush v. Scott Specialty Gases, Inc., 113 F.3d 479 (1997)................................8

Spain v. Gallegos, 26 F3d 439, 447 (3rd Cir 1994).....................................18

Statutes:

Title VII of The Civil Rights Act of 1964, § 701 et seq................................passim

42 U.S.C.A. § 2000e et seq...........................................................passim

Other citations:

Plaintiff's Complaint 10-06-2006.

Race and Incarceration in Delaware: A Preliminary Consideration by Thomas Eichler
*Delaware Center for Justice and Metropolitan Urban League* (June 2004)

Delaware's Deadly Prisons. Critics say there is little oversight. Is this solution national
accreditation. *News Journal.* 09-28-2005

Executive Order Sixty Creating A Task Force on Security Issues At the Delaware Correctional
Center. Governor Ruth Ann Minner (July 12, 2004).

## NATURE AND STAGE OF PROCEEDINGS

On August 23, 2005 Karen Brandewie filed a complaint pursuant to Title VII against the Delaware Department of Correction in this Court. The Delaware Department of Correction filed a motion for summary judgment. This is Plaintiff's answering brief.

2

## SUMMARY OF ARGUMENT

I)      THE PLAINTIFF PROPERLY EXHAUSTED THE REQUIRED ADMINISTRATIVE REMEDIES

II)     THE DEFENDANT'S ACTIONS VIOLATED TITLE VII AND THE DEFENDANT DID NOT TAKE ADEQUATE REMEDIAL MEASURES

III)    THE OFFER OF A LESSER PAYING POSITION SEVERAL YEARS AFTER THE COMPLAINT IS NOT PROMPT NOR REMEDIAL AND DAMAGES SHOULD BE DETERMINED AT TRIAL

## STATEMENT OF FACTS

Karen Brandewie ("Plaintiff"), a 41 year-old white female, began her employment with the State of Delaware Department of Correction ("DOC") on November 30, 2000. Plaintiff grew up in a law enforcement family and viewed her time as a correction officer as a "stepping stone" to eventually becoming a police officer. Plaintiff's father was a police officer and becoming a police officer was her dream (*Plaintiff's deposition*).

After the initial training, Plaintiff began employment at Delaware Correctional Center in Smyrna, Delaware. She worked at DCC until being transferred to Sussex Correctional Institute ("SCI") located in Georgetown, Delaware on November 27, 2002 (*Plaintiff's record of training* attached as Exhibit A).

The DOC's code of conduct states the following:

"The Department of Correction has as its mission the protection of the public through the confinement, supervision and rehabilitation of offenders. To that end, all employees are responsible for the security and safety of the public, their fellow employees and the offender. This code sets out high moral and ethical standards for correctional employees to assure unfailing honesty, respect for dignity and individuality of human beings and a commitment to professional and compassionate service."

The Sussex Correctional Institution (SCI) is located in Georgetown, Delaware. Opened in 1931, SCI is one of Delaware's oldest correctional facilities. SCI houses maximum, medium, and minimum-security inmates. SCI houses an all-male population. http://www.state.de.us/correct/BOP/PrisonSCI.shtml.

4

Recently, the DOC has been under intense public scrutiny for security issues stemming from prison understaffing and other mismanagement. On July 12, 2004 the Governor launched a Task Force on Security Issues at DCC and on March 8, 2006 Federal civil rights regulators launched a probe and investigation of the DOC. *(7/12/04 Executive Order)*.

The State and the DOC have a sexual harassment policy and Acceptable Use Policy concerning computers. (*Policies* attached as Exhibits J and K). Although correctional officer have no need to use the internet in order to perform their job (*Kearney* Deposition).

During her employment with DOC, the Plaintiff has enjoyed positive reviews from her supervisors. She took pride in her work and was highly committed to serving as a law enforcement officer *(Plaintiff's deposition and Performance Evaluations* listed as Exhibits A thru D, and Letter from Kearney -Exhibit I).

Beginning in January 2003 until February 5, 2003, another correctional officer Lenny Whitman propositioned the plaintiff numerous times for sex (*Plaintiff's deposition*). Specifically, he asked if she would have sex with him in the watchtower at the institution. Officer Whitman informed the Plaintiff that "everyone does it" and no one would find out.  When the Plaintiff refused, Officer Whitman than asked Plaintiff why. The Plaintiff rejected Officer Whitman's sexual advances informing him that she was a married woman. After Plaintiff's rejection of Officer Whitman's sexual advances, he sent an email claiming "she would not have anything to do with him because she liked black men." ("2-05-03 *Whitman Emails attached as* Exhibit G and H).

After the email, Plaintiff approached deputy warden Mike Deloy. Deloy responded, "well

5

you got to understand Karen, its not everyday that we have officers that look like you that come here." *(Plaintiff's deposition).* Subsequently, Whitman informed Plaintiff that Deloy never spoke with him and plaintiff never heard from Deloy about any actions taken. Shortly thereafter, plaintiff was approached by male correction officers that they had seen a picture of her on a website. *(Website print-out).* Plaintiff initially believed that they were referring to a cover of Delaware Technical Institute's catalogue which she was feature in.

However, she learned they were referring to a pornographic picture on the internet where plaintiff was soliciting black men for sex. *(1/25/03 Memorandum on Complaint and Investigation to Lupinetti from Rogers attached as Exhibit M and P, also website printout attached as Exhibit A-1).* The plaintiff is not on the website and has never been a participant in pornographic activity. Between June 2003 and November 2003, the Plaintiff spoke with numerous superiors about the happenings. *(Plaintiff's complaint and hearing) (1/25/03 Memorandum on Complaint and Investigation to Lupinetti from Rogers attached as Exhibit Z).*

Specifically, she informed Captain Flaherty. She also spoke with Captain Brittingham, Captain Truitt, Staff Lieutenant Johnson, Lieutenant Fisher, Lieutenant Beckett, Lieutenant Atallian, Sergeant Rick Van Heckle, and Sergeant Jeff Rogers about the website. *(Plaintiff's deposition and Exhibit Z).* The picture was downloaded from a SCI computer and displayed in the multi-security building with a new picture surfacing after her formal complaint to the Warden *(Exhibit Z).*

The multi-security building was a high traffic area where officers constantly passed through.

The officers advised the Plaintiff not to let the rumors affect her and that it "would die down soon." (*Hudson Deposition*).

She was also informed that this was a common occurrence for female officers and happens to female officers when they first arrive (*Plaintiff's deposition*). A female correctional officer approached the Plaintiff and advised her that if she just admitted the picture was her then the harassment would end.

After receiving no response from her direct supervisors, Plaintiff reported the incident to Deputy Warden Mike Deloy who informed her that the matter should be addressed "in-house". The Plaintiff then informed Warden Richard Kearny contacted internal affairs (*Exhibit Z*).

Subsequent to her conversation with Warden Kearney she regularly updated him on the individuals who she spoke with concerning the rumors (*Plaintiff's Deposition and Exhibit Z, and email attached as Exhibit B-2*). These included her superiors and fellow officers. During this time, plaintiff was also processing several applications to the Delaware State Police and City of Wilmington Police Department (*Exhibit Z*) Inmates began confronting the plaintiff about the picture after hearing the information from the other guards (*Exhibit Z*).

Subsequently, Plaintiff had a nervous breakdown in the Key Building around July 2003. After her breakdown and upon a medical recommendation, plaintiff was transferred to EDC. On September 2004, plaintiff was told she could not stay at EDC and was transferred to Morris Correction Center ("MCC") (*Return to Work Transfer* attached as Exhibit U).

While at MCC, Plaintiff encountered many of the same issues at SCI. Inmates that had been previously housed at SCI told other inmates that plaintiff was featured on a pornographic

7

website soliciting black men for sex. Plaintiff complained several times about the incidents to her supervisors including the Warden Bianco (*Emails to Bianco* attached as Exhibit S). The DOC took no action in response to her complaints.

Just recently, Plaintiff has resigned her position from the DOC and found new employment.

## ARGUMENT I

### I)    THE PLAINTIFF PROPERLY EXHAUSTED THE REQUIRED ADMINISTRATIVE REMEDIES

**A.    Standard of Review:**

With respect to summary judgment in employment discrimination cases, the court's role is to determine whether, upon reviewing all the facts and inferences to be drawn there from in a light most favorable to plaintiff, whether there exists sufficient evidence to create a genuine issue of material fact as to whether an employer intentionally discriminated against the plaintiff. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**B.    The Delaware Department of Correction actions represent a continuing violation**

The United States Supreme Court established the "continuing violation theory" that allows a plaintiff to pursue a Title VII claim for discriminatory conduct that began prior to the filing period if she can demonstrate that at least one act is part of ongoing practice or pattern of discrimination of defendant. <u>Rush v. Scott Specialty Gases, Inc</u>. 113 F.3d 479 (1997). To demonstrate a continuing violation:

a) The employee must show that at least one discriminatory act occurred within 300-day period

b) The employee must show a continuing pattern of violation and;

c) The Harassment is more than an occurrence of isolated or sporadic acts of intentional discrimination. <u>Id</u>.

The very nature of "hostile work environment" claims involve "repeated conduct" and therefore an unlawful employment practice involving such claims "cannot be said to occur on any particular date," rather they occur "over a series of days or perhaps years," and "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." <u>National</u>

Railroad Passenger Corp. v. Morgan. 112 S.Ct. at 2068 (2002).

The "continuing violation doctrine" is to be broadly interpreted. In order for a charge to be timely, the employee need only file a charge within 300 days of *any act* that is part of the hostile work environment. Id.

Defendants' conduct constitutes a continuing violation. Here, the majority of the discriminatory acts committed by the DOC occurred within the 300-day filing period (between 3/12/03 and 1/06/04). The defendant's own investigation concluded that the pornographic picture purported to be plaintiff displayed within the prison was printed on July 20, 2003. Therefore, the picture passed around at the prison was printed well within the 300-day limitation.

Defendant's other findings confirmed the following acts:

1.     The website was accessible and viewed by Correction Officers at SCI until December 2, 2003.

2.     SCI officers were viewing the website in August 2003.

3.     Officer Hudson was shown the pornographic picture purported by them to be Plaintiff by her fellow officers at SCI in August 2003.

4.     Officer Brzezicki was informed of the picture and website by other SCI employees around October 2003.

5.     A pornographic picture was displayed openly in a high traffic area.

After her complaint to Warden Kearney in November 2003, Officer Brandewie continually reported that the hostile work environment still existed. As of January 2003, the

9

Plaintiff told internal affairs and the Warden that the harassment was attacking her character and undermining her authority with the inmates. Even after her filing in this Court, Plaintiff reported that inmates and officers confronted her about the pornographic picture and website.

There is no dispute that the harassment against the plaintiff occurred. These are not simply contested statements by the plaintiff; they are the finalized conclusions of the DOC investigation.

Defendant attempts to isolate the February 5, 2003 email from Officer Whitman ("Whitman email"). The Whitman email should be considered as part of the totality of the circumstances. Defendant simplistically states that the February 5, 2003 email "underlies" plaintiff's complaint.

However, the acts subsequent to the email caused the plaintiff to eventually file a formal complaint to the Warden and then later to the EEOC. After the email, another pornographic picture represented as Plaintiff and the rumors around it were circulated at SCI by Plaintiff's supervisors and co-workers.

The interest in the picture stemmed from the fact that SCI officers proffered that it was the Plaintiff and that she was soliciting sex from black men on the internet. Plaintiff, a white female, was a correction officer in an institution were over 64.2% of the inmates were African American. Her co-workers depicted her as soliciting sex with black men and posing in a pornographic picture. This message permeated the institution and reached other offices within the DOC such as probation and parole. More dangerously, inmates learned of the information

10

through correction officers and began to confront Plaintiff about the information.

Initially, Plaintiff attempted to let the rumors die down. However, the hostile work environment was such that her authority with the inmates and reputation as an officer were being ruined. The Whitman email is one part of the continuing harassment of Plaintiff and substantially related as it confirms the modus operandi for the subsequent acts of the other officers.

Whitman propositioned the Plaintiff for sex in the watchtower. Responding to Plaintiff's rebuke, he disclosed a glimpse of the upcoming onslaught about to come. Specifically, Officer Whitman writes, "…the reason you wouldn't do anything with me or anyone else around here was because you liked black guys…".

The evidence rebuts Defendant's mischaracterization of the Plaintiff's complaint. Brandewie's therapist confirms that the harassment occurred within the 300-day period. As late as June 22, 2005, the Plaintiff was being subjected to claims that she was having an affair with an inmate. On March 29, 2005, Plaintiff complained about the hostile work environment as a correction officer. The therapist's notes confirm the ongoing hostile work environment.

A brief synopsis demonstrates such:

1-13-04: Reports about men at work who ridicule her.

3-24-04: Reports about harassment from fellow officers.

3-24-05: Reports about guards telling inmates about pornographic picture.

3-22-05: Report Inmate confronts her about pornographic picture.

Plaintiff's deposition clarifies the ongoing harassment.

Q: What happened in March of 2003?

11

A. That's when I was approached by people.

Q: Well the email, you discussed being approached by Lenny Whitman and his email, which apparently at that date that he sent you the email – that stopped and that was —

A: That was in February.

Q: Right.

A: His emails stopped. He (Whitman) didn't write me any more emails or talk to me about sex from that point on, From that point on it just went to other officers talking about the only reason I wouldn't hang out with them and talk with them was because I only liked black men."

     Further:

Q: Okay. So they're talking about things that started in March, not thing in February.

A. Probably not.

Perhaps, Plaintiff's deposition states the hostile work environment, which was created:

Q: Now, while you were in the academy, they (DOC) clearly told you what the hazards were, correct?

A. Okay.

Q. I mean you were under no delusions that it was going to be —

A. No. But it makes it even more dangerous when people put you out to be a slut, and the inmates are looking at you as a slut while you go down that tier as opposed to somebody they respect.

     The plaintiff has clearly identified more than one act occurring within the 300-day period. By the very nature of her working in a hostile work environment, Plaintiff's claim cannot be viewed by dissecting one act outside the 300-day period.

12

**II)    THE DEFENDANT'S ACTIONS VIOLATED TITLE VII**

The defendant minimizes plaintiff's supervisors and colleagues' acts as idle gossip. In determining whether harassment was severe or pervasive enough to support hostile work environment claim, the court must determine whether the employee suffered harassment was severe or pervasive enough to alter the conditions of her employment and create an abusive working environment. Title VII Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq. Factors to be weighed in determining whether harassment was severe or pervasive enough to a support hostile work environment claim include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Jensen v. Potter. 435 F.3d 444 (1997).

Under Title VII, if supervisors create the hostile environment, the employer is strictly liable. In order to establish employer negligence in a coworker harassment case, the plaintiff must show that management knew or should have known about the harassment, but failed to take prompt and adequate remedial action. Id.

This Court has decided previously that the posting of pornographic pictures in common areas and in workspaces serve as evidence of a hostile environment. Bennett v. Corroon & Black Corp., 845 F.2d 104, 106 (5th Cir.1988) mot. denied, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1988). Also, obscene language and pornography that could be regarded as "highly offensive to a woman who seeks to deal with her fellow employees and clients with professional

13

dignity and without the barrier of sexual differentiation and abuse." <u>Bennett</u>, 845 F.2d at 106. Although men may find these actions harmless and innocent, it is highly possible that women may feel otherwise. *Id.*

The law requires that an employer take prompt action to prevent bigots from expressing their opinion in a way that abuses or offends their co-workers. By informing people that the expression of racist or sexist attitudes in public is unacceptable, people may eventually learn that such views are undesirable in private, as well. Thus, Title VII may advance the goal of eliminating bias and prejudice in society. <u>Davis v. Monsanto Chem. Co.</u>, 858 F.2d 345, 350 (6th Cir.1988), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989).

In <u>Davis</u>, the Court remanded the case and ordered the lower court to look at all of the incidents to see if they produced a work environment hostile and offensive to women of reasonable sensibilities.

Given the share number of individuals who participated in the acts, the DOC knew as should have known about the hostile work environment. Similar to <u>Andrews</u>, the pornographic picture portrayed as if Plaintiff were played in common areas. Officers and supervisors shared the picture and information to the extent that even inmates were aware of the website and picture. Deputy Warden knew about the information. In addition, Plaintiff discussed the information with supervisors. Here, Deputy Warden Mike Deloy was aware of the sexual harassment as of 2003 and the plaintiff had discussed the information with Lieutenant Fisher, Captain Flaherty, and her union representative John Ryan prior to reporting it to the Warden.

14

These notices to her supervisors occurred prior to complaining to the Warden. In Andrews, the Court stated that a law

enforcement captain acquiesced where there was evidence that he was aware of the problems concerning the sexual harassment.

As concluded in the EEOC's report:

"Given the prevalent atmosphere, Respondent's existing policy against sexual harassment is inadequate. Given the sheer number of individuals who knew about the sexually inappropriate behaviors, Respondent should have known that the sexually hostile work environment existed and taken corrective measures even prior to Charging party having to file an internal complaint."

Similar to Davis, the hostile work environment was created by the acts of her supervisors and co-workers. Here the hostile work environment took place for a period of November 2003 until Plaintiff's recent departure from the DOC. Therefore, plaintiff was regularly subjected to this conduct for a period of almost three (3) years. The conduct involved both supervisors and coworkers:

The pornographic picture portrayed as plaintiff displayed in common areas is evidence of acquiescence and awareness. Officers and supervisors shared the picture and information to the extent inmates were aware of the website and picture. In Andrews, the Court reasoned that a law enforcement captain acquiesced where there was evidence that he was aware of the problems concerning the sexual harassment.

15

**III)    THE OFFER OF LESSER PAYING POSITION SEVERAL YEARS AFTER THE COMPLAINT IS NOT PROMPT NOR REMEDIAL AND DAMAGES SHOULD BE DETERMINED AT TRIAL**

A material fact question regarding adequacy of remedial efforts to prevent sexual harassment precludes summary judgment on a Title VII respondent superior hostile work environment claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Remedial efforts to prevent sergeant's sexual harassment of dispatcher precluded summary judgment on dispatcher's Title VII respondent superior hostile work environment claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

The DOC did not take prompt remedial action to respond to plaintiff's concerns. Employers are liable for employee's behavior under negligence theory of agency if employee proves that management-level employees had actual or constructive knowledge about existence of sexually hostile work environment and failed to take prompt and adequate remedial action.

A harassment claim procedure must be reasonably calculated to correct or prevent harassing behavior. The DOC's existing sexual harassment procedure was inadequate. Genuine issues of material fact, as to whether failure to take down the website until December 2, 2003 was an adequate response to the alleged sexual harassment and whether the DOC's sexual harassment claim procedure was reasonably calculated to correct or prevent harassing behavior. ("[A]n effective grievance procedure-one that is known to the victim and that timely stops the harassment-shields the employer from Title VII liability for a hostile work environment.").

16

In this case, it is clear that the department's harassment policy and procedure was inadequate. Plaintiff had complained to Deputy Warden Deloy on February 5, 2003 about Officer Whitman's offer to have sex in the watchtower. Defendant produces no evidence of any actions taken against Whitman or any formal investigation. The only response was Whitman being formally counseled by a superior. Subsequent emails from Whitman state that the "rumor mill" had been generating sexual commentary with racial overtones from "white shirts"[1]. In addition, numerous captains and lieutenants discussed the hostile work environment with plaintiff prior to her November 2, 2003 email to Warden Kearney. Even after the email to Kearney, Plaintiff consistently reported that no actions were being taken and that the situation wasn't improved until the point she reached a physical breakdown and was transferred to another facility.

Defendant's offer on September 27, 2005 was after the harassment had been taking place since February 5, 2003. Plaintiff was transferred only after having a nervous breakdown due to the ongoing hostile work environment. In addition, prior to September's offer, Plaintiff complained of the sexual harassment at MCC. Considering the length of time this harassment has occurred and its nature – defendant's response was neither adequate nor timely. In addition, defendant is still liable since their knowledge of the hostile work environment was as early as February 5, 2003, yet nothing was done until mid – January 2004.

17

---

1. Correction Officer Supervisors and Administration were white shirts as opposed to the blue shirts of correction officers.

**B.    Plaintiff's Supervisors and Co–Workers Created a Hostile Work Environment**

Defendant asserts that plaintiff's complaint "seems" to be centered around nothing more than rumors. However, as stated above and found in DOC's investigation- the case involves overt sexual harassment by both her co-workers and supervisors.

Defendant's brief misapplies Spain v. Gallegos, 26 F3d 439, 447 (3rd Cir 1994) to plaintiff's situation. In Spain, the Court reversed the lower court deciding the requirements of Title VII allowed Spain to proceed with her sexual discrimination and harassment claims. *Spain has presented evidence that she was subjected to a sexually hostile work environment in the form of rumors among her colleagues that she was involved in a sexual relationship with her superior.* Similarly, in Jew v. University of Iowa, 749 F.Supp. 946 (S.D.Iowa 1990) a sexually hostile work environment was found where there were rumors that a female professor and her male superior were having an affair, and other faculty members in the position of evaluating her for promotion purposes spread the rumors and conducted a campaign of open slander and innuendo of a sexual nature against her.

Here, the acts of the defendant were not just rumors. For example, a pornographic picture that was purported to be plaintiff was in plain view around a high traffic area of SCI. Courts have previously determined the posting of pornographic pictures in common areas and in the plaintiffs' personal work spaces serve as evidence of a hostile environment. The fact that the picture was not plaintiff makes no difference. A hostile environment involves "unwanted, personally offensive sexual attention".

18

Supervisors and co-workers shared the picture. The picture was being passed around for the specific reason that it was the plaintiff. The picture and the discussion were both sexually and racially motivated. One fellow co-worker stated she wouldn't have sex with him because she only liked black guys. This activity is especially egregious considering that the employees were in charge of the general safety of an all male population and each other. Female officers are at particular risk as stated by Officer Hudson:

A.  I would -- there could be.

Q.  Why could there be?

A.  Because they're females and -- I mean, if you're in a male institution and you're a female, then there definitely could be -- because, I mean, you're a female. You're locked in with a bunch of guys that have been deprived of certain things for a long time.  And those guys could...

Q.  Are you referring to just the sexual aspect of it?

A.  That's the way I take it. I mean, you take a female officer and put her on a housing unit with 64 inmates and that female is locked into that housing unit with 64 inmates, I mean, I wouldn't feel comfortable with my wife being locked on a tier with 64 inmates.  But that's just me.

Defendant's action and lack of response damaged Plaintiff's reputation and credibility as a Correction Officer. The actions of the DOC had real consequences on Plaintiff. Officer Alvin Hudson talked about respect and credibility being important to an officer:

Q.  Is respect an important quality for a correction officer?

A.  Yes, respect is a good quality for an officer.

Q.  And why is respect an important quality?

19

A. If you don't respect an individual, an individual is not going to respect you.

Q. What about credibility? Is credibility an important quality in a correction officer?

A. Credibility, I'd say, is an important quality.

Q. And why is that an important quality?

A. If you tell somebody that you're going to do something, they expect you to do it. I mean, you don't want to tell somebody you're going to do something for them and then don't do it. Then you have no credibility. And then they won't respect you because you have no credibility. It kind of goes hand-in-hand.

Q. And when you're talking about respect and credibility, it seems like you're referring to the inmates; is that correct?

A. Staff, inmates, people you deal with on a daily basis.

Further Officer Ronald Brzezicki was asked by Defendant's counsel if the rumors could have damaged Plaintiff's reputation even if they were not true:

Q. Could it have damaged her reputation even it wasn't true just based on the nature of the rumor?

A. I would say so, just by the nature of the rumor.

Even Defendant's own conclusions to its investigation give more credence to the situation. On February 1, 2004, internal affairs concluded that rumors were circulated by her fellow officers that she was pictured in a pornographic web site and that the site was accessed by a computer at SCI, and the picture was printed and passed around SCI. The present attempt to minimize the situation as simply "rumors' is not supported by the evidence.

20

## CONCLUSION

Defendant's opening brief attempts to minimize the acts of the Department of Correction as untrue "rumors" and isolating the Whitman email. The law requires that the incidents be seen under the totality of the circumstances in a light most favorable to the Plaintiff. Here, the Defendant's lack of action put her safety at risk and destroyed her credibility which eventually led to her physical breakdown. For all of the foregoing reasons, it is respectfully submitted that the Court should deny summary judgment.

Respectfully submitted,


**YOUNG, MALMBERG & HOWARD, P.A.**


/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
30 The Green
Dover, DE 19901
Supreme Court I.D. 4447
302-672-5600
*Attorney for Plaintiff*

21