IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


KAREN BRANDEWIE,                    )
                                    )
            Plaintiff,              )
                                    )  Civil Action
v.                                  )  No. 05-625 (GMS)
                                    )
STATE OF DELAWARE                   )
DEPARTMENT OF CORRECTION,           )
                                    )
            Defendant.              )


            Deposition of RICHARD KEARNEY taken
pursuant to notice at the offices of the Department of
Correction, 245 McKee Road, Dover, Delaware, beginning at
12:10 p.m. on August 24, 2006, before Vincent J. Bailey,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        RONALD G. POLIQUIN, ESQ.
        YOUNG, MALMBERG & HOWARD, P.A.
          30 The Green
          Dover, Delaware  19901
          For the Plaintiff

        MARC P. NIEDZIELSKI, ESQ.
        DEPUTY ATTORNEY GENERAL
          820 N. French Street, 6th Floor
          Wilmington, Delaware  19801
          For the Defendant


                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

            www.wilfet.com

Richard Kearney                    2

```
 1                    RICHARD KEARNEY,

 2          the deponent herein, having first been

 3          duly sworn on oath, was examined and

 4          testified as follows:

 5                       EXAMINATION

 6   BY MR. POLIQUIN:

 7      Q.   Good afternoon, Warden Kearney.  You understand

 8   my name is Ron Poliquin, I represent the plaintiff in

 9   this case, Karen Brandewie?

10      A.   Yes.

11      Q.   Okay.  Mr. Kearney, what is your position with

12   the department of -- the State of Delaware, Department of

13   Correction?

14      A.   I'm the warden of the Sussex Correctional

15   Institution.

16      Q.   How long have you been warden?

17      A.   Since January of 1994.

18      Q.   Prior to that, what was your employment?

19      A.   I was the deputy warden at SCI.

20      Q.   When you say "SCI," you mean Sussex Correctional

21   Institute?

22      A.   That's correct.

23      Q.   So just from now, this point on, if you say SCI

24   we will assume that's what you are referring to.  Is that
```

Richard Kearney                    3

1  okay?

2      A.   That's fine.

3      Q.   Okay.  How long were you the deputy warden?

4      A.   Two weeks.

5      Q.   Prior to that what was your position?

6      A.   I was a captain.

7      Q.   When you say captain, what exactly -- can you

8  describe the position?

9      A.   Shift commander.

10     Q.   What is a shift commander?

11     A.   I was responsible for the daily operation of the

12 facility on a shift, on a particular shift.

13     Q.   Where was this at?

14     A.   Sussex Correctional Institution.

15     Q.   How long were you the shift commander there?

16     A.   About three years.

17     Q.   Prior to that, where did you work?

18     A.   At the Sussex Correctional Institution.

19     Q.   In what position?

20     A.   I was a staff lieutenant.

21     Q.   What is a staff lieutenant?

22     A.   Staff lieutenant is assistant shift supervisor

23 and administrative duties are assigned to the staff

24 lieutenants.

Richard Kearney                    4

1    Q.    How long were you a staff lieutenant?

2    A.    I believe two years.

3    Q.    Prior to that what was your employment?

4    A.    I was a lieutenant at SCI.

5    Q.    What was your responsibilities and duties as a

6    lieutenant?

7    A.    I was a first line supervisor in charge of a

8    housing unit.

9    Q.    When you say first line supervisor, what exactly

10   does that mean?

11   A.    It means I -- when I was a lieutenant we didn't

12   have corporals and sergeant ranks within the Department

13   of Corrections.  They just had correctional officers.  So

14   I was the first supervisor.  I had correctional officers

15   as subordinate staff to me.

16   Q.    How long were you a first line supervisor?

17   A.    Five years.

18   Q.    Prior to that what was your employ?

19   A.    I was a correctional officer.

20   Q.    Was that also at the Sussex Correctional

21   Institute?

22   A.    That's correct.

23   Q.    Can you please describe your responsibilities and

24   duties as a correctional officer?

Richard Kearney                    5

1      A.    I was charged with maintaining a safe and secure

2  environment for the inmate population.

3      Q.    How long were you a correctional officer?

4      A.    Five years.

5      Q.    What is your formal education?

6      A.    I have 30 college credits and a high school

7  diploma.

8      Q.    Now, where do you attend college or do you still

9  currently attend school?

10     A.    No, I do not.

11     Q.    Where did you attend school?

12     A.    Harford Community College in Belair, Maryland.

13     Q.    Are those general college credits?

14     A.    Yes.

15     Q.    What was the reason that you did not complete

16 your degree there?

17     A.    I sought full-time employment.

18     Q.    Is this what was your full-time employment after

19 that, being a correctional officer at SCI?

20     A.    Eventually.

21     Q.    If you can remember, what was the first year that

22 you were employed at SCI?

23     A.    1979.

24     Q.    Now, during your employment as a correctional

Richard Kearney                    6


1  officer, did you receive training in sexual or racial

2  harassment?

3      A.   I don't recall.

4      Q.   As you stated, you were employed as a

5  correctional officer for about five years until you

6  eventually became a first line supervisor?

7      A.   That's correct.

8      Q.   Now, did you receive any training in sexual or

9  racial harassment as a first line supervisor?

10     A.   I don't recall.

11     Q.   Do you remember, either in your position as a

12 correctional officer or a lieutenant, if SCI had a policy

13 concerning sexual or racial harassment or discrimination?

14     A.   I don't know.

15     Q.   Now, you were promoted eventually to become a

16 staff lieutenant?

17     A.   That's correct.

18     Q.   At that point in time did you receive any

19 training concerning racial or sexual harassment or

20 discrimination?

21     A.   I don't recall.

22     Q.   Do you recall the policy of SCI at that point in

23 time concerning racial or sexual harassment or

24 discrimination?

Richard Kearney                    7

1      A.   No.

2      Q.   Eventually you were promoted to be a captain or a

3   shift commander?

4      A.   Correct.

5      Q.   You were essentially running the shift and the

6   daily operations for that facility at that time?

7      A.   That's correct.

8      Q.   Did you receive any training or education

9   concerning racial or sexual harassment or education at

10  that point in time?

11     A.   I don't recall.

12     Q.   Do you know what year you were promoted to become

13  shift commander or captain?

14     A.   I believe it was 1990.

15     Q.   Do you recall the Department of Correction policy

16  concerning sexual or racial harassment or discrimination

17  at that point in time?

18     A.   No, I do not.

19     Q.   Then you were eventually promoted to deputy

20  warden?

21     A.   That's correct.

22     Q.   That was in the same year, 1990?

23     A.   No.

24     Q.   Excuse me.  What year were you promoted to deputy

Richard Kearney                    8

1  warden?

2      A.   1993.

3      Q.   At that point in time did you receive any

4  training --

5      A.   No.

6      Q.   In your position as deputy warden, did you often

7  handle complaints concerning sexual or racial harassment

8  or discrimination?

9      A.   No.

10      Q.   Prior to becoming warden, did you ever handle any

11  kind of complaints concerning racial or sexual

12  discrimination or harassment?

13      A.   I don't recall.

14      Q.   As deputy warden, how many, approximately how

15  many correctional officers were you in charge of at that

16  point in time?

17      A.   I don't recall the exact number.

18      Q.   Can you give a general number?

19      A.   No.

20      Q.   Can you explain your -- if you could go through a

21  typical day as a deputy warden, if there is a typical day

22  as a deputy warden, what your -- how you would proceed,

23  starting when you got there, start your shift, to the end

24  of the shift?

Richard Kearney                    9

1      A.   I was on vacation the whole time I was deputy

2  warden.

3      Q.   Okay.  Fair enough.

4           You eventually became warden in 1994?

5      A.   Yes.

6      Q.   What training or education did you receive

7  concerning sexual harassment and discrimination, racial

8  harassment and discrimination at that point in time?

9      A.   I believe I received part of that type of

10 training at a New Wardens Training Conference in

11 Longmont, Colorado, that was sponsored by the National

12 Institute of Corrections.

13     Q.   Do you remember, can you exactly describe the

14 type of training you received there?

15     A.   No, I cannot.

16     Q.   Do you know if it was just for a whole day?  Was

17 it for an hour?

18     A.   I don't recall the length of the session.  It was

19 an informational session.  I do recall that.

20     Q.   At the time you became warden, can you describe

21 the procedure by the Department of Correction to report a

22 complaint of sexual harassment, racial harassment or

23 discrimination?

24     A.   Could you repeat the question, please?

Richard Kearney                    10

1      Q.   Yeah.  Let me try to put it a little simpler.  If

2   someone would, was there a procedure or policy in place

3   for someone on how to complain of sexual harassment or

4   racial harassment, discrimination at the time you became

5   warden?

6      A.   Yes.

7      Q.   Can you describe that procedure?

8      A.   If an employee felt that they had been harassed

9   or discriminated against, they could file a report with

10   their supervisor initially.  That would be the first step

11   the employee would take.

12      Q.   If it was a correctional officer, who would their

13   supervisor be?

14      A.   It would be a lieutenant.

15      Q.   Was there an alternative reporting system or

16   procedure for them if they weren't comfortable to report

17   it to the lieutenant?

18      A.   Yes.

19      Q.   What was that?

20      A.   They could report it to any supervisor.

21      Q.   Was this policy written in some way?

22      A.   I don't recall.

23      Q.   When you are stating the procedure, you are just

24   talking about your firsthand experience when you became

Richard Kearney                    11

1  warden?

2      A.   I believe there was a written procedure, but I

3  don't know for sure.  Procedures come and go and change.

4      Q.   I'm trying to not refer to a specific time and

5  date, so I'll always try to specify.  I'm talking about

6  when you became, when you became, initially became warden

7  of SCI, who hired you as warden?

8      A.   The then commissioner was Robert Watson.

9      Q.   Other than the one seminar that you had attended

10  for new wardens, was there any other training that you

11  received concerning sexual or racial harassment or

12  discrimination and employees?

13      A.   Yes.

14      Q.   What was that?

15      A.   I don't recall the specifics.

16      Q.   Did you read the policy concerning racial or

17  sexual harassment and discrimination at the time you

18  became warden?

19      A.   I don't recall.

20      Q.   Did you read -- is there an employee manual for

21  the Department of Correction at the time you became

22  warden?

23      A.   I don't understand the question.

24      Q.   Was there a manual for correctional officers or

Richard Kearney                    12

1  employee manual of some kind at the time you became

2  warden in '94?

3      A.   There was a code of conduct manual, post orders

4  and procedure manuals.  There's institutional policy

5  manuals.

6      Q.   Let's go through that, step by step.  You said

7  there's a code of conduct manual?

8      A.   That's correct.

9      Q.   What does that consist of?

10     A.   It consists of regulations and policies and

11 expectations that the department has concerning their

12 employees.

13     Q.   You said regulations and policies?

14     A.   Yes.

15     Q.   You also mentioned a policy manual or procedure

16 manual?

17     A.   Yes.

18     Q.   How would that differ from the code of conduct?

19     A.   The code of conduct is applied to all employees

20 throughout the Department of Corrections.  The

21 institutional policy manuals are applied to the employees

22 of the facilities, each individual facility.

23     Q.   So Sussex would get their own, have their own

24 particular institutional policy manual?

Richard Kearney                13

1     A.   That's correct.

2     Q.   The code of conduct would essentially be for

3   anyone that was employed by the State of Delaware in the

4   Department of Correction?

5     A.   That's correct.

6     Q.   Now, did either of these manuals have references

7   or information concerning sexual harassment or racial

8   harassment and racial discrimination or sexual

9   discrimination?

10    A.   I believe they do.

11    Q.   Do you know what -- presently do you know what

12  they are?

13    A.   No, I don't.

14    Q.   Now, as of November 30, 2000, do you recall what

15  the policy and procedure concerning reporting -- excuse

16  me.  Let me rephrase it to make it sound like English.

17            What was the policy and procedure to report

18  sexual or racial harassment or discrimination for

19  correctional officers?

20    A.   It was to report to their immediate supervisor if

21  they had a complaint.

22    Q.   If they were -- you stated previously that if

23  they weren't comfortable doing that, they would report it

24  to any supervisor?

Richard Kearney                    14

1      A.    That's correct.

2      Q.    What would that supervisor do with that complaint

3  or how would they handle that complaint?

4      A.    They would initiate an investigation into the

5  complaint.

6      Q.    What would that investigation encompass?

7      A.    I believe it would depend on the type of

8  complaint.

9      Q.    If it was a complaint of sexual harassment what

10  would it encompass?

11      A.    An interview of the complainant and subsequent

12  notification to my office with notification to our Human

13  Resources department.

14      Q.    Who would interview the complaining party?

15      A.    It would depend.

16      Q.    So when you described the investigation, are you

17  describing it based on experience or based on uniform

18  policy?

19      A.    On experience.

20      Q.    Now, after a supervisor received a complaint, you

21  said they would notify your office, notify Human

22  Resources?

23      A.    They would notify my office and Human Resources

24  would be notified.  I'm not sure who would do that

Richard Kearney                    15

1  notification.

2      Q.   When they notified -- if a complaint came to your

3  office, how would you proceed with that complaint?

4      A.   I would begin an investigation into that

5  complaint.

6      Q.   Who would be involved in that investigation?

7      A.   It depends on the type of complaint.

8      Q.   How would you decide how to investigate the

9  complaint?

10     A.   I would confer with Human Resources' agents and

11  proceed with whatever direction I received.

12     Q.   So you would first have -- you said "confer."

13  Would you have a -- would you sit down and talk with them

14  or pick up the phone and talk with them?

15     A.   Pick up the phone.

16     Q.   Who would you talk to in Human Resources?

17     A.   I would expect it would be Alan Machtinger, Janet

18  Durkee, John Smart, or Janice Jordan.

19     Q.   Who is Alan Machtinger?

20     A.   He is the director of Human Resources.

21     Q.   Is he the head of that department?

22     A.   That is correct.

23     Q.   When you called one of these individuals, would

24  it be based on availability or would it be based on the

Richard Kearney                16

1  type of complaint that was involved?

2      A.   Availability.

3      Q.   Can you talk about the other individuals?  You

4  said Janice --

5      A.   Janet Durkee is a human resource specialist III.

6  It is the next step under the director.

7      Q.   Who was the other individual?

8      A.   John Smart, who is I believe a human resource

9  specialist II, which is directly under Janet.

10     Q.   There was a Janice Jordan?

11     A.   Janice Jordan is diversity coordinator for the

12  department.

13     Q.   Do you know the difference between, what those

14  numbers signify between a III and a II?

15     A.   It's a career ladder.

16     Q.   Are all of those individuals qualified to handle

17  complaints concerning sexual or racial harassment and

18  discrimination?

19     A.   They are all knowledgeable.

20     Q.   Why would you say that they were all

21  knowledgeable?

22     A.   Past experience.

23     Q.   In your entire employment with the Department of

24  Correction how many complaints of sexual or racial

Richard Kearney                    17

1  harassment or discrimination have you received?

2      A.   I don't know.

3      Q.   Is it more than one?

4      A.   Yes.

5      Q.   Prior to Ms. Brandewie's complaint, what was the

6  most recent complaint prior to that?

7      A.   I don't recall.

8      Q.   Would you remember something like that or --

9      A.   I don't recall if there was one before hers.

10     Q.   Now, do you remember -- when you say you don't

11 recall whether there was one before hers, are you

12 referring to your time as a warden?  Or your time at the

13 Department of Corrections?

14     A.   As a warden.

15     Q.   At the time of Ms. Brandewie's complaint, how

16 long had you been a warden at Sussex?

17     A.   Could you refresh my memory as to the date of her

18 complaint?

19     Q.   Yes.  We will use the date November 2003.

20     A.   I had been a warden for, I don't know, nine

21 years.

22     Q.   It's your best recollection that this was the

23 first complaint of sexual harassment and racial

24 harassment or discrimination in those entire nine years?

Richard Kearney                18

1    A.   No.

2    Q.   In those nine years do you recall how many

3  complaints there have been?

4    A.   No.

5    Q.   But you know there's been, in those nine years

6  there has been at least some complaints?

7    A.   Yes.

8    Q.   Did any of those complaints lead to litigation or

9  lead to a lawsuit?

10    A.   Yes.

11    Q.   Do you recall which ones led to litigation?

12    A.   I can recall one.

13    Q.   What was that one?

14    A.   Lieutenant Alfred Beckett.

15    Q.   When was that?

16    A.   I don't recall.

17    Q.   Do you remember if it was in the beginning of

18  your term as warden or closer to the present time?

19    A.   It was closer to the beginning than to the

20  present time.

21    Q.   Do you know what the outcome of that litigation

22  was?

23    A.   There was a finding against the Department of

24  Corrections.

Richard Kearney                    19

```
 1      Q.    Finding by who?

 2      A.    U.S. District Court.

 3      Q.    Was there damages awarded to Mr. Beckett?

 4      A.    Yes.

 5      Q.    Do you recall the amount of those damages?

 6      A.    No.

 7      Q.    Do you recall if there was any other relief that

 8   came from that litigation, other than money?

 9      A.    Yes.

10      Q.    What was that?

11      A.    He was promoted.

12      Q.    Is Mr. Beckett still employed by the Department

13   of Corrections?

14      A.    Yes.

15      Q.    What is his position?

16      A.    He's a lieutenant.

17      Q.    Do you have any idea what year that occurred?

18      A.    No.

19      Q.    What was the basis of Mr. Beckett's, Lieutenant

20   Beckett's complaint?

21      A.    His basis was that he was not selected for

22   promotion due to his race.

23      Q.    Was that a jury trial?

24      A.    Yes.
```

Richard Kearney                    20

1       Q.    Did you testify at that trial?

2       A.    I don't recall.

3       Q.    Did you give a deposition in that litigation?

4       A.    I don't recall.

5       Q.    In the past have you given depositions or

6   testified in depositions?

7       A.    Yes.

8       Q.    How many depositions have you testified in?

9       A.    I don't know.

10      Q.    Is it more than five?

11      A.    I don't believe so.

12      Q.    Do you know what the nature of those depositions

13  were for?

14      A.    Yes.

15      Q.    What were they for?

16      A.    One was an inmate lawsuit.  One was an employee

17  lawsuit.  Those are the only two I remember off the top

18  of my head.

19      Q.    What was the inmate lawsuit about?

20      A.    Medical care.

21      Q.    What was the result of that lawsuit?

22      A.    A settlement was reached.

23      Q.    Was it a confidential settlement?

24      A.    Yes.

Richard Kearney                    21

1    Q.    What was the nature of the employee lawsuit?

2    A.    Wrongful termination.

3    Q.    What was the -- why was the employee alleging

4    that they were terminated wrongfully?

5    A.    They said it was a constitutional issue.

6    Q.    What was the constitutional issue?

7    A.    Freedom to associate outside of the workplace.

8    Q.    Do you know what the employee's name was?

9    A.    Patricia Toomey.

10   Q.    Did you testify in that lawsuit?

11   A.    Yes.

12   Q.    Did you testify at trial?

13   A.    Yes.

14   Q.    Was Ms. Toomey successful in that lawsuit?

15   A.    Yes.

16   Q.    Was she awarded monetary damages?

17   A.    Yes.

18   Q.    Do you recall the amount of those damages?

19   A.    No.

20   Q.    Was there any other remedies awarded to

21   Ms. Toomey?

22   A.    Yes.

23   Q.    What were they?

24   A.    I don't know the particulars.

Richard Kearney                    22

1      Q.    Is Ms. Toomey still employed by the Department of

2    Correction?

3      A.    No.

4      Q.    What was her position prior to the litigation?

5      A.    She was a corporal.

6      Q.    Since you have become warden, has the policy

7    concerning sexual harassment or racial harassment and

8    discrimination changed at all?

9      A.    I don't recall.

10     Q.    Would that be something that you would be aware

11   of?

12     A.    Yes.

13     Q.    Now I'm going to show you what I've already

14   showed to your attorney.  This is a copy of

15   Ms. Brandewie's complaint.  Do you recognize that?

16     A.    Yes.

17     Q.    Have you read that complaint thoroughly?

18     A.    Yes.

19     Q.    Is there anything in that complaint that you

20   disagree with factually?

21     A.    Yes.

22     Q.    What is that?

23     A.    I would disagree with number 9.

24     Q.    What is number 9?  If we can just go --

Richard Kearney                    23

1      A.    It says, "since her employment with the DOC the

2    plaintiff has been diligent, loyal, and able employee

3    receiving positive reviews from her supervisors."

4      Q.    You are stating that's incorrect?

5      A.    I'm stating that -- no.  I would state that is

6    correct.

7      Q.    So you don't disagree with number 9?

8      A.    I don't disagree with that.

9      Q.    Okay.

10     A.    I'm not sure I can answer each one of these.  I

11   disagree with number 10.

12     Q.    Why do you disagree with number 10?

13     A.    It is not true.

14              I disagree with number 11.

15     Q.    Let's go back to number 10.  Why do you disagree

16   with number 10 specifically, other than it is not true?

17   What do you base that on?

18     A.    I don't believe that the DOC engaged in racially

19   and sexual offensive statements.

20     Q.    What is your definition of racially and sexually

21   offensive statements, to your --

22              MR. NIEDZIELSKI:  I'm going to object.

23   These questions are all legally argumentative.  But you

24   can go ahead and answer.

Richard Kearney                    24

1     A.    I would say that a racially and sexually

2  offensive statement would be a statement that offended

3  someone, either racially or sexually.

4     Q.    Do you know the definition pursuant to the policy

5  of the Department of Correction of what a racially or

6  sexually offensive statement is?

7     A.    No.  Not off the top of my head.

8     Q.    Do you know what the definition of a racially or

9  sexually offensive behavior is under the Department of

10  Correction policy?

11     A.    I would say it is any behavior that is offensive

12  to an individual, either based on their race or their

13  sexual orientation or gender.

14     Q.    Based on the facts that you have firsthand

15  knowledge of concerning Ms. Brandewie's complaint, do you

16  believe there was racially and sexually offensive

17  behavior conducted by the -- by employees of the

18  Department of Correction?

19     A.    There are allegations of sexually offensive

20  behavior by employees.

21     Q.    There were allegations and you conducted an

22  investigation.  Is that correct?

23     A.    That is correct.

24     Q.    Based on your findings in that investigation, do

Richard Kearney                    25

1   you believe there was racially and sexually offensive

2   behavior conducted by the employees of the Department of

3   Correction against Ms. Brandewie?

4       A.   I don't know that to be true.

5       Q.   Okay.  When you say -- that is based on the

6   findings of your investigation?

7       A.   Would you like to show me the findings?  I don't

8   recall what's in the findings.

9       Q.   Well, you do recall Ms. Brandewie's complaint,

10  correct?

11      A.   Yes.

12      Q.   And you were the warden at the time after that

13  complaint?

14      A.   Correct.

15      Q.   And were you involved in the investigation

16  concerning Ms. Brandewie?

17      A.   I was involved in the initial complaint.

18      Q.   Okay.  You were involved in the initial

19  complaint.  So at the point the initial complaint was

20  filed you were no longer involved in the investigation?

21      A.   That is correct.  Once I turned it over to

22  Internal Affairs, I was not involved in the

23  investigation.

24      Q.   Prior to turning it over to Internal Affairs, did

Richard Kearney                    26

1  you conduct an investigation?

2      A.   No.  I took a statement.

3      Q.   Who did you take a statement from?

4      A.   Officer Brandewie.

5      Q.   Is that the only statement that you took during

6  your initial investigation?

7      A.   We had conversations on and off for months.

8      Q.   Now, when Ms. Brandewie first complained to you

9  of this, of sexual and racial harassment --

10             MR. NIEDZIELSKI:  I'm going to object and

11  the reason I'm objecting is because you are

12  characterizing in a legal context what she's complaining

13  about.

14             Now, if you want to ask him or want to say

15  she complained about, you know, photographs or whatever,

16  that's fine.  But I'm going to ask you not to

17  characterize.

18             MR. POLIQUIN:  I'll try not to characterize.

19  I think that's a good idea.

20  BY MR. POLIQUIN:

21      Q.   What would you describe -- how would you describe

22  Ms. Brandewie's complaint?

23      A.   Ms. Brandewie brought a complaint to me that

24  someone or some parties had a pornographic picture that

Richard Kearney                    27

1  had been downloaded off of the Internet and were alleging

2  that it was her in the photograph.  And it was, you know,

3  causing her a lot of anxiety and --

4      Q.   Who were these parties?

5      A.   Her fellow officers.

6      Q.   Now, how did they -- what was -- specifically,

7  what did she complain about the photograph, concerning

8  the photograph?

9      A.   That it was not her.

10     Q.   And that these -- I'm trying to -- these were

11 sexual photographs in nature?

12     A.   Yes.  It was -- the person in the photograph was

13 nude.

14     Q.   Who was the person in the photograph with --

15 excuse me.  Have you seen the photographs?

16     A.   Yes.

17     Q.   Can you please describe the photograph to me?

18     A.   The photograph showed a female, an unclothed

19 female, laying on a bed or cushion, prone on her back.

20     Q.   Was there anyone else in the photograph?

21     A.   No.

22     Q.   Is that the only photograph you have seen?

23     A.   That's correct.

24     Q.   Okay.  Upon receiving this complaint from

Richard Kearney                    28

1   Ms. Brandewie, what steps did you take?

2       A.   I informed her that I took her complaint

3   seriously.  I notified Human Resources immediately.  And

4   requested an Internal Affairs investigation.

5       Q.   How did you do that?

6       A.   By telephone and, I believe, a letter.

7       Q.   Did Ms. Brandewie give you the names of some of

8   these parties that were showing this photograph?

9       A.   I don't recall if she did at the initial meeting

10  or not.

11      Q.   Other than notifying Human Resources, did you

12  take any steps to remedy Ms. Brandewie's complaint, to

13  fix the complaint or to --

14      A.   No.

15      Q.   Would you describe Ms. Brandewie's complaint to

16  be a complaint of sexual harassment or discrimination?

17      A.   Yes.

18      Q.   Would you describe her complaint to be one of

19  racial harassment or discrimination?

20      A.   Possibly.

21      Q.   Why do you say possibly?

22      A.   I hadn't thought about this before, but on the

23  Yahoo site that had the picture on it I believe, I

24  believe there was a reference to liking big black men or

Richard Kearney                29

1    something along those lines.

2        Q.   Did you see -- at the time of her initial

3    complaint, did you just see a picture or did you actually

4    see the website?

5        A.   At the time of the original complaint I didn't

6    see any picture.  It was a while before I saw a picture,

7    but it was -- I never did see the website.  Never.

8        Q.   How do you know it's a Yahoo site?

9        A.   It says it on the picture.

10       Q.   So you could tell -- did that, did you think --

11   did she complain about it being on the Internet?

12       A.   I don't recall.

13       Q.   Did she complain about employees of the

14   Department of Correction viewing the website at SCI?

15       A.   Yes.

16       Q.   What steps -- did you take any steps to block the

17   website?

18       A.   I did not.  Internal Affairs did.

19       Q.   Were you involved with Internal Affairs'

20   investigation?

21       A.   What do you mean by "involved"?

22       Q.   Well, did you participate in the investigation?

23       A.   No.

24       Q.   Were you updated concerning the investigation by

Richard Kearney                    30

1  Internal Affairs?

2      A.   I don't recall.

3      Q.   Did either Human Resources or Internal Affairs

4  request that you make, take any immediate steps to remedy

5  Ms. Brandewie's complaint?

6      A.   No.

7      Q.   Do you know if there's a system within SCI to

8  monitor computer usage by employees?

9      A.   I believe there is.

10     Q.   Is there somebody, some department in charge of

11 that?

12     A.   Yes.

13     Q.   Who are they?

14     A.   The MIS folks.

15     Q.   What does "MIS" stand for?

16          MR. NIEDZIELSKI:  That's not actually SCI,

17 though.

18     A.   That's DTI I guess.  And we didn't -- we did not

19 have that capability at this time.

20     Q.   Okay.  When you talk about "this time," you are

21 talking about at the time of Ms. Brandewie's complaint?

22     A.   That's correct.

23     Q.   So MIS came later on?

24     A.   Actually --

Richard Kearney                    31

1      Q.    The technology to monitor the website came after

2  Ms. Brandewie's complaint?

3      A.    That's correct.

4      Q.    Do you know if Internal Affairs or Human

5  Resources took any steps to see who viewed these sites at

6  SCI?

7      A.    Internal Affairs interviewed officers that

8  Officer Brandewie indicated had either seen or discussed

9  or talked to her about the pictures.  But as far as

10 viewing the website, we did not have the technology,

11 Internal Affairs did not have the technology to see who

12 had been accessing the website.

13     Q.    Did they make any efforts to retain a private

14 company or outside individuals to do, to monitor the

15 websites or to see who was -- to conduct some kind of

16 investigation as to how the website -- who exactly viewed

17 these, the website complained about by Ms. Brandewie?

18     A.    Internal Affairs contacted DTI, which is the

19 Department of Technology and Information, and had the

20 site blocked.

21     Q.    How long was it between Ms. Brandewie's initial

22 complaint and the time where the site was blocked?

23     A.    I don't know.

24     Q.    Was it more than a month?

Richard Kearney                    32

1     A.   I don't know.

2     Q.   Now, you had stated that you told Ms. Brandewie

3  that you took her complaint seriously?

4     A.   Absolutely.

5     Q.   And why did you take it seriously?

6     A.   I take all complaints seriously.

7     Q.   Are there some -- as far as this complaint goes,

8  was there, were you concerned about Ms. Brandewie at all?

9     A.   She was upset, appeared to be offended, you know.

10  I know as my role as a warden, I took the immediate

11  necessary action and she appreciated that.

12     Q.   You say "immediate necessary action."  You mean

13  contacting Human Resources?

14     A.   And beginning an investigation and trying to fix

15  the problem.

16     Q.   Did you take any steps to actually fix the

17  problem immediately, other than contacting Human

18  Resources and starting an investigation?

19     A.   No.

20     Q.   Was Ms. Brandewie's employment changed at all

21  initially to protect -- to remedy the situation?

22     A.   I don't recall when her employment situation was

23  changed.

24     Q.   Based on your experience as a, in the Department

Richard Kearney                    33

1   of Correction, is there a particular, are there

2   particular safety concerns for female correctional

3   officers as opposed to male correctional officers?

4        A.   No.

5        Q.   So there's no additional problems specific to

6   female correctional officers rather than male

7   correctional officers?

8        A.   No.

9        Q.   SCI is an all male institution?

10       A.   With the exception of a handful of female boot

11  camp cadets.  We also house females waiting for

12  transportation to BWCI.

13       Q.   But the vast majority is, it is a male

14  population?

15       A.   That's correct.

16       Q.   Is there any special procedures or protocol

17  conducted with female correctional officers as opposed to

18  male correctional officers?

19       A.   I don't understand the question.

20       Q.   Are male correctional officers -- are female

21  correctional officers treated any differently than male

22  correctional officers?

23       A.   No.

24       Q.   In any way?

Richard Kearney                34

1    A.   No.

2    Q.   Were you concerned about Ms. Brandewie's safety

3 at the time you received the complaint?

4    A.   No.

5    Q.   Now, after you contacted Human Resources about a

6 complaint of sexual or racial harassment, how involved do

7 you stay in an investigation?

8    A.   I am not actively involved in the investigation.

9 In this case the complaint was one of such that she

10 alleged that there were rumors and photographs and staff

11 involvement and she had enough detail that it was easy to

12 begin an investigation by Internal Affairs.

13    Q.   Do you know when the investigation was completed?

14    A.   I don't recall.

15    Q.   Do you know what were the findings of the

16 investigation?

17    A.   I recall reading the results of the

18 investigation.  I don't recall the particular findings of

19 the investigation.

20    Q.   Did the findings of the investigation require you

21 to change Ms. Brandewie's employment at all?

22    A.   Her employment had already changed I believe by

23 the time the investigation had been completed.

24    Q.   Did the investigation -- did the findings of the

Richard Kearney                    35

1    investigation change any procedures or policies on how

2    you conduct -- let me rephrase.

3                    Did the findings require any change in

4    policy or procedure?

5        A.    I don't believe so.

6        Q.    Now, was there allegations that inmates knew

7    about this photograph on the website?

8        A.    Yes.

9        Q.    And did that cause you to be concerned about

10   Ms. Brandewie's safety?

11       A.    No.

12       Q.    Why not?

13       A.    People talk about different things all the time.

14   It doesn't rise to the level of an officer safety issue.

15       Q.    So you don't think this complaint rose to any

16   kind of level of officer safety issue?

17       A.    No.

18       Q.    What percentage of SCI's population is African

19   American?

20       A.    I don't know.

21       Q.    Do you have any idea of the percentage?

22       A.    Approximately 50 percent.

23       Q.    Do you know the percentage that is Caucasian?

24       A.    Probably 49 percent.

Richard Kearney                    36

1     Q.   Based on your statements this complaint alleged,

2   had at least racial overtones, this complaint?

3               MR. NIEDZIELSKI:  Are we saying this

4   complaint or the complaint he received from your client?

5     Q.   Concerning the complaint that you received from

6   Ms. Brandewie.

7     A.   No.  At the onset I did not believe there was a

8   racial overtone to it.

9     Q.   Did the picture that you initially viewed have

10   the statement concerning black males?

11    A.   Yes.

12    Q.   Prior to Ms. Brandewie's change of employment,

13   was there any steps taken by yourself or the Department

14   of Correction to protect Ms. Brandewie in any way?

15    A.   I don't believe there was anything to protect

16   Ms. Brandewie from.

17    Q.   Okay.  Now, she had made allegations that others

18   were spreading rumors about this picture?

19    A.   Yes.

20    Q.   And were those allegations confirmed based on the

21   Internal Affairs investigation?

22    A.   Yes.

23    Q.   And was there any steps taken by yourself or SCI

24   to ensure that this website was not viewed and that

Richard Kearney                    37

1    these -- let's first say that this website was no longer

2    viewed?

3        A.    It was no longer viewed after Internal Affairs

4    had asked DTI to shut down access to that site.

5        Q.    Now, did you have the authority to ask DTI to

6    shut down the site prior to that?

7        A.    I didn't think of it.  Didn't even -- I didn't

8    know that you could shut sites down.

9        Q.    What steps -- prior to her being transferred,

10   what steps did you take to stop the rumors from spreading

11   at the institution?

12       A.    We took disciplinary action against several staff

13   members for propagating rumors.

14       Q.    Can you name those staff members?

15       A.    Lieutenant Derrick West.

16       Q.    What was the disciplinary action for Mr. West?

17       A.    I believe he had a supervisory counseling.

18       Q.    What is a supervisory counseling?

19       A.    It is a meeting between the supervisor and

20   subordinate staff to discuss behaviors that are not

21   conducive to workplace harmony.

22       Q.    What was Mr. West specifically disciplined for?

23       A.    I don't recall the exact reason.

24       Q.    But it was in connection to Ms. Brandewie's

Richard Kearney                    38

1  initial complaint to you?

2      A.   I don't know that to be true.

3      Q.   Now, does the supervisory counseling, how long in

4  duration is it?

5      A.   Two years.

6      Q.   Exactly how does it work?

7      A.   I don't know what you mean.

8      Q.   Well, does the counseling happen once a week?

9  Once a day?  Once a month?

10     A.   No.  They meet, the supervisor meets with the

11  staff person, discusses the behavior that is the result,

12  is causing the problem and puts that person on notice

13  that any continued behavior will result in progressive

14  discipline.

15     Q.   You said it was for two years.  Is that some kind

16  of probationary period?

17     A.   That's the life span of the counseling.

18     Q.   How often does the counseling take place?

19     A.   If the desire --

20          MR. NIEDZIELSKI:  It is usually done once

21  and the document is placed in the personnel file for two

22  years.

23          MR. POLIQUIN:  I appreciate it, but I would

24  still like him to answer the questions and not be

Richard Kearney                39

1  interrupted.

2           MR. NIEDZIELSKI:  It is just that we

3  produced you the documents and you got a copy.

4           MR. POLIQUIN:  That's fine.  But this is a

5  deposition and I think his knowledge of this information

6  is relevant and you can object and he can answer.

7           THE WITNESS:  Could you repeat the question?

8  BY MR. POLIQUIN:

9      Q.   What is the life span of this counseling?

10     A.   The document exists for two years.

11     Q.   What exactly does "the document exists for two

12  years" mean?

13     A.   Any time you have unwanted behaviors or

14  disciplinary actions they are -- those actions are

15  addressed by the supervisor, documented, placed in an

16  employee's personnel file for a period -- for a period.

17  Some documents are longer than others.  This one in

18  particular is two years.  And then they can be referred

19  to, in the event that the behavior does not change, then

20  we have progressive disciplinary action.

21     Q.   On the scales of disciplinary action, is this the

22  lowest level of disciplinary action that someone can --

23     A.   Yes.

24     Q.   Who was the supervisor doing the counseling?

Richard Kearney                    40

1     A.   I don't recall.

2     Q.   Would it be someone from Human Resources or

3   someone from a correction -- senior correctional officer?

4     A.   It would be a staff lieutenant or Lieutenant

5   West's supervisor.

6     Q.   Who were the other individuals that received

7   disciplinary action?

8     A.   I don't recall.

9     Q.   Do you know how many there were?

10    A.   Not offhand.

11    Q.   Did they all receive the same disciplinary action

12   that Mr. West received?

13    A.   I don't recall.

14    Q.   Do you know of any individual that received a

15   harsher disciplinary action than Mr. West?

16    A.   I don't recall.

17    Q.   Now, during this time -- I say "during this

18   time," between January 2003 and February 2003, did you

19   receive information that an Officer Wittman propositioned

20   Ms. Brandewie for sex?

21    A.   I don't know if I heard about it within that time

22   frame.  But I did hear about it.

23    Q.   Was Officer Wittman disciplined?

24    A.   Yes.

Richard Kearney                41

1      Q.    What was the disciplinary action?

2      A.    I don't recall.

3      Q.    Do you know if Officer Wittman's, the complaint

4  against Officer Wittman involved racial harassment?

5      A.    I know what the complaint was, but I don't know

6  if that constitutes racial harassment.

7      Q.    Did you read an e-mail from Officer Wittman to

8  Officer Brandewie?

9      A.    No.  I've never seen that e-mail.

10      Q.    Did you see it in the complaint, the complaint

11  Ms. Brandewie filed in District Court?

12      A.    I don't recall seeing that document.

13      Q.    Okay.  Now -- but you read over the complaint?

14      A.    Yes.

15      Q.    Did you read what was attached to it as Exhibit A

16  was an e-mail from Officer Wittman to Officer Brandewie?

17      A.    I don't recall reading that document.  I

18  understand the nature of the complaint against Officer

19  Wittman by Officer Brandewie, but I don't recall seeing

20  that document.

21      Q.    Now, is Officer Wittman still employed by the

22  Department of Correction?

23      A.    Yes.

24      Q.    What is his position there currently?

Richard Kearney                 42

 1      A.   He's a correctional officer.

 2      Q.   Has he received any pay raises or promotions

 3 since that time?

 4      A.   Yes.

 5      Q.   Do you know what type of promotion he received?

 6      A.   He has not received any promotion.

 7      Q.   So he received a pay raise?

 8      A.   Yes.

 9      Q.   Did that pay raise -- what was that pay raise

10 based on?

11      A.   Annual pay raise that every correctional officer

12 received.

13      Q.   Now, was there -- before Ms. Brandewie's

14 transfer, what other actions did SCI take to remedy the

15 rumors being spread about her?

16      A.   We had supervisors, you know, discussing rumor

17 mongering out with the subordinate staff in hopes of

18 reducing the rumors.  But rumors are difficult to get a

19 handle on.

20      Q.   Was there any specific actions taken concerning

21 the specific rumors against Ms. Brandewie?

22      A.   Just directing the first line supervisors, the

23 lieutenants to discuss with their subordinate staff the

24 importance of not spreading rumors.

Richard Kearney                43

1      Q.   But that was a general instruction concerning

2   rumors?

3      A.   Correct.

4      Q.   Was there any actions taken concerning viewing

5   the website that was the subject of the complaint to you?

6      A.   I don't recall.

7      Q.   Would that be something you would be informed of?

8      A.   That would be something I would have initiated,

9   but I don't recall whether I did or did not issue any

10  direction about viewing that particular website.

11     Q.   Now, based on your knowledge of the Internal

12  Affairs investigation, correctional officers were

13  interviewed, correct?

14     A.   Correct.

15     Q.   Were there any inmates ever interviewed?

16     A.   I don't recall.

17     Q.   Do you know if there was any staff members

18  interviewed?

19     A.   I don't recall.

20          MR. NIEDZIELSKI:  Just so I understand your

21  question, when you say "staff," are you referring to

22  other correctional officers?

23          MR. POLIQUIN:  Yes.

24  BY MR. POLIQUIN:

Richard Kearney                44

1      Q.   Did you understand that was what I was referring

2  to?

3      A.   It was an assumption I made.

4           MR. NIEDZIELSKI:   When you say "staff," do

5  you mean any employee?

6           MR. POLIQUIN:   Right, other than

7  correctional officer.

8           MR. NIEDZIELSKI:   Are you meaning

9  lieutenants and captains as well?

10          MR. POLIQUIN:   Let me address that with the

11 warden.

12 BY MR. POLIQUIN:

13     Q.   Do you consider lieutenants and captains

14 correctional officers?

15     A.   I do.

16     Q.   So when I've been asking you questions concerning

17 this, your answers reflect the fact that you are lumping

18 in lieutenants and captains with correctional officers?

19     A.   I guess so.

20     Q.   Just to make it clearer, did any lieutenants or

21 supervisors, supervisors of correctional officers, take

22 any actions concerning Ms. Brandewie's complaint?

23     A.   I don't recall.

24     Q.   Would they have authority to do that without

Richard Kearney                45

1  consulting with you first?

2      A.   Yes.  If I could just -- lieutenants were

3  drumming down to the subordinate staff the desire of the

4  administration, the facility administration, to

5  discontinue the rumor mongering that was going on.  That

6  was taking effect.

7      Q.   How did that happen?

8      A.   By individual contacts between the supervisors

9  and their subordinate staff.

10      Q.   Was this initiated by yourself?

11      A.   It was initiated through a staff meeting.  I gave

12  direction to the unit commanders who have lieutenants

13  that work for them to drum this down to the line staff.

14      Q.   What was specifically the direction?

15      A.   That propagating rumors was unacceptable

16  behavior.

17      Q.   Was this direction, did this direction refer to

18  Ms. Brandewie at all?

19      A.   Not specifically.

20      Q.   Do you know if any of these supervisors,

21  lieutenants, the people that were at this meeting, confer

22  to their staff members rumors about Ms. Brandewie, to

23  stop rumors specifically about Ms. Brandewie?

24      A.   I do not know that.

Richard Kearney                46

1    Q.    But that was not your direction?

2    A.    No -- wait a minute.  What did you mean by that

3    was not my direction?

4    Q.    When you -- based on what you just stated, you

5    said you directed your staff lieutenants -- when I say

6    lieutenant staffs I'm referring to supervisors of other

7    correctional officers -- to stop the rumor mongering?

8    A.    Yes.

9    Q.    But you gave no specific direction concerning

10   Ms. Brandewie?

11   A.    No.  But the atmosphere of the facility was one

12   that, it wasn't a great leap to figure out where that,

13   why that direction was coming down.

14   Q.    When you say "atmosphere of the facility," what

15   was the atmosphere of the facility at that time?

16   A.    There were folks that were propagating rumors

17   concerning Ms. Brandewie.

18   Q.    Was that known -- let me rephrase.

19          Based on your knowledge, was that well-known

20   to the correctional officers at SCI?

21   A.    I don't know to what extent it was known by all

22   the correctional officers at SCI.

23   Q.    Would you say all the supervisors and lieutenants

24   knew about these rumors?

Richard Kearney                    47

1      A.   No.

2      Q.   Were any of these individuals found to be

3  involved in any of the rumors?

4      A.   Yes.

5      Q.   What individuals -- when I say "individuals," I'm

6  talking about your supervisors and lieutenants.

7      A.   No.

8      Q.   Did Ms. Brandewie ever state that any of these

9  supervisors or lieutenants were involved?

10     A.   Lieutenant West was involved in the propagation

11 of a rumor.

12     Q.   Was he at that staff meeting?

13     A.   No.

14     Q.   Is he still currently a lieutenant?

15     A.   He is a staff lieutenant.

16     Q.   He still has a supervisory position?

17     A.   Correct.

18     Q.   Why was he not at that meeting?

19     A.   I believe it was a unit commanders meeting.  That

20 is my recollection.

21     Q.   So the individuals at that meeting were unit

22 commanders?

23     A.   That's correct.

24     Q.   What is a unit commander?

Richard Kearney                    48

1      A.    They are in charge of specific sections of the

2  facility.  They have lieutenants as subordinate staff

3  that answer to them running their individual units.

4      Q.    Prior to informing you of the complaint, did

5  Ms. Brandewie report the complaint to Deputy Warden Mike

6  DeLoy?

7      A.    Not to my knowledge.

8      Q.    Have you ever talked to Mr. DeLoy about this?

9      A.    Are we talking about the original --

10     Q.    When you refer to the complaint, I'm talking

11  about the initial complaint of sexual harassment, not the

12  complaint filed in U.S. District Court.

13            MR. NIEDZIELSKI:  You are talking about the

14  November e-mail, 2003 e-mail?

15     Q.    I'm talking about the initial complaint she

16  complained to you about.

17     A.    No.

18     Q.    Did you ask Ms. Brandewie if she complained to

19  any supervisors prior to e-mailing you her complaint?

20     A.    She came to my office and spoke the complaint

21  prior to e-mailing -- I asked her -- she told me what was

22  going on.  I asked her to put it in writing for me and

23  the e-mail was the result of that initial complaint.

24  That's what -- when I talk about an initial complaint,

Richard Kearney                49

1  I'm talking about the original conversation and

2  subsequent e-mail.

3      Q.   When did that original conversation take place?

4      A.   I don't recall the exact date.

5      Q.   How long before the e-mail was sent did you have

6  this conversation with Ms. Brandewie?

7      A.   I don't recall.  It may have been the same day.

8      Q.   Do you have any knowledge that Ms. Brandewie

9  complained to any other supervisors prior to having a

10 verbal conversation with you and then e-mailing you?

11     A.   About this particular complaint?

12     Q.   Yes.

13     A.   No.

14     Q.   Did you check with any of your supervisors about

15 whether Ms. Brandewie complained to them about this,

16 about the website?

17     A.   No.  My recollection was Ms. Brandewie was

18 bringing it to my attention first.

19     Q.   But you didn't take any steps to confirm that?

20     A.   No.

21     Q.   How would you describe your approach to, as a

22 warden?

23     A.   I'm a hands on warden.

24     Q.   When you say "hands on," can you describe what

Richard Kearney                    50

1    that means to you?

2        A.   I'm involved to some degree in the overall

3    operation of the institution, but from a management

4    philosophy I like to drum down decision making as far as

5    possible.  So the correctional staff have X amount of

6    authority, first line supervisors have authority.  I want

7    folks making decisions at the lowest possible level.

8        Q.   Was there ever a memo sent out concerning the

9    pictures of Ms. Brandewie?

10       A.   I don't recall.

11       Q.   What is the policy at SCI concerning viewing

12   websites?

13       A.   We have what's called an acceptable use policy

14   that is signed by every employee at SCI, which describes

15   an acceptable use of the State e-mail computer system.

16       Q.   Now, practically speaking, how would -- were

17   correctional officers able to use computers at SCI?

18       A.   Yes.  They are required to use computers.

19       Q.   Okay.  How would they use the computer?

20       A.   We have, our mail system is, it is called the

21   Outlook system.  I believe it is Internet based.  Our

22   Delaware Automated Correctional System, which is, tracks

23   all the inmate information system, is web based.  So in

24   order for a correctional officer to do his job he has to

Richard Kearney                51

1  access these databases and systems.

2      Q.   Would these correctional officers have access to

3  the Internet?

4      A.   Yes.

5      Q.   Would they use the Internet for recreational

6  purposes or just for work purposes?

7      A.   They are supposed to use it for work purposes.

8      Q.   Are they allowed to use it for entertainment or

9  recreational purposes?

10     A.   No.

11     Q.   Is there any reason why a correctional officer

12  would have to, would be -- would have to go onto the

13  Internet to do their job?

14     A.   No.

15     Q.   But the computers at SCI are accessible to the

16  Internet?

17     A.   Yes.

18     Q.   Now, concerning the inmates, was there any steps

19  taken to ensure that the inmates weren't viewing this

20  website that were causing the rumors?

21     A.   The inmates don't have access to the Internet.

22     Q.   Was there any action taken prior to Ms. Brandewie

23  transferring to stop the rumors concerning the website

24  with inmates?

```
 1      A.    No.

 2      Q.    Other than what you have testified to today, was

 3  there any other preventative measures taken to stop this,

 4  to remedy Ms. Brandewie's complaint to you in the e-mail

 5  and what caused the investigation?

 6      A.    From where I was sitting, she informed me of the

 7  complaint.  I processed the complaint according to what I

 8  felt was the appropriate policy and procedure at the

 9  time.  I involved our Human Resource department,

10  requested an Internal Affairs investigation.  Subsequent

11  to that I drummed down to the subordinate staff to

12  discontinue rumoring behaviors.  And Ms. Brandewie

13  wasn't -- shortly after she filed the complaint, she

14  wasn't at the facility, because she had other issues.

15      Q.    Now, when you refer to these other issues, what

16  are you referring to?

17      A.    She was out.  She had some personal issues that

18  took her away from the workplace.

19      Q.    Prior to that was Ms. Brandewie, how would you

20  describe her as an employee?

21      A.    Satisfactory.

22      Q.    Did you have any problems with Ms. Brandewie?

23      A.    No.

24      Q.    You understand that everything you have testified
```

Richard Kearney                53

1   to today you are under oath to testify truthfully?

2       A.   Correct.

3       Q.   You understand that even though we are in an

4   informal conference, your testimony essentially has the

5   same force and effect as if we were in a courtroom in

6   front of a jury or judge?

7       A.   Correct.

8       Q.   You understand you will be asked to sign a

9   transcript attesting to the accuracy of these statements?

10      A.   Correct.

11      Q.   That would be under the penalty of perjury?

12      A.   Correct.

13      Q.   Is there anything you would like to add to any of

14  the questions I asked you today?

15      A.   No.

16      Q.   Is there any reason why -- any reasons why your

17  testimony would not be accurate today or you weren't able

18  to testify truthfully?

19      A.   No.

20      Q.   So you are not impaired by any substances or --

21      A.   No.

22      Q.   You understand that you will be given a chance to

23  supplement or correct the record if you feel that it

24  was -- that it is incorrect?

Richard Kearney                54

1     A.   Correct.

2     Q.   Has the policy of sexual discrimination or sexual

3  harassment or racial discrimination or racial harassment,

4  did it change at all during Ms. Brandewie's employment?

5     A.   I don't recall.

6     Q.   Did you receive any additional training or

7  seminars concerning sexual harassment or --

8     A.   Subsequent to -- within the past 18 months there

9  has been an increase in diversity and sexual harassment

10  training offered by our Employee Development Center.

11     Q.   How was that -- who initiated that?

12     A.   The Employee Development Center.

13     Q.   Do you know what that training encompasses?

14     A.   It is about a 2-hour block of instruction that is

15  given by Janice Jordan, who is the diversity coordinator

16  at the facility levels.

17     Q.   Did you take that training?

18     A.   I don't recall.  I believe I did.

19     Q.   Since the time of Ms. Brandewie's initial

20  complaint to you, verbal and then followed up by e-mail,

21  did you review the policy of the DOC concerning sexual

22  harassment, sexual discrimination, racial harassment and

23  discrimination?

24     A.   Yes.

Richard Kearney                    55

1      Q.    When did you review that?

2      A.    I don't recall.

3      Q.    Did you review that after the complaint?   During

4   the investigation or --

5      A.    After her complaint.

6      Q.    Why did you review that?

7      A.    To make sure I was doing what I was supposed to

8   do according to policy.

9            MR. POLIQUIN:   No further questions.   Thank

10   you.

11   BY MR. NIEDZIELSKI:

12      Q.    Just a few questions.

13            You indicated this complaint came to you,

14   you initially had a discussion with Ms. Brandewie, and

15   then you asked her to send it to you in writing.   She did

16   that by e-mail?

17      A.    That's correct.

18      Q.    Is it your impression that your discussion with

19   her and the e-mail were fairly close in time?

20      A.    Yes.

21      Q.    All right.   To the extent you got that complaint,

22   that e-mail when it is dated, you subsequently met with

23   Ms. Brandewie.   Is that correct?

24      A.    Yes.

Richard Kearney                    56

1      Q.    Then you asked for an Internal Affairs

2  investigation.  Is that correct?

3      A.    That's correct.

4      Q.    Now, during the Internal Affairs investigation,

5  you indicated that DTI was contacted?

6      A.    That's correct.

7      Q.    And your understanding is that site or access to

8  the site through the State's system was discontinued?

9      A.    That's correct.

10     Q.    Has the State, prior to the time of the complaint

11 that you received from Ms. Brandewie, had an acceptable

12 use policy on these computers?

13     A.    Yes.

14     Q.    That's something that each employee is required

15 to sign?

16     A.    That's correct.

17     Q.    Is any employee's acceptable use in SCI, is it

18 acceptable use to access such a site?

19     A.    No.

20     Q.    Is it acceptable for employees to get on the

21 Internet and shop?

22     A.    No.

23     Q.    The acceptable use policy provides -- and I'm not

24 quoting verbatim -- that if, in fact, employees use the

Richard Kearney                    57

1    computer in an inappropriate fashion, they can suffer
2    discipline?
3        A.    That is correct.
4        Q.    Also, Mr. Poliquin has asked you a lot of
5    detailed questions about specific times, dates and things
6    that you may or may not have done in response to this.
7    Over the time were there quite a number of documents that
8    were generated by this process?
9        A.    That's correct.
10       Q.    You can't recall every one of them, can you?
11       A.    No.
12       Q.    You can't recall the details of every one of
13   them, can you?
14       A.    No.  I cannot.
15       Q.    Let's ask you about -- you've had a lot of
16   questions about captains, lieutenants and others.  Do
17   captains, lieutenants or deputy wardens have the
18   authority to suspend an employee?
19       A.    No.
20       Q.    Do they have the authority to promote an
21   employee?
22       A.    No.
23       Q.    Do they have the authority to fire an employee?
24       A.    No.

Richard Kearney                     58

1     Q.   Do they have the authority to change the rate of

2   pay of an employee?

3     A.   No.

4             MR. NIEDZIELSKI:  That's all the questions I

5   have.  We will read and sign.

6   BY MR. POLIQUIN:

7     Q.   Just a few questions to follow up.

8             Now, when an individual is promoted as a

9   correctional officer to a lieutenant or to a -- who gets

10   an promotion of any kind, how is that process -- who

11   makes that decision?

12     A.   A recommendation is forwarded to me for

13   institutional promotions.

14     Q.   Who would that recommendation be by?

15     A.   By an interview panel.

16     Q.   So there's a panel of individuals that would

17   interview this person?

18     A.   There are many panels of individuals.

19     Q.   Would they question or would they get information

20   from that employee's supervisor considering, as part of

21   the process to promote an individual?

22     A.   They would review the performance evaluations

23   that are written by the employee's supervisor and they

24   would review discipline that was in the file that was

Richard Kearney                59

1   written by the employee's supervisor.  I don't believe

2   they would interview the employee's supervisor.

3       Q.   But they would review performance evaluations?

4       A.   Yes.

5       Q.   That would be considered by them as to whether or

6   not to promote this individual?

7       A.   They would score the individual and make a

8   recommendation.

9               MR. POLIQUIN:  I don't think I have any

10  further questions.

11              MR. NIEDZIELSKI:  Thank you.

12              (Kearney Deposition Exhibit No. 1 marked for

13  identification.)

14              (The deposition concluded at 1:50 p.m.)

15

16

17

18

19

20

21

22

23

24

```
 1                  I N D E X

 2    DEPONENT:  RICHARD KEARNEY                    PAGE

 3        Examination by Mr. Poliquin              2, 58
          Examination by Mr. Niedzielski           55
 4

 5                  E X H I B I T S

 6    KEARNEY DEPOSITION EXHIBITS                   MARKED

 7        1            Complaint                    59

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1

 2

 3              REPLACE THIS PAGE

 4              WITH THE ERRATA SHEET

 5              AFTER IT HAS BEEN

 6              COMPLETED AND SIGNED

 7              BY THE DEPONENT.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1   State of Delaware)
                     )
2   New Castle County)

3

4                      CERTIFICATE OF REPORTER

5
         I, Vincent J. Bailey, Registered Professional
6   Reporter and Notary Public, do hereby certify that there
    came before me on August 24, 2006, the deponent herein,
7   RICHARD KEARNEY, who was duly sworn by me and thereafter
    examined by counsel for the respective parties; that the
8   questions asked of said deponent and the answers given
    were taken down by me in Stenotype notes and thereafter
9   transcribed by use of computer-aided transcription and
    computer printer under my direction.
10
         I further certify that the foregoing is a true
11  and correct transcript of the testimony given at said
    examination of said witness.
12
         I further certify that I am not counsel,
13  attorney, or relative of either party, or otherwise
    interested in the event of this suit.
14

15

16
                    Vincent J. Bailey, RPR,
17                  Certification No. 171-RPR
                    (Expires January 31, 2008)
18

19  DATED: 9-11-06

20

21

22

23

24
```