# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

KAREN BRANDEWIE,                          :
                                          :
               Plaintiff,                 :
                                          :
v.                                        :   C. A. No. 05-625-MPT
                                          :
STATE OF DELAWARE DEPARTMENT              :
OF CORRECTION,                            :
                                          :
               Defendant.                 :

## MEMORANDUM OPINION

Ronald G. Poliquin, Esquire, Young, Malmberg & Howard, P.A., Dover, Delaware; counsel for plaintiff Karen Brandewie.

Marc P. Niedzielski, Deputy Attorney General, Department of Justice, Wilmington, Delaware; counsel for defendant State of Delaware Department of Correction.

Wilmington, Delaware
December 11, 2006



F I L E D

DEC 1 1 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Thynge, U.S. Magistrate Judge

## I. INTRODUCTION

On August 25, 2005, Karen Brandewie ("plaintiff"), then known as Karen Atwell,

filed suit against the State of Delaware Department of Correction ("DOC" or

"defendant") pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000 et seq., ("Title

VII") alleging claims of employment discrimination on the basis of sex, hostile work

environment, and retaliation.[1]  Presently before the court is defendant's motion for

summary judgment.[2]  For the reasons stated below, the court finds there are genuine

issues of material fact which preclude summary judgment and denies defendant's

motion.

## II. BACKGROUND[3]

---

[1] D.I. 1.

[2] D.I. 29.

[3] The court feels compelled to express extreme frustration with plaintiff's summary judgment submissions. First, plaintiff's answering brief, D.I. 39 (mistitled "Plaintiff's Opening Brief In Opposition of Summary Judgment") and 26 exhibits were filed on October 6, 2006. The court had already granted an extension for the filing of case dispositive motions from August 31, 2006 to September 15, 2006. *See* D.I. 22 (Stipulation and Order).  Defendant timely-filed, and electronically served, its motion for summary judgment and supporting brief on September 15, 2006. D.I. 29, D.I. 30. Under this court's local rules, plaintiff's reply brief was due on Friday, September 29, 2006. *See* Local Rule 7.1.2. Without leave of the court, plaintiff did not file her answering brief until a week after that deadline on Friday, October 6, 2006. A full week later, on Friday, October 13, 2006, plaintiff filed an "Exhibit" to her Answering Brief, D.I. 41, again without leave of the court, which contains an additional 15 documents. Plaintiff's electronically-filed answering brief, D.I. 39 includes exhibits A-Y (including Exs. A-1 and B-1). Subsequently, plaintiff delivered a courtesy copy of D.I. 39 to chambers, however, the exhibits attached thereto were not exhibits A-Y as originally electronically filed, but were the fifteen documents previously filed separately as D.I. 41. Unfortunately, the frustration does not stop there.

Plaintiff's deposition transcript, cited throughout her brief is not an exhibit to any of plaintiff's summary judgment submissions. Moreover, plaintiff does not once have the courtesy to indicate **where** in the 144 pages of plaintiff's deposition transcript (fortuitously attached as an exhibit to defendant's brief) the cited testimony is to be found. Instead, the less than helpful citation of *"Plaintiff's [D]eposition"* is recited, *see, e.g.,* D.I. 39 at 4-6, or includes a transcription of questions and answers from that deposition, but again without citation to the pages on which that testimony appears. *See, e.g., id.* at 11-12. Plaintiff also cites to *"Hudson Deposition,"* see, e.g., id. at 7, or again transcribes what are apparently questions and answers from that deposition. *See, e.g., id.* at 19-20. The court uses the word "apparently" because there is no transcript for the Hudson deposition attached to any of plaintiff's summary judgment submissions and no indication of page numbers where the quoted questions and answers could be found. In another instance, plaintiff merely cites to *"Kearney Deposition,"* see id. at 5, with no pinpoint site and no copy of that transcript.

(continued...)

Plaintiff, a forty-one year old white female, was hired by the DOC on November

30, 2000 and began Correctional Officer Training Academy as a Cadet. On January

27, 2001, plaintiff successfully completed training and was sworn in as a Correctional

Officer and was transferred to the Delaware Correctional Center ("DCC") at Smyrna,

Delaware. On November 24, 2002, plaintiff requested and was selected for transfer to

the Sussex Correctional Institute ("SCI") in Georgetown, Delaware.[4]

Plaintiff alleges that beginning in January 2003 until February 5, 2003, another

correctional officer, Leonard Whitman, propositioned her numerous times for sex, which

---

[3](...continued)

Other curiosities in plaintiff's brief are a citation to "*1/25/03 Memorandum on Complaint and Investigation to Lupinetti from Rogers attached as Exhibit M and P*," *id.* at 6, where exhibit M is a memorandum from Howard to Lupinetti and exhibit P is an email from plaintiff to Kearney. The very next sentence apparently cites to the same document as "*1/25/03 Memorandum on Complaint and Investigation to Lupinetti from Rogers attached as Exhibit Z*." *See id.* Once again, this citation is less than helpful as there is no "Exhibit Z" in any of plaintiff's summary judgment submissions. After perusing plaintiff's forty-one exhibits, i.e., those attached as exhibits to D.I. 39 and those separately filed a week later as D.I. 41, it appears that plaintiff is citing to D.I. 41, Ex. 11, which is a memo from Lupinetti to Rogers dated January 25, albeit in the year 2004, not 2003. Plaintiff also cites to her therapist's notes giving a "brief synopsis" reciting four dates and comments without including copies of those notes for the court's review. *See* D.I. 39 at 11.

Plaintiff's citation to case law is equally perplexing. For instance, plaintiff states that "*This court has previously decided*" a particular issue and directs the court to *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir. 1998). *Id.* at 13 (emphasis added). Plaintiff is reminded that *this court* is the United States District Court for the District of Delaware and, incidentally, is in the Third, not Fifth, Circuit. Plaintiff also directs the court to what must be a significant case in light of it being referred to three times. Unfortunately, each of those references is simply to "Andrews," with no indication of a pinpoint cite, date of decision, or even the court rendering that decision. *See id.* at 14-15. No case having "Andrews" in the caption is included in the table of authorities for plaintiff's brief. A brief search on Westlaw of only cases from federal courts within the Third Circuit that have "Andrews" in the title returned more than 90 cases. With fingers firmly crossed in the hope that the case cited by plaintiff was issued by a one of the courts within the Third Circuit, narrowing searches and review of many cases leads the court to believe that the case referenced in plaintiff's brief is *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990). Indeed, that is a relevant case and the court cites it numerous times in this opinion, but some more indication than "Andrews" by plaintiff is required. Lack of adherence to filing deadlines, proper citation, and inclusion of cited documentary evidence is sufficient justification for the court to have rejected plaintiff's submission. Such sloppy work and complete disregard to the court's rules and procedure, the Federal Rules of Evidence, and the Federal Rules of Civil Procedure will not be tolerated in the future, particularly in the pretrial documents, the pretrial conference, or during trial.

[4] D.I. 39 at 1; D.I. 36 at 1 (Declaration of John Smart, Human Resources Specialist with DOC). "SCI houses maximum, medium, and minimum security inmates. SCI houses an all-male population." http://www.state.de.us/correct/BOP/PrisonSCI.shtml

she consistently rejected.[5]  After rejecting Whitman's advances, plaintiff received an

email on February 5, 2003 from Whitman (the "02/05/03 email") which states:

> [I] heard just before or during your marriage that you were sleeping with
> this black guy and when you told this guy you would leave your husband
> to live with this guy that he said he didn[']t want a relationship he just
> wanted to have sex with you and you got mad and slapped him, then [I]
> heard you were caught in a vehicle with this same black guy or some
> other black guy, but anyway they told me the reason you wouldn[']t do
> anything with me or anyone else around here was because you liked
> black guys and not white guys even though you are married to one NOW.[6]

Immediately after receiving the 02/05/03 email, plaintiff showed it to Deputy

Warden Mike DeLoy.  When plaintiff informed DeLoy that Whitman had asked her for

sex, DeLoy reportedly responded, "[w]ell you got to understand, Karen, it's not every

day that we have officers that look like you that come here."[7]  Plaintiff testified  she told

DeLoy that, while she was not trying to get Whitman in trouble, she wanted Whitman to

stop and that DeLoy responded that he would talk to Whitman.[8]   According to plaintiff,

Whitman later told her no one had spoken to him about the matter, but she

acknowledged that Whitman's advances ended.[9]   Defendant contends that Whitman

"was counseled regarding the matter on February 22, 2003."[10]  The record reflects that

Whitman received a letter from Lieutenant Gerald M. Cordrey Jr., in which he was

reminded "to play close attention to the department policy and procedure on the use of

---

[5] D.I. 31 at 67-69 (Plaintiff's August 25, 2006 deposition transcript).

[6] D.I. 39, Ex. G.  This email was sent from Whitman's SCI email account to plaintiff's SCI email account.  In an email exchange between plaintiff and Whitman on February 6, 2003, Whitman said that he heard the rumors that were the subject of the 02/05/03 email from "white shirts."  D.I. 41, Ex. 2 (February 6, 2003 email to plaintiff from Whitman).  Correctional Officer Supervisors and Administrators wear white shirts as opposed to the blue shirts of correctional officers.  D.I. 39 at 17 n.1.

[7] D.I. 31 at 70-71.

[8] Id. at 71-72.

[9] Id. at 72-74.

[10] D.I. 30 at 6-7 (citing D.I. 37 (February 23, 2003 letter from Lieutenant Gerald M. Cordrey Jr. to Whitman)).

3

state computers when it comes to communications on them. Per discussion with the Warden and Deputy Warden I was directed to inform you that the computer communication programs should only be used for official state business."[11] That letter begins, however, by stating that it was "in no way being issued to you as disciplinary nor counseling."[12]

According to plaintiff's answering brief (and without any supporting citation), *shortly after* receiving the 02/05/03 email, she was approached by male correctional officers who told her that they saw a nude picture of her on a website.[13] Plaintiff testified that, prior to contacting Warden Kearney directly in November 2003, she verbally complained about the alleged harassment to, at least, Captain Flaherty, Captain Brittingham, Lieutenant Johnson, and Lieutenant Fisher, but she could not recall the dates of these conversations.[14]

On November 2, 2003, plaintiff sent an email to SCI Warden Rick Kearney informing him that she learned "some time back" of the rumors about her being pictured on "porn site" which featured a posting by a married white female seeking a black male;

---

[11] D.I. 37.

[12] *Id.*.

[13] *See* D.I. 39 at 6. When plaintiff first learned of the rumors about her purported appearance on the website in question is unclear from the record. At deposition, on August 25, 2006, plaintiff testified that Officer Jim Henry first told her about the website in question and rumors of a picture of her on that site. *See* D.I. 31 at 52-53. She could not recall when this conversation occurred, but believed it happened before her email to Warden Kearney on November 2, 2003, which references her learning of those rumors "[s]ome time back". *Id.* at 54-55; D.I. 38 at D00003. A January 25, 2004 Internal Affairs memorandum indicates that during a November 18, 2003 IA interview with plaintiff, she indicated that she was aware of the rumors since July 2003. *See* D.I. 41, Ex. 11 at 1. The same IA memorandum recites that, during a December 1, 2003 interview with Officer Henry, he recalled seeing a piece of paper which purportedly depicted plaintiff in guard post 7 on a desk and informed plaintiff approximately a week later. Henry related that this occurred in December 2002. *Id.*, Ex. 11 at 2. In her complaint filed with the Delaware Department of Labor and the Equal Employment Opportunity Commission on January 6, 2004, plaintiff stated that she learned of the rumors that she was depicted on a pornographic website approximately a month after the 02/05/03 email, or March 2003. D.I. 38 at D00006.

[14] D.I. 31 at 53-55.

4

that an inmate told her about officers telling inmates that she was on a porn site; and
that the rumors had spread to probation and parole offices ("P&P), violation of parole
offices ("VOP"), and work release. Plaintiff also expressed concern that such rumors
could put her "in a more dangerous position with the inmates as they begin to see me
differently"; that she previously informed DeLoy about the Whitman incident; and that
she might sue should the situation continue, but would request a meeting with Kearney
prior to seeking legal remedy.[15]

On November 6, 2003, plaintiff met with Kearney, union representative John
Ryan, and SCI Business Office Manager Helen Lowman. Following that meeting,
Kearney sent a memo to Alan Machtinger (Director of Human Resources &
Development) outlining plaintiff's complaint, the meeting, and his request that Internal
Affairs ("IA") and Management Information Systems ("MIS") conduct an investigation to
identify and sanction those responsible for originating and propagating the rumors.[16]
Shortly thereafter, IA began its investigation, and interviewed plaintiff and several other
correctional officers.

---

[15] D.I. 38 at D0003; see also D.I. 41, Ex. 9 at D02450 (Letter from Kearney to Alan Machtinger
stating that "[o]n November 2, 2003 [plaintiff] was informed by Officer Ronald Brzezicki that his wife (who
works at Georgetown Probation and Parole) had told him there was [an] Officer Atwell at SCI that had a
pornographic web site. On the same date Officer Alvin Hudson told [plaintiff] that an inmate had told him
about the rumor.")

[16] D.I. 38 at D00001-D00002. Kearney told plaintiff that the DOC was "taking her complaint very
seriously and that it was [Kearney's] intention to determine the origin of the rumors and take appropriate
action against participating individuals" and "that it was [his] intention to use Internal Affairs and M.I.S. to
identify the source of the rumor and those propagating it . . . [and that he] would make [the investigation] a
priority." See also D.I. 41, Ex. 14 (Notes by union representative John Ryan, dated Nov. 4, 2003, of
meeting with plaintiff, Kearney, Ryan, and Lowman ("Warden Kearny [sic] states he '[i]ntends to terminate
involved individuals if he can establish who has been propagating the rumor.'" After informing Warden
Kearney that the Internet picture was not plaintiff "Warden Kearny [sic] states 'if it was her we would look
at you in a different light' Warden Kearney also states he intends to put enough pressure on people to
show them there is interest in the rumors and dealing with who started propagating them.")).

5

On November 18, 2003, IA interviewed plaintiff. Plaintiff denied having and
viewing the website in question. She advised that Officers Jim Henry and Ronald
Brzezicki had informed her that other correctional officers were saying that she was
depicted on that website. Plaintiff further related that Brzezicki's wife, who worked at
P&P, heard the rumors of plaintiff having a porn site; that inmates also brought the
rumors to her attention; and, that at least ten individuals had questioned her about
them. Plaintiff felt that her character was being damaged and her pending applications
with the Delaware State Police and Wilmington Police Departments were in jeopardy.[17]

On December 1, 2003, IA interviewed Officer Henry. He stated that, in
December 2002, he saw a picture resembling plaintiff on a desk in guard post 7. There
were other officers looking at the picture and laughing. Due to the passage of time,
however, he could not remember which officers were present. He also did not know
who accessed the computer and printed the picture. Approximately a week later, he
told plaintiff about the picture and she purportedly asked if "she at least look[ed] good."
In November 2003, plaintiff told Henry that the picture had been "all over the place,"
including outside of SCI; that it was causing her stress; and that she intended to report
the situation. Henry was shown the picture from the website. He confirmed that it was
the same picture printed out at the guard post. Henry said that SCI lieutenants

---

[17] D.I. 38 at D00021-D00022; *see also* D.I. 41, Ex. 14 (IA Meeting Notes from interview with
plaintiff, dated November 11, 2003 (Plaintiff stated that "she had heard the rumors of this website
sometime before July of 2003 but had not pursued the issues hopping [sic] it would die off. Rumor has
now gone beyond S.C.I. to other parts of Dept, since it has [plaintiff] states . . . she has been approached
by several officers and [inmates] now she wants it investigated and stopped as it may impact her search
for a position on state or local police department, it could also harm current criminal case against her
estranged husband for molesting her 15 year old daughter. And is making her very uncomfortable at work
causing stress etc[.] with all of the other things she is currently dealing with. . . . Discussion continues
[that] they will look into it, and they are unsure of MIS capabilities etc. [o]n retrieval of info from computers
but will advise after they had looked into it.")).

confirmed that viewing this type of website or leaving pictures for officers to view was in violation of department policy.[18]

Officer Alvin Hudson was also interviewed on December 1, 2003. Hudson stated that around August 2003, someone showed him a picture on a computer, which he identified as the picture in question. Although uncertain, he thought that he saw the picture while at pretrial and could not remember who had shown it to him. Hudson confirmed that plaintiff was upset, and told him that the rumor had spread to P&P.[19]

On December 2, 2003, Officer Mike Shockley was interviewed and advised that he previously discussed the rumors with plaintiff. Shockley never saw the picture, but knew of the rumors. He also related that sometime after November 21, 2003, he learned that, after plaintiff made her complaint to Kearney, the picture on the website was changed and there were new rumors. He further heard that plaintiff was instructed to remove the picture or she would be terminated. Shockley was also aware of the 02/05/03 email which he knew had been handled in house and understood that plaintiff was satisfied with the resolution of that incident.[20]

Officer Ronald Brzezicki was interviewed on December 2, 2003. He heard of the rumors concerning plaintiff approximately two months prior to his interview and told plaintiff about them. According to Brzezicki, the current rumor was that plaintiff changed the original picture to another pornographic picture which did not show the subject's face. The rumors and the changed website picture were related to him by

---

[18] D.I. 38 at D00022.
[19] *Id.* at D00023.
[20] *Id.*

7

Officer Donna Short. He confirmed that his wife at P&P also heard the rumor of plaintiff appearing on the website. Officer Short also provided Brzezicki with the website address and, out of curiosity, he accessed that site from his home computer. He viewed what he identified as the second, or changed, picture. He did not observe any of the pictures at SCI and did not know how the rumors started.[21]

Ed Zabowski of MIS was contacted to determine who had accessed the website in question. Zabowski informed IA that, since no password or ID was required to access the Internet from SCI computers, access identity could not be confirmed. On December 2, 2003, IA contacted Colleen Gause of the Department of Technology and Information ("DTI"). Her department could block the Internet site from the state server, and shortly thereafter, the site was blocked through a firewall system.[22]

On January 6, 2004, plaintiff filed a charge of discrimination with the Delaware Department of Labor ("DDOL") and the Equal Employment Opportunity Commission ("EEOC"). Her charge recites that Whitman was upset with her refusal to have sex with him and that Whitman made statements about her alleged relationships with black men. The charge continues stating that approximately one month later, which would have been March 2003, there were rumors that she was on a pornographic website seeking a black man.[23]

On January 11, 2004, based on an anxiety-post traumatic stress disorder

[21] *Id.* at D00023-D00024.
[22] *Id.* at D00024.
[23] *Id.* at D00006. In her deposition plaintiff testified that the second paragraph of her discrimination charge concerning Whitman was referred to the 02/05/2003 email. *See* D.I. 31 at 82-83.

8

diagnosis by her healthcare provider, plaintiff began medical leave.[24]

On January 25, 2004, IA issued a memorandum outlining its investigation and concluded that unknown DOC employees accessed the website in question through the state computer in the MSB building at SCI; that a picture printed therefrom on July 20, 2003 was lying on a desk in that building; that a rumor had circulated (and was continuing to be circulated) that plaintiff was depicted on the website; and that the rumor was propagated through word of mouth.[25]

A memorandum from James J. Lupinetti (Director Internal Affairs Unit) to Paul Howard (Chief Bureau of Prisons) summarizes plaintiff's complaint and the IA investigation. The memorandum is not dated, but it is stamped as received by the SCI Warden's Office on February 11, 2004. The memo relates that 1) upon plaintiff's complaint of the rumors about her, Warden Kearney requested an IA investigation; 2) from IA interviews with plaintiff and other SCI staff, it could be concluded that there were rumors concerning plaintiff being pictured on a pornographic website; and 3) the staff used either their home computers or those at SCI and printed pictures from the site. The investigation did not determine who was responsible. The memorandum continued that SCI administrators and supervisors reinforced DOC policies on computer use and access to the website in question was blocked and was no longer accessible from state computers. IA and MIS were attempting to obtain software which would enable investigators to better monitor the use of state computers and researching and

---

[24] D.I. 36 at 1.
[25] D.I. 38 at D00024-D00025.

9

testing of various products was underway.[26]

On February 17, 2004, plaintiff emailed Warden Kearney concerning her limitations on returning to work and stated that, although she "never had a problem with the inmates; . . . I was very intimidated because they were bringing the subject of the porn site to me. I knew that raised my level of vulnerability." Plaintiff expressed that her "biggest problems were with officers acting unprofessional, passing around vulgar material trying to pass it off as me. The stress of going to work every day listening to the talk and knowing the photo was not only passed around the prison but also P&P, VOP, and Work Release became too much for me to deal with."[27]

On February 23, 2004, plaintiff sent Warden Kearney an email recounting their conversation of February 20, 2006. According to plaintiff, Sergeant Rick VanHeckle told her that Lieutenant Derrick West overheard certain officers talking about another officer who visited plaintiff at her home and allegedly saw an ex-inmate sitting on her couch. Plaintiff emphatically denied that she entertains ex-inmates at her home and related her displeasure about this rumor. Plaintiff also claimed that West refused to provide her any names. She reminded Warden Kearney that he had agreed to investigate the rumors and reiterated her request for him to do so.[28]

On February 25, 2004, plaintiff forwarded a letter from her therapist to the

---

[26] D.I. 39, Ex. M.

[27] *Id.*, Ex. N.

[28] *Id.*, Ex. B-1. On May 3, 2004, Captain Gerard Flaherty sent a memorandum to Lieutenant Derrick West (with a copy to the Deputy Warden) concerning "Verbal Counseling." Captain Flaherty met with West "regarding the results of the investigation regarding him spreading rumors about another employee. West stated that his intentions were sincere and only done to help the officer in question. We agreed that in the future more thought would be given to these situations prior to saying anything at all, no matter how sincere we were." D.I. 41, Ex. 12.

10

Department of Human Resources.  The therapist diagnosed plaintiff as suffering from anxiety due to a hostile work environment and recommended for her to temporarily work at another DOC location.[29]

On February 26, 2004, plaintiff emailed Warden Kearney, with copies to DeLoy and Steve Rogers of IA, relating a conversation in which Officer Edwards informed her that Whitman told Edwards there was a rumor that plaintiff and Edwards were seeing each other.  Plaintiff expressed concern that, because Officer Edwards was married, the rumor could cause him marital problems and asked Warden Kearney to address this matter.[30]

On February 26, 2004, plaintiff was assigned with her consent to the Employee Development Center ("EDC"), which is a non-custodial training and administration facility in Dover, Delaware where she performed light duty clerical work.[31]

On March 1, 2004, plaintiff returned to work at the EDC.[32]

On September 20, 2004, plaintiff was transferred, again at her therapist's recommendation, to a half-way house facility, the Morris Correctional Center ("MCC"), in Dover, Delaware as a correctional officer.[33]

On December 30, 2004, the DDOL issued plaintiff a Final Determination and Right to Sue Notice, effective after the completion of a conciliation procedure on

---

[29] D.I. 36 at 1.  The document cited in the Declaration of John Smart does not appear to be included in the record before the court.  However, there is another document, a form titled "RETURN TO WORK," in which plaintiff's physician, on "4/ /04," diagnosed her as suffering from depression, anxiety disorder, and post traumatic stress disorder.  That document also indicates that plaintiff could return to work beginning May 17, 2004 and stated that plaintiff "is better suited to work [at] MCI since [it is a ] less hostile environment for her."  *See* D.I. 39, Ex. U.

[30] D.I. 39, Ex. P.

[31] D.I. 36 at 2.

[32] *Id.*

[33] *Id.*

11

January 26, 2005, finding reasonable cause that plaintiff was subjected to a sexually

hostile work environment:

> Given the prevalent atmosphere, [defendant's] existing policy against
> sexual harassment is inadequate.  Given the sheer number of individuals
> who knew about the sexually inappropriate behaviors [defendant] should
> have known that the sexually hostile work environment existed and taken
> corrective measures even prior to [plaintiff] having to file an internal
> complaint. . . . [Defendant] took an unreasonable amount of time in
> blocking access to the web site and the fact that its employees had
> access to such a web site is alarming.  [Defendant's] investigation was not
> timely, during which [plaintiff] complained of additional acts.  Its
> investigation did not conclude until weeks after [plaintiff] filed her
> complaint with this agency, and did not in a timely or in an appropriate
> manner discipline individuals known to have participated in and
> propagated the sexually hostile work environment.  [Plaintiff's] physician
> eventually diagnosed her with anxiety and removed her from the hostile
> work environment.[34]

On March 25, 2005, plaintiff emailed MCC Warden Vince Bianco and Captain

Kenneth Wilson, with copies to Lieutenant William Smith and Balwant Singh, relating

that, three days earlier, an inmate informed her that other inmates were talking about

the website which allegedly contained her picture.  According to plaintiff, the inmate

indicated that SCI officers and other inmates were the source of the rumor.  Plaintiff

stated that she began having anxiety attacks on March 23, 2005 and that her doctor

placed her out of work until March 25.[35]

On April 15, 2005, plaintiff sent an email to Bianco, Wilson, and Smith reporting,

on that date, an inmate told her that other inmates were still talking about her naked

pictures on the Internet and that one inmate claimed to have seen the pictures on the

---

[34] D.I. 39, Ex. W.  On July 29, 2005, the EEOC adopted the DDOL's December 31, 2004 findings
and determined that the available evidence establishes a violation of Title VII, as alleged. *Id.*, Ex. Y.
[35] *Id.*, Ex. Q.

website. Plaintiff further claimed that the inmate saw the photos "upstairs in the bubble on night shift when he has been permitted by the officer to enter the bubble to look at porn sites and that I am naked in these photos." Plaintiff related that her email was being forwarded on the advice of Lieutenant Smith.[36]

On April 18, 2005, plaintiff followed up with another email to Bianco and Wilson requesting an investigation into whether an inmate was "permitted in the control at night to view porn sites . . . [who] now claims he and this officer have seen me naked on my alleged website." She also requested that she be informed of "any and all findings." She added that she was "strongly concerned as I am being placed in a light that puts me at a much higher risk of harm by one of our inmates."[37]

On April 19, 2005, Bianco responded to plaintiff via email to memorialize a discussion he had with her the previous afternoon. He informed plaintiff that an investigation had already been initiated. Bianco also stated that they discussed the possibility of assigning her to the duty office permanently but that plaintiff declined, by indicating that the rumors were not going to interfere with her job. He also confirmed that no staff at MCI had been speaking to her or with others about plaintiff with regard to her employment history at SCI. Bianco reiterated for plaintiff to keep him apprised of any such incidents and to work together to resolve them.[38]

On May 9, 2005, plaintiff emailed Bianco asking for an update on the investigation concerning the inmate who allegedly viewed the website. She advised

---

[36] *Id.*, Ex. R.
[37] *Id.*, Ex. S.
[38] *Id.*

13

that she would forward the information to her attorney.[39]  On May 23, 2005, Bianco responded via email that, if IA's investigation discovered any wrongdoing on the part of any staff members, he "will deal with same as I would in any other personnel matter."[40]

On June 20, 2005, plaintiff again emailed Bianco advising that she felt uncomfortable in light of the rumors about her.  She related that certain correctional officers seem to "hover" over her and that the rumors hinder her from "performing [her] job without feeling like I am walking on eggshells."[41]

On August 5, 2005, plaintiff took medical leave for surgery and returned to work at MCC on September 22, 2005.[42]

On August 25, 2005, plaintiff filed her Title VII action against the DOC in this court.

On September 27, 2005, plaintiff, through counsel, was unconditionally offered any open position at her present pay grade within the DOC at any facility.  That offer also authorized plaintiff to choose a non-correctional officer position, but noted that such a position might not be eligible for hazardous duty pay; could be 37.5 hours per work week as opposed to her present 40 hours; and may not be eligible for Selective Market Variation.[43]  On November 7, 2007, plaintiff's counsel requested a list of current openings at plaintiff's present pay grade.[44]  Plaintiff's counsel was provided with a November 28, 2005 memorandum from Alan Machtinger listing several vacant

---

[39] *Id.*, Ex. T.
[40] *Id.*
[41] *Id.*, Ex. V.
[42] D.I. 36 at 2.
[43] D.I. 33.
[44] D.I. 34.

14

correctional officer and non-correctional officer positions, and non-security positions, but noted that only the correctional officer positions offered the same amount of total compensation plaintiff currently received.[45]

Plaintiff recently resigned her position from the DOC and found new employment.[46]

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[47] At the summary judgment stage, the court is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue of material fact for trial.[48] The moving party bears the burden of proving that no genuine issue of material fact exists.[49] "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[50] If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'"[51] The court will "view the underlying facts and all

---

[45] D.I. 35.

[46] D.I. 39 at 7.

[47] Fed. R. Civ. P. 56(c).

[48] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[49] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).

[50] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir.1995) (internal citations omitted).

[51] *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) (emphasis omitted)).

15

reasonable inferences therefrom in the light most favorable to the party opposing the motion."[52] The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.[53] If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.[54] With respect to summary judgment in discrimination cases, the court must "determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff."[55]

## IV. DISCUSSION

The anti-discrimination provision of Title VII provides:

It shall be unlawful employment practice for an employer--
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit segregate, or classify his employees or applicants for employment in a way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

---

[52] *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995).

[53] *See Anderson,* 477 U.S. at 249.

[54] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

[55] *Revis v. Slocomb Indus., Inc.,* 814 F. Supp. 1209, 1214-15 (D. Del. 1993) (quoting *Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987)).

Defendant argues three bases in favor of its motion for summary judgment. First, plaintiff did not properly exhaust her administrative remedies as required to commence a Title VII action. Second, co-worker rumors about non-employment matters that are not caused by the employer do not state a Title VII action, and relatedly, defendant effected prompt remedial action to address plaintiff's concerns, thereby eliminating possible liability. Third, and finally, plaintiff is not entitled to any damages after she was offered any similar open position at any location and the unaccepted offer demonstrates that subjectively and objectively plaintiff is not in a hostile work environment.

Plaintiff counters that the harassment she alleges represents a continuing violation and, therefore, her complaint need only be filed within 300 days of any act that is part of the hostile work environment to comply with Title VII. Next, plaintiff contends defendant's characterization that the acts complained of were merely idle gossip concerning non-employment matters is misplaced and that those acts created a hostile working environment. Plaintiff argues that if supervisors create the hostile environment, the employer is strictly liable under Title VII. Finally, plaintiff maintains that a material question of fact exists concerning the adequacy of defendants' remedial efforts, therefore precluding summary judgment.

A.    *Allegations Occurring More Than 300 Days Before Plaintiff's EEOC Complaint*

Under 42 U.S.C. § 2000e-5(e)(1), a charge of employment discrimination must be filed within 300 days "after the alleged unlawful employment practice occurred." This filing requirement, however, "is not a jurisdictional prerequisite to suit in federal court,

17

but a requirement that, like a statue of limitations, is subject to waiver, estoppel, and equitable tolling."[56] In *West v. Philadelphia Electric Co.*, the Third Circuit stated that "[o]ne such equitable exception to the timely filing requirement is the continuing violation theory."[57] Under this theory, a "plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if [she] can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant."[58] To establish a continuing violation, a plaintiff must establish: (1) that at least one discriminatory act occurred within the filing period and (2) that the harassment is "'more than the occurrence of isolated or sporadic acts of intentional discrimination,'" i.e., that the discrimination demonstrates "a persistent, on-going pattern."[59] In determining whether a continuing violation exists, the Third Circuit instructs the court to consider:

> (i) subject matter-whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence-whether the nature of the violations should trigger the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.[60]

> Once the plaintiff has alleged sufficient facts to support use of the continuing violation theory, however, the 300-day filing period becomes irrelevant-as long as at least one violation has occurred within that 300 days. Plaintiff may then offer evidence of, and recover for, the entire continuing violation. At that point as well, the Federal Rules of Evidence and the substantive law at issue, rather than the statutory filing period, should govern evidentiary determinations of the trial court.[61]

---

[56] *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

[57] 45 F.3d 744, 754 (3d Cir. 1995).

[58] *Id.*

[59] *Id.* at 754-55 (quoting *Jewett v. Int'l Tel. and Tel. Corp.*, 653 F.2d 89, 91 (3d Cir. 1981)); *accord Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481 (3d Cir. 1997).

[60] *West*, 45 F.3d at 755 n.9 (adopting the approach of the Court of Appeals for the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983)).

[61] *West*, 45 F.3d at 755.

The *West* Court also noted the "natural affinity" between hostile work environment and continuing violation claims:

> In the arena of sexual [or racial] harassment, particularly that which is based on the existence of a hostile environment, it is reasonable to expect that violations are continuing in nature: a hostile environment results from acts of sexual [or racial] harassment which are pervasive and continue over time, whereas isolated or single incidents of harassment are insufficient to constitute a hostile environment. Accordingly, claims based on hostile environment sexual [or racial] harassment often straddle both sides of an artificial statutory cut-off date.[62]

### 1. Plaintiff's Claims are Not Barred for Failure to Exhaust Administrative Remedies

Plaintiff filed a charge of discrimination with the DDOL and the EEOC on January 6, 2004.[63] Defendant contends that plaintiff's charge of discrimination is based on the 02/05/03 email and, therefore, plaintiff's Title VII claim accrued on that date. Because plaintiff did not bring her discrimination charge until January 6, 2004, more than 300 days later, defendant maintains it is entitled to summary judgment for failure to properly exhaust the required administrative procedures under § 2000e-5.[64]

Defendant summarizes its argument by stating that "[p]laintiff failed to bring her charge of discrimination within 300 days of the *incident* and therefore failed to properly exhaust her administrative remedies prior to bringing suit"[65] but, therein lies the flaw in defendant's position. Although defendant focuses on the 02/05/03 email referred to in plaintiff's charge of discrimination, plaintiff's charge is not solely based on that single *incident*. Her charge includes references to rumors of her sexual associations and

---

[62] *Id.* (quoting *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 877 (D. Minn. 1993) (alterations in original)).

[63] D.I. 38 at D00006.

[64] D.I. 30 at 12.

[65] D.I. 30 at 5 (emphasis added).

19

appearance on a pornographic website; the pornographic picture circulated in the

prison; and that she informed Deputy Warden DeLoy and Warden Kearney about those

matters. Plaintiff's charge of discrimination specifically alleges violation of Title VII "for

continuing to allow me to work in a hostile work environment."[66] After her email to

Warden Kearney, plaintiff reported continued incidents of harassment. Plaintiff

reported additional instances of being confronted by inmates and officers concerning

the pornographic picture and website after the conclusion of the IA investigation and

even after being transferred to MCC. Plaintiff is not, therefore, basing her Title VII claim

on a discrete act, as defendant attempts to portray her complaint.

The United States Supreme Court has noted the difference in hostile work

environment claims and claims based on a discrete act in the very case cited by

defendant in its brief:

Hostile environment claims are different in kind from discrete acts. Their
very nature involves repeated conduct. . . . The "unlawful employment
practice" therefore cannot be said to occur on any particular day. It
occurs over a series of days or perhaps years and, in direct contrast to
discrete acts, a single act of harassment may not be actionable on its
own. . . . Such claims are based on the cumulative effect of individual
acts. . . . Thus, "[w]hen the workplace is permeated with 'discriminatory
intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an abusive
working environment,' Title VII is violated."[67]

The Court went on to instruct that, "[i]n determining whether an actionable hostile work

environment claim exists, we look at 'all the circumstances,' including the 'frequency of

the discriminatory conduct; its severity; whether it is physically threatening or

---

[66] D.I. 38 at D00006.
[67] *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

20

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[68]

Based on the evidence presented by plaintiff, and appropriate legal authority, the court holds that plaintiff's Title VII claim is one of discrimination under the continuing violation theory, and  therefore, not barred by the 300-day limit of Section 2000e-5(e)(1).

### B.    Hostile Work Environment Claim

Plaintiff argues she was subjected to a hostile work environment.  To state a Title VII claim based on a hostile work environment, plaintiff must demonstrate that:  "(1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was [severe or pervasive]; (3) the discrimination detrimentally affect the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability."[69]

Here, there is certainly enough evidence that plaintiff suffered intentional discrimination because of her gender to preclude summary judgment on this element. The Third Circuit has noted that, "[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexually derogatory language is implicit, and thus should be recognized as a matter of course."[70]

---

[68] *Id.* at 116 (quoting *Harris*, 510 U.S. at 23).

[69] *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990) (footnote omitted).  The Third Circuit recently noted that the United States Supreme Court recited that discriminatory harassment be "severe or pervasive," rather than "pervasive and regular," as previously recited in cases such as *Andrews*. *See Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 133 (2004)); *see also E.E.O.C. v. MBNA America Bank, N.A.*, No. 04-425 SLR, 2006 WL 2801879, *4 n.5 (D. Del. Sept. 29 2006) (noting the Supreme Court's utilization of a "severe or pervasive" standard (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)).

[70] *Andrews*, 895 F.2d at 1482 n.3.

21

Plaintiff has presented evidence that she was the subject of rumors including: certain purported sexual relationships and ethnic preferences; that she maintained a website in pursuit of sexual partners; and that she was purportedly in a pornographic picture on that website (which was printed and left in a common area and viewed on DOC computers); that she was romantically involved with a fellow officer;[71] and that a former inmate was seen with her in her house.[72]

Plaintiff also sufficiently raises a question of fact as to whether the complained of incidents were severe or pervasive. A sexual harassment claim is stated if "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently sever or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[73] The determination of whether a workplace is sufficiently hostile or abusive is made by considering "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[74] "Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity.'"[75] Plaintiff reports facing ongoing harassment beginning in early 2003, continuing after her complaint to Warden Kearney on November 2, 2003, and occurring even after the IA

---

[71] D.I. 39, Ex. P (February 26, 2004 email to Warden Kearney from plaintiff regarding rumors that she was seeing Officer Edwards).

[72] *Id.*, Ex. O (February 23, 2004 email to Warden Kearney from plaintiff regarding a conversation with Lieutenant West that he overhear officers stating that another officer visited plaintiff at her house and saw an ex-inmate sitting on her couch).

[73] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

[74] *Faragher v. Boca Raton*, 524 U.S. 775, 787-788 (1998) (quoting *Harris*, 510 U.S. at 23).

[75] *Andrews*, 895 F.2d at 1484 (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987)).

investigation and her transfer to MCC.[76]

Likewise, elements three and four of a Title VII hostile work environment claim survive summary judgment. Those elements include both subjective (element 3) and objective (element 4) standards. With regard to the subjective standard, the Third Circuit stated that it is "crucial because it demonstrates that the alleged conduct injured this particular plaintiff giving her a claim for judicial relief."[77] That injury, however, does not require plaintiff to suffer "concrete psychological harm."[78] While "Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, . . . the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived as hostile or abusive, . . . there is no need for it also to be psychologically injurious."[79] Here, plaintiff has presented evidence that she was subjectively affected by the complained of incidents. On more than one occasion she complained that the rumors affected her sense of well being and the respect afforded her by other DOC employees, as well as, inmates. For instance, plaintiff informed internal affairs and Warden Kearney that the harassment was demeaning her character and undermining her authority with the inmates.[80] Moreover,

---

[76] D.I. 39, Ex. Q (March 25, 2005 email to Warden Bianco and Captain Wilson from plaintiff stating that an inmate related rumors concerning her alleged pornographic website were being repeated at MCC and that the inmate had "heard it from the officers and inmates at S.C.I. and they are talking here [at MCC]."); *id.*, Ex. R (April 15, 2005 email to Warden Bianco, Captain Wilson, and Lieutenant Smith from plaintiff stating that an inmate informed her that a correctional officer permitted another inmate to view pornographic websites, including the one purportedly showing plaintiff naked).

[77] *Andrews*, 895 F.2d at 1483.

[78] *Harris*, 510 U.S. at 22.

[79] *Id.* (citation omitted).

[80] *See* D.I. 38 at D00003 ("This type of rumor could place me in a more dangerous position with the inmates as they begin to see me differently. . . . I already have enough to deal with than to have to deal with the immaturity level of the officers hired by the Department [o]f Corrections."); *id.* at D00021 (Plaintiff informed IA that the rumors were "undermining her authority and effecting how the inmates were (continued...)

23

she alleges to have actually suffered concrete psychological harm from the resulting stress which required a medical leave of absence.[81]

With regard to the objective standard, there is likewise a genuine issue of material fact. That factor is "more critical" than the subjective standard because "it is here that the finder of fact must actually determine whether the work environment is sexually hostile. Congress designed Title VII to prevent the perpetuation of stereotypes and a sense of degradation which serve to close or discourage employment opportunities for women."[82] Through an objective standard, employers are protected "from the 'hypersensitive' employee, but still serves the goal of equal opportunity by removing the walls of discrimination" that might deter women from either entering the work force or accepting particular employment.[83]

The court is convinced that it would be impossible to say, as a matter of law, that a reasonable woman in plaintiff's position would not be detrimentally affected by the incidents complained of. The Third Circuit noted that:

> Obscene language and pornography quite possibly could be regarded as 'highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse.' . . . Although men may find these actions harmless and innocent, it is highly possible that women may feel

---

[80](...continued)

viewing her as an Officer. She was also concerned at how the other Officers were treating her through the institution."); *id.* at D00022 (Plaintiff reported to IA that "she had applications in with the Delaware State Police and Wilmington Police and her Character was in question.").

[81] *See* D.I. 39, Ex. U (plaintiff's "Return to Work" form in which her physician's diagnoses are depression, anxiety disorder, and post traumatic stress disorder); *id.*, Ex. N (February 17, 2004 email to Warden Kearney from plaintiff (stating that she believed the rumors "raised my level of vulnerability" with the inmates and that "[t]he stress of going to work every day listening to the talk and knowing the photo was not only passed around the prison but also P&P, VOP, and Work Release became too much for me to deal with.")).

[82] *Andrews*, 895 F.2d at 1483.

[83] *Id.*

otherwise.[84]

Plaintiff, subjectively, testified that the rumors affected her reputation and degraded her respect as a correctional officer. There is objective evidence that the alleged harassment would detrimentally affect a reasonable person of the same sex in plaintiff's position. Officer Hudson testified of the particular risk generally faced by female correctional officers, "[b]ecause they're females . . . . You're locked in with a bunch of guys that have been deprived of certain things for a long time. . . . I mean, you take a female officer and put her on a housing unit with 64 inmates . . . I wouldn't feel comfortable with my wife being locked on a tier with 64 inmates."[85] Likewise, Officer Brzezicki agreed that, based on the nature of the rumors, plaintiff (and presumably any female correctional officer) could have her reputation damaged whether or not the rumors were true.[86] Indeed, Warden Kearney purportedly told plaintiff that if the rumors were true, "we would look at you in a different light."[87] The court determines, therefore, that there is at least a question of fact as to whether a reasonable female correctional officer in a facility exclusively housing male inmates would have been detrimentally affected by the conduct plaintiff alleges.[88]

---

[84] *Id.* at 1485-86 (citations omitted).

[85] D.I. 39 at 19.

[86] *Id.* at 20.

[87] D.I. 41, Ex. 14.

[88] Defendant argues that plaintiff's testimony that she was able to perform her then-present duties at MCC and that she believed she does her job well, coupled with her failure to accept the DOC's unconditional offer of other positions, demonstrates that she was neither subjectively nor objectively subject to a hostile work environment. *See* D.I. 30 at 16 n.2 (quoting plaintiff's deposition transcript, D.I. 31 at 94). However, plaintiff's testimony immediately following her statements that she believed she did her job well concerned her breakdown while at SCI and she stated, "[t]hat was during all the mess with the photographs, and it was like several times a week I'd have a captain or a lieutenant come up to the Key tower and talk to me, and I was crying all the time about it. Told them I'm tired of it, I want the rumors to stop, I just want, I want it to end." D.I. 31 at 94. For the reasons discussed above, material issues of fact (continued...)

25

Regarding the fifth element, respondeat superior, the *Andrews* court stated that:

> In determining whether an employer is liable for a sexually hostile environment, we are instructed to "look to agency principles for guidance in this area.". . . According to these principles, "liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action.". . . Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile and failed to take prompt and adequate remedial action, the employer will be liable.[89]

Defendant contends that it can not be liable because a Title VII claim can not be supported here because the rumors concerning plaintiff "are in the nature of idle gossip about non-employment matters that were neither started nor maintained by her employer."[90] Defendant also contends that plaintiff's suggestion that some action should have been taken earlier due to the knowledge of the rumors by her supervisors, i.e., captains and lieutenants at SCI, is legally flawed. Defendant contends that it can not be strictly liable because those captains and lieutenants are not supervisors for Title VII purposes since they do not have the "authority to hire, fire, demote, promote, transfer or discipline an employee."[91] Moreover, according to defendant, prompt remedial action was taken to address plaintiff's complaint once she contacted Warden Kearney. These actions included an investigation by IA to determine who was spreading the rumors, blocking the website in question, advising staff about proper computer use, and transferring plaintiff to two different work locations at her request.

---

[88](...continued)
regarding the subjective and objective elements of a hostile work environment claim preclude the grant of summary judgment. With regard to defendant's offer of other positions with the DOC as it relates to the issue of damages, *see* footnote 115, below.

[89] *Andrews*, 895 F.2d at 1486 (citations omitted).

[90] D.I. 30 at 14.

[91] D.I. 42 at 6 (quoting *Jensen v. Potter*, 435 F.3d 444, 453 n.4 (3d Cir. 2006)).

Based on the evidence of record, and giving plaintiff all reasonable inferences

therefrom, there remains questions of fact as to whether defendant's management-level

employees knew or should have known of the purportedly hostile work environment to

which plaintiff was subjected and the adequacy of defendant's remedial actions.[92]

First, as to defendant's argument concerning whether captains or lieutenants are

supervisors for liability purposes in this case, a similar argument was rejected by this

court in another suit involving the DOC. In *Lowman v. Delaware Dept. of Corrections*,[93]

the DOC argued that it was not vicariously liable for the actions of the conduct of a

sergeant towards a correctional officer because the sergeant was not a supervisor

under Title VII. There, as here, the DOC maintained that the sergeant is not a

supervisor "because he does not have the actual power to hire, fire, demote, transfer,

promote, or discipline correctional officers."[94] The plaintiff in that case argued that the

sergeant "is a supervisor because the DOC has a para-military chain of command

which dictates that Officer's are obligated to obey all higher ranking personnel and are

subject to discipline for insubordination if they do not."[95] The *Lowman* court concluded

that genuine issues of material fact, including whether the sergeant was a supervisor,

precluded summary judgment to defendant on plaintiff's Title VII sexual harassment

---

[92] The court is not persuaded by defendant's characterization of plaintiff's complaint as being merely based upon the idle gossip of co-workers. The rumors concerning plaintiff are certainly important to plaintiff's claims but, there is also evidence concerning a pornographic picture, purportedly of plaintiff, which was left in a high traffic area at SCI, as well as, evidence that DOC staff was viewing the website in question on state computers at both SCI and MCC. It is a combination of all of these incidents upon which plaintiff's complaint is based and, considering the totality of the circumstances in this case, the court does not agree that plaintiff's claim is merely based on "idle gossip."

[93] No. Civ. A. 01-477-JJF, 2003 WL 471344 (D. Del. Feb. 21, 2003).

[94] *Id.* at *1.

[95] *Id.* at *2. Plaintiff, in that case, also noted that the warden agreed in deposition that the sergeant had supervisory authority over plaintiff. *Id.*

claim.[96]

Here, the court also determines that genuine issues of material fact preclude

summary judgment for defendant on the supervisor issue. Although Warden Kearney

testified that captains and lieutenants do not have the authority to suspend, promote,

fire, or change the rate of pay of an employee,[97] he also stated that lieutenants were

correctional officers' supervisors.[98] A correctional officer's immediate supervisor would

have been the individual to whom they could report perceived harassment or

discrimination, or to any supervisor if the officer did not feel comfortable reporting the

harassment or discrimination to their immediate supervisor.[99] Plaintiff testified that she

complained to several captains and lieutenants about the rumors concerning her.[100]

Moreover, Warden Kearney testified that Lieutenant West was a supervisor who was

involved in propagating rumors about plaintiff and was disciplined for propagating those

rumors.[101] Also, because defendant first raised this argument in its reply brief, plaintiff

did not have an opportunity to test defendant's assertions on this issue.

The court notes that the Delaware Department of Labor's determination of

plaintiff's charge of discrimination states that:

> Given the prevalent atmosphere, [defendant's] existing policy against
> sexual harassment is inadequate. Given the sheer number of individuals
> who knew about the sexually inappropriate behaviors, [defendant] should

---

[96] *Id.*

[97] D.I. 43 at 57-58 (Kearney deposition transcript).

[98] *Id.* at 10.

[99] *Id.* at 10, 13-14,

[100] D.I. 31 at 53-55.

[101] D.I. 43 at 37, 47. The disciplinary action imposed on West was supervisory counseling (a meeting between an individual's supervisor "to discuss behaviors that are not conducive to workplace harmony") which was documented in West's personnel file for two years. Supervisory counseling is the lowest level of disciplinary action. *Id.* at 37, 39.

28

> have known that the sexually hostile work environment existed and taken
> corrective measures even prior to [plaintiff] having to file an internal
> complaint.[102]

The evidence before the court is consistent with that determination, to the extent
that a genuine issue material fact exists as to whether defendant knew or should have
known about the allegedly hostile work environment. Deputy Warden DeLoy was
aware of plaintiff's complaint concerning Whitman's sexual advances toward plaintiff
and the 02/05/03 email as of that date.[103] A February 23, 2003 letter to Whitman
indicates that Warden Kearney was also aware of that complaint sometime in February
2003. That letter states that "[p]er discussion with the Warden and Deputy Warden"
Whitman was to use DOC computer communications programs only for official state
business.[104] There was further testimony that plaintiff complained about the rumors to
Captain Flaherty, Captain Brittingham, Lieutenant Johnson, and Lieutenant Fisher prior
to her November 2, 2003 email to Warden Kearney.[105] At the very least, this evidence
raises a genuine issue of fact concerning defendant's knowledge of plaintiff's allegedly
hostile work environment.

Defendant nevertheless argues that its remedial actions insulate it from liability.
"[I]f the employer knows of the harassment, it is obligated to take prompt remedial
action."[106] "[U]nder negligence principles, prompt and effective action by the employer

---

[102] D.I. 39, Ex. W; *see also id.*, Ex Y (EEOC adopting the findings fo the Delaware Department of
Labor).
[103] D.I. 31 at 70-72.
[104] D.I. 37.
[105] D.I. 31 at 53-55.
[106] *Spain v. Gallegos*, 26 F.3d 439, 450 (3d Cir.1994).

29

will relieve it of liability."[107] Defendant points out that the *Knabe* court stated that "to
determine whether the remedial action was adequate, we must consider whether the
action was 'reasonably calculated to prevent further harassment.'"[108] Defendant argues
that after plaintiff's November 2, 2003 email, it took prompt remedial steps to address
her complaint. Warden Kearney had IA initiate an investigation, the website was
purportedly blocked, staff was advised about acceptable computer use, and the plaintiff
was transferred to two different work locations at her request.

First, there is a question of fact as to whether defendant should have taken
action months earlier in response to plaintiff's complaints of harassment made to
various captains and lieutenants.[109] Second, the court again agrees with the Delaware
Department of Labor's questioning whether the length of time taken to block the
website and for the IA to conclude its investigation was timely.[110] Plaintiff's report of
continued incidents of harassment further raises a question of fact as to whether, as a
matter of law, defendant's remedial actions were "reasonably calculated to prevent
further harassment."

One of those instances is particularly disturbing. That being, the incident at MCC
plaintiff reported to Warden Bianco on April 15, 2005 about a correctional officer
allegedly permitting an inmate to view pornographic websites (including the one

---

[107] *Knabe v. Boury Corp.*, 114 F.3d 407, (3d Cir. 1997) (quoting *Bouton v. BMW of North America, Inc.*, 29 F.3d 103, 107 (3d Cir. 1994) (alteration in original)).

[108] *Knabe*, 114 F.3d at 412 (citation omitted).

[109] This question of fact also rebuts defendant's argument, raised for the first time in its reply brief, that "she cannot complain about rumors and then wait almost a year to tell the Warden." D.I. 42 at 5.

[110] *See* D.I. 39 Ex. W ("[Defendant] took an unreasonable amount of time in blocking access to the web site . . . [and defendant's] investigation did not conclude until weeks after [plaintiff] filed her complaint with this agency, and did not in a timely or in an appropriate manner discipline individuals known to have participated in and propagated the sexually hostile work environment.").

rumored to show nude pictures of plaintiff).[111] Plaintiff asked Warden Bianco to investigate that matter and keep her informed of the status of any investigation. Although Warden Bianco stated in an April 19, 2005 email that an investigation had been initiated,[112] his reply to plaintiff's May 9, 2005 inquiry on the status of the investigation (which reply was not emailed until May 23, 2005) was a curt "[s]hould I.A. discover wrongdoing on the part of a staff member or members as a result of their investigation, please be advised that I will deal with same as I would in any other personnel matter."[113] The record before the court does not reflect any resolution or determination by either Warden Bianco or IA regarding that matter. This incident also calls into question the adequacy of defendant's remedial efforts. The January 25, 2004 IA report stated that "[o]fficers or others eventually blocked the site through the State Server in [an] attempt to stop its use through the use of a State Computer."[114] From the record before the court, that "attempt" seems to have failed. The apparent failure to adequately block access to the website in question from state computers is particularly troubling since DOC employees viewing that site was a primary contributor to the ongoing rumors being spread about plaintiff. Consequently, the court determines that genuine questions of material fact preclude granting defendant's motion for summary judgment based on the actions it took in response to plaintiff's complaint.

## V. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is

---

[111] *Id.*, Ex. R.
[112] *Id.*, Ex. S.
[113] *Id.*, Ex. T.
[114] D.I. 38 at D00025.

denied.[115]

_____

[115] In its briefing in support of its motion for summary judgment, defendant does not address plaintiff's retaliation claim. "Retaliation" is never mentioned in defendant's briefs and the only possible tangential inference to such claim is the statement that "[p]laintiff does not suggest that she was denied a promotion or otherwise discriminated against based on sex, gender or race." D.I. 30 at 13. Accordingly, that issue is not properly presented to the court for determination. Similarly, defendant's assertion that its offer of other positions within the DOC "ends any potential Title VII liability of defendant beyond September 27, 2005," *Id.* at 15, is inadequately presented for determination at this stage. Although defendant made that offer on September 27, 2005, see D.I. 33, plaintiff was not provided with a list actual open positions (some of which did not provide equivalent compensation levels) until November 28, 2005. *See* D.I. 35. Also, other than including the word "damages" in the heading of section III of its brief, plaintiff does not directly address this issue. *See* D.I. 39 at 16 ("III. THE OFFER OF LESSER PAYING POSITION SEVERAL YEARS AFTER THE COMPLAINT IS NOT PROMPT NOR REMEDIAL AND DAMAGES SHOULD BE DETERMINED AT TRIAL").